IN THE
# UNITED STATES COURT OF APPEALS
### FOR THE THIRD CIRCUIT
_____

No. 24-1376
_____

DEBORAH BENNETT

*Appellant*

V.

SEPTA and SCOTT SAUER

*Appellee*
_____

## BRIEF OF APPELLANT, DEBORAH BENNETT AND VOLUME ONE OF JOINT APPENDIX APPX1 TO APPX51
_____

Appeal from the
the United States District Court
for the Eastern District of Pennsylvania
Pappert, J., Civil Action No. 23-1271(GJP)
Dated February 2, 2024
_____

Jonathan J. Sobel, Esquire
*Counsel for Appellant, Deborah Bennett*

**LAW OFFICES OF JONATHAN J. SOBEL**
15000 Walnut Street, Suite 2000
Philadelphia, PA  19102
(215) 735-7535
(215) 735-7539
Mate89@aol.com

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant Deborah Bennett makes the following disclosure:

1) For non-governmental corporate parties please list all parent corporations:

**None.**

2) For non-governmental corporate parties please list all publicly held companies that own 10% or more of the party's stock:

**None.**

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests.

**None.**

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

**Not a Bankruptcy Proceeding.**

*/s/Jonathan J. Sobel, Esquire*

Dated: October 7, 2024              JONATHAN J. SOBEL, ESQUIRE

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

Table of Authorities ............................................................  vi

I.      Jurisdictional Statement ...........................................  1

        A.    Basis for the District Court's Subject Matter
              Jurisdiction……………………………………..  1

        B.    Basis for the Court of Appeals' Jurisdiction…………..  1

        C.    Filing Dates…………………………………………  1

        D.    Appeal from a Final Order…………………………..  2

II.     Statement of the Issues with Placed Raised and Ruled Upon ....  3

III.    Related Cases and Proceedings ...................................  5

IV.     Statement of the Case ..............................................  6

    1.  Procedural History......................................................  6

    2.  Facts of the Case........................................................   7

    3.  The District Court's Opinion.......................................  19

V.      Summary of Argument ..............................................  20

VI.     Argument…………………………………………………..22

        A.      Summary Judgment:  Standard of Review……………..  22

B.   The District Court erred in granting Appellees' Motion for Summary Judgment dismissing Appellant, Deborah Bennett's claims by finding there was nothing to show Bennett's race played any role in anything Sauer or anyone else at SEPTA did or didn't do and that Bennett could not establish a *prima facie* case on any of her retaliation claims and that SEPTA had legitimate, nondiscriminatory reasons for its actions ............... 24

1.   Appellant, Deborah Bennett adduced sufficient evidence to make her *prima facie* case of race discriminatory compensation practices against defendants under Title VII and the PHRA …….... 24

2.   Appellant presented sufficient evidence to make her *prima facie* case of race motivated hostile work environment against defendants ………….. 27

3.   Appellant adduced sufficient facts to make her claims of retaliation against Appellees ……......... 36

4.   Appellant adduced sufficient facts showing she engaged in protected activities under Title VII and the PHRA………………………………... 37

5.   Appellant adduced sufficient facts showing she was subjected to adverse actions following her protected activities…………………………… 39

6.   Appellant adduced  sufficient facts to show causal connection between her protected activities and the adverse actions…………………………………… 44

7.   Appellees' so-called explanation for their discriminatory and retaliatory actions against Appellant were pretext and cover-up for race discrimination and retaliation…………………… 47

C.    The District Court erred in denying Appellant, Deborah Bennett's Motion pursuant to Fed. R. Civ. P. 56(d) to obtain discovery to supplement the motion record where Appellant made a showing that the discovery was germane to the motion and Appellant could not present certain facts to justify its opposition to the Motion................ 51

VII.   Conclusion ................................................................. 57

Required Certifications........................................................ 58

Certificate of Service.................................................... 59

# <u>TABLE OF AUTHORITIES</u>

<u>PAGES</u>

## CASES

*Alers v. City of Philadelphia*, 919 F.Supp.2d 528 (E.D. Pa. 2013)...... 43

*Anderson v. Liberty Lobby,* 477 U.S. 242 (1986)…………………….. 23

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482
(3rd Cir. 1990).................................................................................... 28

*Barber v. CSX Distribution Services,* 68 F. Supp. 627, 632
(W.D. Pa. 1979), *aff'd*, 624 F.2d 1090 (3d Cir. 1980)……………….. 36

*Beck v. City of Pittsburgh,* 89 F.3d 966 (3d Cir.),
*cert. denied*, 519 U.S. 1151 (1997)………………………………….. 33-34

*Bennett v. SEPTA*, No. 23-1271, 2024 U.S. Dist. LEXIS
19228 (E.D. Pa. Feb. 2, 2024)…………………………………… *passim*

*Bradley v. United States*, 299 F.3d 197, 207 (3d Cir. 2002)………….. 54

*Brock v. Richardson*, 812 F.2d 121 (3d Cir. 1987)............................... 37, 43

*Burlington N & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-64 (2006). 42, 43, 45

*Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009)........... 37

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 254 (1988).............. 53

*Dowling v. City of Phila.*, 855 F.2d 136, 138-39 (3d Cir. 1988)……… 53-54

*Dubrey v. SEPTA*, Civil Action, 2:14-cv-01370, May 7, 2015............. 42

*EEOC v. Cognis Corporation*, 2012 U.S. Dist. LEXIS 71870,
115 Fair Empl. Prac. Cas (BNA) 228, May 23, 2012............................ 39

*EEOC v. Collegeville/Imagineering*, 2007 WL 2051448,
(D. Ariz. July 16, 2007)........................................................    40

*EEOC v. Restaurant Co.*, 490 F. Supp. 2d 1039, 1050
(D. Minn. 2007)……………………………………………    39-40

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5
(3d Cir. 2000)......................................................................    45

*Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005)...........................    46

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)...........................    51

*Harris v. Forklift Systems*, 510 U.S.17, 22 (1993)................................    35

*Harris v. SEPTA,* 1992 WL435826 (E.D. Pa. 1992)..............................    36

*Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996)................................    44

*Heredia-Caines v. Lehigh Valley Hospital,* 580 F. Supp. 3d 114, 126
(E.D. Pa. 2022).....................................................................    27

*Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).......    37

*Highwood v. Indiana State Police*, 2007 WL 3286811, at *12
(N.D. Ind. Nov. 5, 2007)…………………………………………    40

*Ivan v. County of Middlesex*, 595 F. Supp. 2d 425 (D.N.J. 2009)........    33

*Jalil v. Avdel Corp.*, 873 F.d3 701 (1998)...........................................    44

*Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)..............................    45

*Krouse v. American Sterilizer Co.,* 126 F. 3d 494 (3d Cir. 1997).........    36

*Loe v. Re/Max of America, Inc.,* 35 PEP Cases 564 (10th Cir. 1984)...    37, 43

*Los Angeles Dept. of Water and Power v. Manhart,*
435 U.S. 702, 707, n.13 (1978)..............................................    27

*Mandia v. Acro Chemical Co.*, 618 F. Supp. 1248 (E.D. Pa. 1985)..... 37, 43

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)................ 24-25, 48

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986).... 27, 34

*Mojica v. Advance Auto Parts, Inc.*, 2016 WL 107844, at *4-5
(E.D. Pa. Jan. 11, 2016)…………………………………………….. 35

*Moore v. City of Philadelphia*, 461 F. 3d 331,352 (3rd Cir. 2006)... 44

*Murphy v. Millennium Grp. LLC*, 650 F.3d 295, 309-10
(3d Cir. 2011)…………………………………………………….. 53

*Novotny v. Great American Federal*, 539 F. Supp. 437
(W.D. Pa. 1982)...................................................................... 37, 43

*Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 157
(3d Cir. 2012)……………………………………………………. 53

*Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir. 2004)......................... 48-49

*Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997).......... 36

*Seybert v. Int'l Group, Inc.* 2009 U.S. Dist. Lexis 21543
(March 17, 2009)................................................................... 45

*Shellenberger v. Summit Bancorp Inc.*, 318 F.3d 183, 189
(3d Cir. 2003)...................................................................... 45

*Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015)……………… 54

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)................... 24

*Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412
(3d Cir. 2002)…………………………………………………….. 53

*Stovall v. Grazioli*, 2023 WL 3116439 at *3
(3d Cir. April 27, 2023)........................................................ 43

*Thompson v. North American Stainless, LP*, 131 S. Ct. 863………    42-43

*University of Texas Southern Medical Center v. Nassar*,
575 U.S. (2013)..................................................................................    37

*Williams v. Aramark Campus LLC*, 2020 WL 1182564, at *5
(E.D. Pa. Mar12, 2020)……………………………………………    35

## STATUTES

28 U.S.C. § 1331…………………………………………………..    1

42 U.S.C. § 2000e…………………………………………………    1, 20, 27

## FEDERAL RULES

F.R.C.P. 56(d)……………………………………………………..    51-56

F.R.C.P. 56(f)……………………………………………………..    53

## OTHER AUTHORITIES

EEOC Compliance Manual, Section 614.3(a)-(f)...............................    36

# I.    JURISDICTIONAL STATEMENT

## A.    BASIS FOR DISTRICT COURT JURISDICTION

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and Title VII of the Civil Rights Act, i.e., 42 U.S.C. § 2000e, *et seq.*, because Deborah Bennett's Complaint set forth claims under Title VII for racial discrimination and retaliation.  Appx52-70; 71-81.

## B.    BASIS FOR THE COURT OF APPEALS' JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 (final decisions of the District Courts because the Order dismissing the instant action disposed of all claims of the parties and is therefore "final" and appealable for purposes of 28 U.S.C. § 1291.  Appx4.

## C.    FILING DATES

There are no timeliness issues in this appeal. The appeal was filed within thirty (30) days of the District Court's entry of the Order granting Appellees' Motion for Summary Judgment, as required by Fed. R. App. P. 4(a).  Appx1. The Order of dismissal was dated February 2, 2024.  Appx4. Appellant's Notice of Appeal was filed twenty-six (26) days later on February 28, 2024.  Appx1.

**D.**     **APPEAL FROM A FINAL ORDER**

This appeal is from the Order of February 2, 2024 of the Honorable Gerald

J. Pappert, U.S.D.J., granting Appellees' Motion for Summary Judgment and

entering judgment in favor of Appellees' and against Appellant, Deborah Bennett.

Appx4.  This is a final order pursuant to 28 U.S.C. § 1291.  This appeal also

includes Appellant's appeal of the District Court's denial of her Motion for Relief

pursuant to Fed. R. Civ. P. 56(d).  *Id.*

## II.    STATEMENT OF THE ISSUES
## WITH STATEMENT OF PLACE RAISED

1.    Whether the District Court erred in granting Appellees' Motion for Summary Judgment dismissing Appellant, Deborah Bennett's claims by finding there was nothing to show Bennett's race played any role in anything Sauer or anyone else at SEPTA did or didn't do and that Bennett could not establish a *prima facie* case on any of her retaliation claims and that SEPTA had legitimate, nondiscriminatory reasons for its actions?

Where Raised and Ruled Upon:

The issues were raised in Appellees' Motion for Summary Judgment and responded to in Appellant's Response to the Motion for Summary Judgment.  Appx90-494; Appx495-935.  The Honorable Gerald J. Pappert, U.S.D.J. granted the Motion for Summary Judgment on February 2, 2024 in the District Court's Opinion.  Appx4.

2.    Whether the District Court erred in denying Appellant, Deborah Bennett's Motion pursuant to Fed. R. Civ. P. 56(d) to obtain discovery to supplement the motion record where Appellant made a showing that the discovery was germane to the motion and Appellant could not present certain facts to justify its opposition to the Motion?

<u>Where Raised and Ruled Upon:</u>

This issue was raised in Appellant's Motion pursuant to Fed. R. Civ. P. 56(d) which was followed *immediately* following oral argument. Appx951-973.  The Motion was opposed by Appellees.  Appx974-987. The Motion was ruled upon by the Court in conjunction with its granting of the Motion for Summary Judgment.  Appx4.

Pursuant to LAR 28.01, Appellant asserts these issues were preserved by her opposition to Appellees' Motion for Summary Judgment and that no further preservation of this issue was necessary.

## III.   STATEMENT OF RELATED CASES AND/OR PROCEEDINGS

There are no related cases or proceedings.

# IV.   STATEMENT OF THE CASE

## A.    Procedural History.

On April 2, 2023, Appellant, Deborah Bennett filed a Civil Action Complaint against Appellees, Septa and Scott Sauer.  Appx52-70.  On April 18, 2023, Appellant filed an Amended Complaint.  Appx71-81.  On June 16, 2023, Appellees' filed an Answer to the Amended Complaint with affirmative defenses.  Appx82-89.

On November 21, 2023, Appellees' filed a Motion for Summary Judgment.  Appx90-494.  On December 5, 2023, Appellant, Deborah Bennett filed an Answer to the Motion for Summary Judgment. Appx495-935.  On December 12, 2024, Appellees' filed a Reply to the Answer to the Motion.  Appx936-950.  On January 16, 2024, the Court entertained oral argument on the Motion for Summary Judgment.  Appx988-1072.

On January 17, 2024, Appellant filed a Motion for Relief pursuant to Fed. R. Civ. P. 56(d).  Appx951-973.  On January 25, 2024, Appellees' filed opposition to the Motion.  Appx974-987.

On February 2, 2024, the Honorable Gerald Pappert, U.S.D.J., granted Appellees' Motion for Summary Judgment and dismissed Appellant, Deborah Bennett's claims.  Appx4.  The Court issued an Opinion amplifying the basis for the dismissal of Ms. Bennett's claims.

*Bennett v. SEPTA*, No. 23-1271, 2024 U.S. Dist. LEXIS 19228 (E.D. Pa. Feb. 2, 2024).  Concomitantly, the Court denied Appellant's Motion for Relief pursuant to Fed. R. Civ. P. 56(d).  *Id.*  On February 28, 2024, Appellant, Deborah Bennett filed a timely Notice of Appeal to this Honorable Court.  Appx1.

### B.    Facts of the Case.[1]

Deborah Bennett sued Septa and Scott Sauer in the United States District Court for the Eastern District of Pennsylvania, alleging race discrimination, hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act.  This claim was based upon a federal question. Appx71-81.

Bennett started at SEPTA in 2000 working at a service desk.  In 2014, she became an Administrative Assistant II and worked under the Chief of Vehicle Maintenance, Joseph Brennan.  Bennett enjoyed working for Brennan and performed her job ably; in her annual performance reviews, Brennan rated her as "Meets Expectations" every year from 2015-2021.

---

[1] The facts cited herein are derived from the District Court's opinion.  While Appellant is citing to the District Court's factual predicate for denying Bennett's relief, she insists these facts created a genuine issue of material fact precluding the entry of summary judgment.  *See* discussion, *infra. Bennett,* at *2-17.

Each year, SEPTA employees are eligible for a salary merit increase, and the amount they ultimately receive is based on their performance assessment and whether their salary is above or below their position's midpoint.  Appx288-291.  Between 2015 and 2019, Bennett's merit increases ranged from 1% in 2017 to 4% in 2016, and she received a 2.5% merit increase in 2015, 2018 and 2019.

In March 2020, Bennett served as the lead ambassador for SEPTA at the Philadelphia Flower Show; she was responsible for guiding other SEPTA employees to their assigned areas.  One of those employees was then-Assistant General Manager Appellee, Scott Sauer, who was standing with another colleague in a section called platform "A." Bennett approached him and said, "Excuse me, but, Scott, you belong in the 'B' section."  According to Bennett, Sauer "laughed it off" and walked to his assigned section, but later, Sauer returned to the "A" section and his administrative assistant, Trayia Hill, purportedly said, "Oh, I thought you were the AGM. I guess [Bennett] showed you."  Bennett contends Sauer's "entire demeanor" changed after this incident.

Later that year, Bennett received another "Meets Expectations" review from Brennan and he recommended she receive a 4.5% merit increase for Fiscal Year 2021. Before the merit increase took effect,

however, Sauer reduced it to 3.5%; Brennan testified he was "not aware" of Sauer reducing anyone else's merit increase in his department, (Appx582-593) and Bennett heard "rumors" that another administrative assistant, Mariellen Medernach, a white woman who had been in the position for just 2 years, received a 4.5% merit increase.  *Id.*[2]

In February 2021, another administrative assistant, Desiree Saunders, was promoted to a new position, (*Id).* and SEPTA decided not to fill Saunders' position but rather reallocate the work to existing employees. (*Id.)* Brennan asked Bennett if she could perform the additional work created by Saunders' promotion, and she agreed to work roughly twenty additional hours per week, on top of her responsibilities for Brennan. (*Id.*). For those additional hours, Bennett received overtime pay, which allowed her to earn more money: she worked 88 hours of overtime in April and 109 hours of overtime in May.  Appx319-320; Appx582-593.

On June 7, 2021, Brennan went out on medical leave.  *Id.*  Looking for ways to limit overtime usage consistent with SEPTA objectives, (Appx321-324), Sauer met with Bennett in his office on June 22, 2021 to discuss her "excessive" overtime.  Appx573-581.  Bennett says Sauer

---

[2] The District Court rejected the argument that Medernach was a comparator.  However, the District Court also refused to allow discovery on this issue.  *Bennett v. Septa*, at *24-25.  However, the information that aduced should have allowed this claim to go to a jury.

accused her of stealing hours and "belittled and embarrassed" her in front of his staff. (*Id.*) Sauer says he never yelled at her or accused her of stealing time.  Appx648-672; Appx321-324.  Nonetheless, after the meeting, Bennett was "visibly upset."  Appx620-637.  Later in the day, Bennett received an email from Leslie Moore, stating, "If you need assistance with your workload, don't hesitate to let me know what it is so that I can help alleviate the load."  Appx366-367.  Bennett responded, "My daily workload is suitable for me. I required overtime for a workload from which was left by another employee and supporting the Vehicle Engineering group. I was advised by Scott to terminate the assignment. I can and will continue to focus on the assignments that fall under my job description."  *Id.*

Still bothered by her meeting with Sauer, however, Bennett emailed SEPTA's EEO department on July 1 saying she felt "subject to an atmosphere of workplace harassment and intimidation from Scott Sauer . . . as a result of the ongoing conflict between himself and my supervisor, Joseph Brennan . . . ."  Appx147-149.  She added that she believed Sauer "had a dislike for me since . . . the Philadelphia Flower Show."  *Id.*

Bennett also noted that Sauer changed her 2021 salary merit increase from 4.5% to 3.5%, which made her feel like she had "been hit with

multiple punches that are directed at me as a result with AGM Sauer's conflict with Joseph Brennan." *Id.*

Five days later, Bennett's email morphed into a formal complaint. Appx734-740. Echoing many of her prior sentiments, Bennett alleged that her encounter with Sauer was "collateral damage" from an apparent feud between Brennan and Sauer as well as harassment and retaliation for the Flower Show incident. *Id.* Bennett wanted an apology, but she also said, "I would like to have my 1% increase retro . . . Mariellen Medernach (who is white) was given her 4.5% increase and she has only been an AAII for approximately two years." *Id.* Ten days later, Bennett followed up with SEPTA's EEO department, where she said she was "a little baffled" because she had been receiving phone calls about her claim yet had not been interviewed. Appx741-742.

Following their June meeting, Sauer attempted to reduce Bennett's overtime hours by minimizing unnecessary work. For instance, he emailed Jessica Herman (then Mangold), Mike Civera and Leslie Moore on July 30, stating, "I offered Deborah assistance from Operations Admin in prioritizing her work. She was told not to worry about mistakes that she was correcting from Desiree Saunders." Appx743. Dennis McAnulla told

Bennett, "You no longer have to keep [COVID spreadsheets]," Appx747, as did Herman, "We don't need regular spreadsheets."  Appx746.

Bennett struggled with the uncertainty surrounding what was expected of her, causing her stress. She felt there was "no consistency" in her work and thought Sauer was overly monitoring her. She believed Sauer thought she was "creating work just to get overtime."  Appx. 748.  Still, she worked 16 hours of overtime in August and 8.5 hours in September. Appx319.  She contacted her union representative, Michael Keyes, who told her "it seems you are in an extremely bad situation" and to seek clarity from Sauer as to what he expected her to do.  *Id.*  At some point, Bennett also filed a grievance against Sauer, alleging a hostile work environment stemming from the June meeting.  Appx594-601.  With Brennan gone, Civera and McAnulla back-filled Brennan's position and supervised Bennett.  Appx573-581. During August 2021, Sauer emailed McAnulla and said:

> I still don't understand why the AA needs so much overtime. I would like a detailed accounting of the "extra" work that we need completed causing us to require so much overtime of her. Within that detail, I need an estimate of the time it takes to perform the tasks. If you still reach the conclusion that she needs overtime then I want you to reassign work to other people within Vehicle Maintenance to keep that overtime at zero.  No other Administrative Assistant in Operations is required to work overtime like this and we have other AA's that are serving multiple supervisors as well.

Appx779; Appx612-619.  McAnulla accordingly told Bennett that "until

further notice she couldn't work overtime," and he told her to "write down

her daily job duties, what she was doing each day and the amount of work

that she was performing each day so we can provide a justification to

support the need for overtime."  *Id.*  According to McAnulla, Bennett

"chose that she didn't want to work the overtime and she didn't . . . want to

provide [McAnulla] the justification, so that was kind of the end of it."  *Id.*

In early August 2021, Bennett was interviewed by Ekaette Oduok,

SEPTA's EEO/Employee Relations Manager, pursuant to Bennett's July 6

internal complaint.  Based on that interview, Oduok drafted a statement on

Bennett's behalf.  Appx751-756.  Regarding Sauer's change of her merit

increase from 4.5% to 3.5%, the letter said, "I never asked Scott about why

the change occurred because I thought it was related to the Flower Show."

Appx. 181-182.  Bennett alleges that Oduok did not accurately capture her

statement yet wanted her to sign it despite Bennett's attempts to make

corrections.  Appx757-767. Though she claimed Oduok misrepresented her

version of events, in her proposed corrections, Bennett *again* stated, "I feel

that I didn't get the full merit because of the Incident at the flower show,"

not because of anything having to do with her race, though she again

references her belief that Sauer did not reduce Medernach's merit increase. Appx775.

Bennett's work-related stress led to her taking sick leave from September 9 to December 8, 2021. While away from the office, Bennett, on October 8, complained to SEPTA's Assistant General Manager for Human Resources, Stephanie Deiger, and SEPTA's General Manager, Leslie Richards, about alleged bias in Oduok's investigation.  Appx573-581. Bennett said that Sauer bullied everyone, regardless of race, and was upset that none of the witnesses she identified, including white men Dennis McAnulla, Mike Civera and Mike Wright, and a black man, Jeff Coppedge, were interviewed in Oduok's investigation.  *Id.*; Appx143-214.  Moreover, Bennett stated it was her belief they were "not being told what is really going on in Vehicle Maintenance and how everyone is being bullied by AGM Sauer. Mr. McAnulla told me and others that he would tell people the truth but is afraid of the retaliation."  Appx784.

On November 3, 2021, Bennett filed a charge of discrimination with the Equal Employment Opportunity Commission, and on November 5, 2021, a complaint with the Pennsylvania Human Relations Commission and the EEOC, alleging race and age discrimination and retaliation. Appx573-581; Appx790-794.

When Bennett returned from sick leave in December 2021, Sauer became her direct supervisor. But for the rest of the year, she only worked Mondays because she had vacation time she needed to use.  Appx799.

In January, Bennett emailed Deiger that she had not received her merit increase for the year, noted her pending EEOC and PHRA claims and said she did not feel comfortable with Sauer giving her a fair and accurate performance review and merit increase recommendation. Appx801; Appx802-803.  About a week later, Bennett received a 3% merit increase, which she disagreed with because two white men, Mike Civera and Ed Carruthers, received "Exceeds Expectations" reviews while allegedly performing two jobs. Bennett believed this to be retaliation for filing the EEOC charge, and further complained that she had not received a performance evaluation.  Appx809.  However, in a February 23, 2022 letter, which Bennett confirmed receiving, SEPTA informed Bennett the reason for both the delayed raise and its amount.  Appx143-214.  SEPTA explained that because Bennett was on sick leave during the fall of 2021, she was absent for the merit consideration process, and according to

SEPTA's policy, she received an increase amount that was set at the average for employees with a "Meets Expectations" rating.  *Id.*[3]

On March 25, 2022, Bennett filed an EEOC charge of race discrimination, where she again alleged that Sauer accused her of fabricating work to qualify for overtime and reduced her merit increase but allegedly did not do the same for Medernach.  Appx813.  SEPTA filed its position statement on November 1, 2022, and Bennett filed a rebuttal letter on November 21.  Appx815-821.

For roughly a year, Bennett had little to no contact with Sauer aside from a few emails where she requested time off, which he granted.  Appx420; Appx880-882.  Bennett claims Sauer started excluding her from email communications, so she received assignments from "third parties."  Appx573-581.  But Sauer already had an administrative assistant and did not need another, (Appx420) and so in November 2022, Sauer emailed Carol O'Neal, the Director of SEPTA's EEO Department, saying:

> You'll probably recall that I never met with Deborah Robinson-Bennett about her performance review last year. She still received her merit last year but the rule is that we don't award merits without a completed evaluation. I have a performance review for Deborah Robinson-Bennett this year. Deborah has been reporting to me since June 2021. We haven't had much

---

[3] The District Court noted that "no reasonable juror could find SEPTA's reason for the 3% merit increase unworthy of credence." *Bennett*, at *31.  This statement does not find support in the record.

interaction though. Aside from a few emails from Deborah requesting time off, I haven't really had much interaction with her. I scored her Meets Expectations. I plan to conduct the 1:1 Meeting but I think I'll need assistance with that.

I also need to speak with someone about having Deborah report to someone else for the coming year. I have no need for a second AA and it's not fair to Deborah to continue having her work with little to no direction. She's completing her routine work but there's nothing else for her to do without a manager directly supervising her.

*Id.*

Bennett similarly felt detached from Sauer and his team. In December 2022, he invited his staff to a holiday breakfast, but Bennett received an email from Sauer's assistant cancelling the invitation and Bennett did not attend.  Appx835-837.  In February 2023, Sauer again raised the issue of Bennett:

We need to discuss Deborah's position. She's technically reporting to me. She needs to be relocated to another management center. Her supervisor's position is eliminated. I don't want to let another year go by where she's working unsupervised. Can we try to bring a resolution to this next week?

Appx43. SEPTA employees, including Sauer, can be transferred "involuntarily" based on need, (Appx648-672), but O'Neal participated in the transfer process to ensure that Bennett would get the same salary, benefits and pension.  Appx466-467.

At the time, Cassandra West, the newly promoted assistant COO of Customized Community Transportation (CCT), needed an administrative assistant.  Appx437-461.  So in March 2023, Bennett was transferred to work under West, a position Bennett did not apply for and considered "less desired."  Appx573-581.  Bennett was paid at her existing grade 36, though she thought it should be compensated at a higher grade because employees who had done similar work were paid at higher levels.  Appx907. But Bennett testified she did not even know what grade 38 responsibilities entailed, (Appx143-214), and West said that Bennett does not perform any grade 38 duties. (Appx. 686-708). Bennett's hours also changed from 6:00 a.m. to 2:30 p.m. to 7:00 a.m. to 4:30 pm (if she took a lunch break). (Appx. 573-581). Bennett lost her telework privileges, as West ended telework for CCT employees in February 2023, except for those with an ADA accommodation. (Appx686-708). Bennett's new work area—right outside West's door—was an enclosed cubicle that was in "disarray" and Bennett had to clean it herself.  (Appx573-581).  Keyes, who accompanied Bennett to the meeting where she was informed of the transfer, described the move as "retaliation."  (Appx143-214).

### C.    The District Court Opinion

On February 2, 2024, the Honorable Gerald Pappert, U.S.D.J., granted Appellees' Motion for Summary Judgment.  Appx4.

The District Court erred in finding there was no evidence from which a jury could reasonably find for Bennett on any of her claims. Clearly, upon review of the facts in the light most favorable to Appellant, Bennett's race played a role in the actions / inactions of Sauer and others at SEPTA. There were multiple instances, cited by Bennett where race was the predominant factor in the decision making.

Similarly, the District Court erred in finding that while Bennett *may* establish a *prima facie* case on her retaliation claims, SEPTA had legitimate, non-discriminatory reasons for its actions.  There was record evidence of pretextual illegal discrimination on the part of Septa in its treatment of Bennett.  The issue of whether Septa's proffered reasons for its actions were pretextual should have been left to a jury to either believe or disbelieve those putative reasons.

## V.   SUMMARY OF ARGUMENT

In this case, Appellant, Deborah Bennett asserted claims of race discrimination, racially motivated hostile work environment and retaliation under the Civil Rights Act 42 U.S.C. 2000e et seq, (Title VII) against SEPTA (Counts One and Two), and race discrimination, racially motivated hostile work environment and retaliation under the Pennsylvania Human Relations Act, ("PHRA"), against SEPTA and Scott Sauer (hereinafter "Sauer") (Counts Three and Four).  Appx71-81.

Appellant alleged she was subjected to racially motivated harassment and hostile work environment by Sauer that was condoned by SEPTA, race discriminatory reduction in her merit increase, in December 2020, and January 2022, and a racial discriminatory involuntary transfer to an undesirable position on March 1, 2023.  Additionally, Ms. Bennett alleged she was subjected to a retaliatory assignment to perform the job duties of two AAII position without adequate overtime pay, retaliatory harassment, retaliatory merit increases in January 2022, retaliatory transfer to an undesired position at CCT in March 2023, and retaliatory denial of telework privileges in March 2023.

There were genuine issues of material facts with regards to Ms. Bennett's claims against Septa and Sauer in this case precluding the entry of an order grating  summary judgment in their favor. The facts of this case were wholly

disputed by *both* parties, and in considering Appellees' motion for summary

judgment, the District Court failed to view those facts presented in the light most

favorable to Plaintiff as the non-moving party.

## VI.    ARGUMENT

The District Court's order granting summary judgment on Appellant's discrimination and retaliation claims should be reversed because there were` genuine issues of material fact to be decided by the jury.

### A.    Summary Judgment:  Standard of Review

The Third Circuit Court of Appeals reviews the grant of summary judgment *de novo*, applying the same standard as the District Court. *Faush v. Tuesday Morning, Inc.,* 808 F.3d 208, 215 (3d Cir. 2015). "Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Massie v. U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 340, 347 (3d Cir. 2010) (citing Fed. R. Civ. P. 56(c)).

The Court is required to examine the evidence of the record in the light most favorable to Plaintiff as the party opposing summary judgment and resolve all reasonable inferences in his favor. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997).

When reviewing a district court's summary judgment decision, the standard of review is plenary—"meaning [the Court] review[s] anew the District Court's summary judgment decision[ ], applying the same standard it must apply." *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 144 (3d Cir. 2023)(quoting *Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 229 (3d Cir. 2021). All evidence is viewed in the light most favorable to the non-moving party and "all justifiable inferences are to be drawn in his[/her] favor." *Anderson*.

A court will grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 501 (3d Cir. 2010), quoting Fed. R. Civ. P. 56(c)(2). However, "'[the Court will] deny summary judgment if there is enough evidence for a jury to reasonably find' for the nonmoving party." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020)(quoting *Minarsky v. Susquehanna Cnty.,* 895 F.3d 303, 309 (3d Cir. 2018).

This Honorable Court exercises plenary review over the District Court's grant of summary judgment, applying the same standard as the District Court, and we may affirm on any basis supported by the record.

*See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

**B.    The District Court erred in granting Appellees' Motion for Summary Judgment dismissing Appellant, Deborah Bennett's claims by finding there was nothing to show Bennett's race played any role in anything Sauer or anyone else at SEPTA did or didn't do and that Bennett could not establish a *prima facie* case on any of her retaliation claims and that SEPTA had legitimate, nondiscriminatory reasons for its actions**

**1.    Appellant, Deborah Bennett adduced sufficient evidence to make her *prima facie* case of race discriminatory compensation practices against Appellees under Title VII and the PHRA**

Under the burden shifting race discrimination analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), the Court must first determine whether the Plaintiff has adduced sufficient evidence to support a *prima facie* case of discrimination; that is, (1) that she is a member of a protected class under the statute, (2) that she is qualified for the job, or subjected to an adverse employment action and (3) that a non-member of her protected class, similarly situated, was treated more favorably than her by the Defendants.

If the Plaintiff succeeds, then the Defendants must come forward with the evidence that would permit the fact finder to conclude that there was legitimate, non- discriminatory reason for treating Plaintiff differently from the co-worker not of the same protected class.

If Defendants meet this burden of articulation, the Plaintiff must then

produce, "evidence, direct or circumstantial, from which a fact finder could reasonably either:

> (1) disbelieve the employer's articulated legitimate reason: <u>or</u>

> (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative factor of the employer's action.

*See*, *McDonnell Douglas*, 411 U.S. 792, at 801.

Appellant, Deborah Bennett is African American by race and was hired by SEPTA in or about September 5, 2000 as a Passenger Receipt Clerk, and on March 31, 2014, she was promoted to an Administrative Assistant II (hereinafter "AAII") to the Chief Operating Officer of the Vehicle Equipment Maintenance Department ("VEM"), Joseph Brennan, performing administrative, secretarial and clerical functions for the Department.  Appx573-581.

Brennan was the Chief Officer of VEM from January 2013. Until he was reassigned to the position of Assistant Chief Operating Officer in April 2023. David Warner was the Chief Officer for the Vehicle Engineering Department in the 2014 to 2021 period. Brennan reported to Sauer. Warner and Sauer reported to Robert Lund.  Appx583; 589.

In or about December 2020, Bennett was given an annual merit increase of 4.5% after the Fiscal Year 2021 performance evaluation conducted by Mr. Brennan. Bennett's 4.5% increase in salary was reduced to 3.5% by Mr. Sauer without discussing it with Brennan as to why he was doing that or giving any

justification for that action.  Sauer never provided any reason for reducing the 4.5%
merit increase given to Bennett by Brennan to 3.5% and there was no policy or
procedure at SEPTA supporting Sauer's reduction of her merit increase.  Appx587-
588.  Brennan is not aware of Sauer reducing any other employee's merit increase
in the VEM department.  Appx588.

Bennett's salary going forward was now paid at this reduced rate on a
biweekly basis, and it continues to affect her wages until today because of this
reduction of the increase, for a loss of income of about $2,000 per year from 2021.
Appx574.

Sauers did not reduce the 4.5% salary increase recommended for a
Caucasian Administrative Assistant, Mariellen Medernach, who had only been in
the position of Administrative Assistant II for two years, doing the same job as
Bennett was doing, and who was also approved for 4.5% merit increase by her
supervisor.  Appx574.

Sauer never provided any reason or explanation in 2021 and before Bennett
filed this lawsuit for reducing her merit increase in 2021, and not that of Ms.
Medernach. SEPTA was requested to produce Ms. Medernach's payroll records
and compensation records but refused to do so.  Appx924.

Appellant, Deborah Bennett has also presented sufficient evidence of
Sauer's race discriminatory reduction of her merit increases as compared to her

Caucasian colleague Ms. Medernach, who was similarly situated to Bennett, albeit

disputed by Appellees.  These disputed facts are for the jury to decide and not for

the Court in a motion for summary judgment. "Whether individuals are similarly

situated is a factual question generally left for the jury." *Heredia-Caines v. Lehigh*

*Valley Hospital,* 580 F. Supp. 3d 114, 126 (E.D. Pa. 2022).

### 2. Appellant presented sufficient evidence to make her *prima facie* case of race motivated hostile work environment against Appellees.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful

employment practice for an employer . . . to discriminate against any individual

with respect to his or her compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. 2000e-2(a)(1).

As the Supreme Court made it clear in *Meritor Savings Bank, FSB v.*

*Vinson*, 477 U.S. 57, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)*,* this language "is

not limited to 'economic' or 'tangible' discrimination. The phrase 'terms,

conditions, or privileges of employment' evinces a congressional intent 'to strike

at the entire spectrum of disparate treatment of men and women in employment,"

which includes requiring people to work free of a discriminatorily hostile or

abusive environment. *Id.*, at 64, quoting *Los Angeles Dept. of Water and Power*

*v. Manhart,* 435 U.S. 702, 707, n.13, 55 L. Ed. 2d 657, 98 S. Ct. 1370 (1978)

(some internal quotation marks omitted).

To establish a hostile work environment claim, an employee only needs to show, by direct or circumstantial evidence:

> (a) that she is a member of a protected class and she suffered unwanted, and offensive conduct because of her protected class;
>
> (b) the conduct was severe *or* pervasive and regular;
>
> (c) she was detrimentally affected by the conduct;
>
> (d) the conduct would detrimentally affect a reasonable person of the same protected class;
>
> (e) there is *respondeat superior* liability.

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3rd Cir. 1990). Bennett has presented sufficient evidence to establish that she was subjected to a hostile work environment by Sauer and SEPTA.

In or about March 2020, Bennett was working and designated by SEPTA as "Lead Ambassador" at the Flower Show in Philadelphia Convention Center, where Bennett was responsible for guiding other SEPTA employee volunteers ("Ambassadors") working at the event to report to their assigned locations. While performing her duties at this event, Sauer got upset with her because she had directed him to report to his assigned section. Following the event, Sauer was talking negatively about her to his staff, Leslie Moore, who told Bennett about Sauer's comments regarding her, and Jessica Mangold apologized to her

about Sauer's behavior.  Appx573.

In February 2021, Bennett was asked by her supervisor, Mr. Brennan to perform the additional duties of Ms. Saunders, who was the Administrative Assistant for the Vehicle Engineering Department and was promoted to another position, leaving the position vacant. A decision was made by Sauer and Lund that Saunders' vacated position would not be filled. Brennan and Warner then met where Warner asked Brennan for Bennett's help to get the vacated job duties of Saunders done.  Brennan talked to Sauer about using her to do the additional duties vacated by Saunders by giving her overtime compensation for the time Bennett would use to perform the additional duties, and Sauer and Lund agreed and approved.  Appx584.

Thereafter, Bennett agreed to assist Warner to perform the job duties vacated by Saunders and that she could use 20 hours per week of overtime to do those duties.  Sauer was made aware of this arrangement and Sauer did not disapprove.  At no time did Sauer tell Brennan after having been informed about this arrangement when it was made in February 2021, that she was doing too much overtime, was to stop the assignment, or was falsifying SEPTA time sheets. Appx585.

For four months, from February to June 2021, Bennett performed the duties of two AAIIs, assisting two Chief Operating Officers, Mr. Brennan, and

Mr. Warner, and was paid overtime to perform these additional duties, and at no time during those four months did Mr. Sauer question Appellant or Mr. Brennan before Brennan went out on medical leave on June 7, 2021, about Bennett working that amount of overtime. Brennan met with Sauer for one-on- one meetings every two weeks, and Sauer never once brought up Bennett's overtime in those four months. Appx585, 589, 574; Appx592-593.

The Director of Administration and Finance, Jeffrey Coppedge, responsible for monitoring use of overtime in Sauer's division was aware of Bennett working this amount of overtime and the reason why and does not recall her name appearing on any "heavy hitter" list between March and June of 2021. Sauer's supervisor, Robert Lund approved Bennett's use of overtime to perform the job duties of the position vacated by Saunders. Coppedge also mentioned this arrangement of Sauer. Appx615, 622-624, 633. Bennett was given 60 hours to do 80 hours of work. Appx589. Joe Brennan went out sick on June 7, 2021. Appx575.

On June 15, 2021, Bennett sent an email to Sauer and copied his supervisor, Robert Lund advising them of her duties to include responsibilities supporting both the VEM Department and Vehicle Engineering Department. Appx723-724.

When Brennan went out sick on June 7, 2021, Assistant Chief Officers

Mike Civera and Dennis McAnulla filled in for him and they also approved of

Bennett's overtime charges to perform these additional duties. She reported to

Mr. Civera in July 2021, and to Mr. McAnulla in August. These two Assistant

Chiefs also knew since February 2021 that she was doing all these overtimes,

and it was because she was doing the job duties of two Administrative Assistants

for two separate departments. This was not a secret in the Operations Division.

Appx575.  This was the history leading to Sauer's meeting with Bennett on June

22, 2021.

As it turns out Sauer's justification for this meeting was a pretext for his

abuse of Ms. Bennett.  He knew or should have known the reason she was

getting paid the amount of overtime she received for the past four months, but

acted as if he was oblivious to its genesis. He was part of the decision not to hire

a replacement for the AAII position vacated by Ms. Saunders and the decision to

have Bennett perform the duties of two AAII positions with just 20 hours of

overtime per week.

On June 22, 2021, Bennett received an email that Sauer wanted to see her

in 15 minutes in his office.  Appx725.  At this meeting, Sauer called her into his

office and berated her, falsely accused her of overcharging, and stealing overtime

hours, and belittled and embarrassed her.  Sauer subjected Bennett to these

defamatory statements, as Sauer was yelling at her about working "excessive"

overtime that she had been requested to do by her supervisors.  Appx575.

The issue is not that Sauer could not ask her  questions about her job duties; it was the way Sauer addressed Bennett like a child on June 22, 2021. Being the Assistant General Manager of SEPTA does not give Sauer the right to intimidate, ridicule and insult her at work, conduct that Sauer did not subject any of the Caucasian employes under his chain of command to.  A reasonable jury could find Sauer's June 22, 2021 conduct towards Appellant as severe.

Immediately following this meeting with Sauer, Bennett reported Sauer's outrageous conduct to Coppedge, and Coppedge observed that she was visibly upset when she returned from Sauer's office.  Appx624-625.  This was not something she made up, she immediately reported Sauer's conduct to a Director at SEPTA.  Sauer was required under SEPTA's policy to treat Bennett with respect and not falsely accuse her of stealing SEPTA's time or belittle her or yell at her. This was an outrageous conduct that Sauer subjected Bennett to that caused her serious emotional injuries for which she later went out on medical leave for three months.  Appx592, 577, 780.  Sauer never asked her supervisor, Mr. Brennan, to explain why she was working so much overtime.  Appx656. Appellees' challenged Bennett's assertions by introducing the statements of individuals who were no present in the room with she and Sauer to suggest Sauer did not engage in this conduct. That disputed fact is for the jury to decide at trial.

Bennett's immediate action after her encounter with Sauer corroborates her assertions.

On or about July 6, 2021, Bennett filed an internal complaint of race discrimination against Sauer with SEPTA's EEO Department wherein she alleged that Sauer subjected her to harassment because of her race and discriminatory reduction of her annual salary increase that had been previously approved by her supervisor. Appx575, 734-740. However, SEPTA conducted a sham investigation to cover-up Sauer's race motivated discriminatory actions against her, failed to interview the witnesses she provided, failed to investigate her claim of race discriminatory reduction of her merit increases, submitted a false statement of her interview which she refused to sign because of its falsity, and failed to obtain a certified interview from Sauer. Appx741-742, 575, 751-773, 774-776, 577, 655, 667, 675-676, 625, 781, 784-788, 801-803, 577, 639-640. On or about September 9, 2021, Bennett went out on sick leave for the anxiety she was experiencing at work. Appx577, 780.

SEPTA took no remedial action against Sauer for his outrageous conduct towards Bennett, but condoned it. It has been held that the failure to act by the employer sends the harassed employee the message that the harassment is acceptable, and that the management supports the harasser. *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425 (D.N.J. 2009). See, also, *Beck v. City of*

*Pittsburgh,* 89 F.3d 966 (3d Cir.), *cert. denied*, 519 U.S. 1151 (1997), where the

Court held that, **"**It is not enough that an investigation process be in place; as

Beck's brief to us notes: The investigative process must be real.  It must have

some teeth.  It must answer to the citizen by providing at least a rudimentary

chance of redress when injustice is done.  The mere fact of investigation for the

sake of investigation does not fulfill a city's obligation to its citizens".  *Beck*,

*supra*, at 974.  SEPTA EEO's investigation of Bennett's complaint against Sauer

could be found to be a sham by the jury.

Bennett has adduced sufficient facts to support her claim of racially

motivated hostile work environment against SEPTA and Sauer. As the Supreme

Court noted, when the workplace is permeated with "discriminatory

intimidation, ridicule, and insult," that is "sufficiently severe <u>or</u> pervasive to

alter the conditions of the victim's employment and create an abusive working

environment", Title VII is violated. [Emphasis added].  *See Meritor Savings*

*Bank, FSB v. Vinson*, 477 U.S. 57, 65-67, 91 L. Ed. 2d 49, 106 S. Ct. 2399

(1986).

As shown in the cited paragraphs of Deborah Bennett's statement of

disputed material facts, she has adduced sufficient facts of Sauer's outrageous

and abusive conduct towards her, yelling and insulting her, which resulted in

Bennett getting sick and taking sick leave away from work, and altering the

conditions of her employment.

In *Harris v. Forklift Systems*, 510 U.S.17, 22 (1993), the Supreme Court

noted,

> But Title VII comes into play before the harassing conduct leads to a
> nervous breakdown. A discriminatorily abusive work environment,
> even one that does not seriously affect employees' psychological
> well-being, can and often will detract from employees' job
> performance, discourage employees from remaining on the job, or
> keep them from advancing in their careers. Moreover, even without
> regard to these tangible effects, the very fact that the discriminatory
> conduct was so severe or pervasive that it created a work
> environment abusive to employees because of their race, gender,
> religion, or national origin offends Title VII's broad rule of
> workplace equality.

Bennett does not have to have been subjected to racial slurs to prove

racially motivated hostile work environment. Claims of racially motivated

hostile work environment against Defendants can be proven by way of

comparators.  It has been held that, an employee can overcome the absence of

overt discrimination "'by way of comparators,' specifically, by alleging that

similarly situated persons who are not members of [the employee's] protected

class were treated more favorably.'" *Williams v. Aramark Campus LLC*, 2020

WL 1182564, at *5 (E.D. Pa. Mar12, 2020) (quoting *Mojica v. Advance Auto

Parts, Inc.*, 2016 WL 107844, at *4-5 (E.D. Pa. Jan. 11, 2016)".  Bennett has

presented sufficient evidence, albeit, disputed by Appellees' of the harassment,

ridicule, embarrassment, and hostility that she was subjected to by Sauer, but

that her Caucasian colleagues in the Operations Division who were also under

Sauer's chain of command, were not subjected to such outrageous conduct.

Appellant, Deborah Bennett respectfully submits that Appellees' motion

for summary judgment regarding her race motivated harassment and hostile

work environment and race discriminatory reduction of merit increases must be

denied.

### 3.  Appellant has adduced sufficient facts to make her claims of retaliation against Appellees.

To establish a *prima facie* case of retaliation, a plaintiff must allege facts to

show that:

> a.      She engaged in protected activity under the statute, i.e., complained or opposed a conduct or practice made unlawful by anti-discrimination statutes or was a participant in an anti-discrimination matter,

> b.      she suffered adverse action from the defendant contemporaneous with or subsequent to her participation in the protected activity, and

> c.      There is a causal connection between the protected activity and the adverse action.

EEOC Compliance Manual, Section 614.3(a)-(f); *See also, Barber v. CSX*

*Distribution Services,* 68 F. Supp. 627, 632 (W.D. Pa. 1979) *aff'd*, 624 F.2d 1090

(3d Cir. 1980); *Krouse v. American Sterilizer Co.,* 126 F. 3d 494 (3d Cir. 1997);

*Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997); and *Harris v.*

*SEPTA,* 1992 WL435826 (E.D. Pa. 1992).  *See also*, *University of Texas Southern*

*Medical Center v. Nassar*, 570 U.S. 338 (2013).

For purposes of analyzing Bennett's retaliation claims, whether she was subjected to race motivated hostile work environment or discriminatory action by Septa is irrelevant.

What is relevant is that when Bennett made her complaints to either SEPTA or the EEOC she had a good faith belief that she was being subjected to a racially motived hostile work environment or discriminatory action by Sauer. The intent of the anti-retaliation statute is to give citizens the right to protest or complain against actions of an employer that the employee reasonably believed to be discriminatory, even if the action turns out not to be, without the fear of being subjected to reprisal by the employer. See, *Brock v. Richardson*, 812 F.2d 121 (3d Cir. 1987); *Mandia v. Acro Chemical Co.*, 618 F. Supp. 1248 (E.D. Pa. 1985); *Novotny v. Great American Federal*, 539 F. Supp. 437 (W.D. Pa. 1982); and *Loe v. Re/Max of America, Inc.*, 35 PEP Cases 564 (10th Cir. 1984).

### 4.    Appellant has adduced sufficient facts showing she engaged in protected activities under Title VII and the PHRA

Courts have long recognized that protected activity can take a variety of forms, "'rang[ing] from filing formal charges to voicing informal complaints to superiors.'" *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). [Emphasis added].

On or about July 6, 2021, Bennett filed an internal complaint of race discrimination against Sauer with SEPTA's EEO Department wherein she alleged that Sauer subjected her to harassment and discriminatory reduction of her annual salary increase because of her race as compared to a Caucasian colleague Mariellen Medernach.  Appx575, 734-740.  This was a protected activity under Title VII and the PHRA.

On October 8, 2021, Bennett complained about Ms. Odouk's biased investigation of her EEO complaint to Stephanie Deiger, the Assistant General Manager for SEPTA's Human Resources and SEPTA's General Manager, Leslie Richards.  Appx781, 784-786, 787-788, 801-803, 812-814.  This was a protected activity under Title VII and the PHRA.

On November 3, 2021, Bennett initiated an EEOC Charge of Discrimination against SEPTA, and on November 5, 2021, she dual filed a Complaint of race and age discrimination and retaliation with the PHRC and EEOC.  Appx574, 789-791, 792-794, 812-814.  This was a protected activity under Title VII and the PHRA.

On or about January 4, 2022, Bennett reported to SEPTA's Assistant General Manager of Human Resources Stephanie Deiger, that she had filed a discrimination complaint with the EEOC and PHRC about AGM Sauer's discriminatory actions and that she had not received her merit increase that other employees were given since December 2021 for the Fiscal Year 2022 increase. Appx801-803, 578.  This was a protected activity under Title VII and the PHRA.

On January 12, 2022, Bennett complained to Ms. Deiger that she was again being subjected to race and gender discriminatory reduced merit increase. Appx578, 809-811.   This was a protected activity under Title VII and the PHRA. On March 25, 2022, she filed an EEOC charge of race discrimination.  Appx812-814.  Each one of these activities by her is protected under Title VII and the PHRA.

> **5.     Appellant adduced sufficient facts showing she was subjected to adverse actions following her protected activities**

As the Court noted in *EEOC v. Cognis Corporation*, 2012 U.S. Dist. LEXIS 71870, 115 Fair Empl. Prac. Cas (BNA) 228, May 23, 2012, the Supreme Court described retaliation as any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination," the Court recognized that "[a] reasonable employee facing the choice between retaining her job and filing a discrimination complaint might well choose the former."  Even, mere "Threats of retaliation" as the Court also noted "certainly may 'dissuade [a reasonable worker from making . . . a charge of discrimination.'" and is therefore considered to be a materially adverse action for retaliation claim purposes. Other courts have not hesitated to recognize that just the threat of retaliation is unlawful.  *EEOC v. Restaurant Co.*, 490 F. Supp. 2d 1039, 1050 (D. Minn. 2007). ("[A] plaintiff does not need to be actually

harmed by the actions of a defendant to suffer an adverse employment action.

The proper analysis is whether the challenged action might dissuade a reasonable employee from engaging in protected activity. It's been held that a "reasonable jury could find that a threatened reduction in hours could satisfy that standard." *See Highwood v. Indiana State Police*, 2007 WL 3286811, at *12 (N.D. Ind. Nov. 5, 2007)(holding threat of discipline or termination was materially adverse action)(unpublished decisions); *EEOC v. Collegeville / Imagineering*, 2007 WL 2051448, at *7-8 (D. Ariz. July 16, 2007) (holding threat of termination if employee continued protected activity in the future was materially adverse action), (unpublished decisions).

Appellant presented sufficient facts that after these protected activities she engaged in under Title VI, PHRA, and Section 1981, she was subjected to adverse employment actions by Appellees.

Following Bennett's first listed protected activity on July 6, 2021, Sauer wanted her to continue doing Saunders' duties but did not want to pay her overtime for doing all those additional duties, but Civera disagreed and had a spirited conversation with Ms. Mangold about this. Civera stated:

> You have no idea what she does every day. You've never managed her. I was in the group-I didn't manage her for more than one month, but I've been in the group with Deborah ever since I've had this job. I interacted with her weekly. So, I know she did plenty of work and I know everyone got paid and there were no mistakes. And now you are asking her to do that for two full departments when somebody

was moved up and you didn't take any of that work from her and she agreed to do it and only working 20 hours overtime a week versus 40 that the other person was taking.

After Brennan went out sick Sauer wanted Brennan to continue doing the duties of the two AAII position without overtime. This is a materially adverse employment action in a retaliation case. Civera objected to the unfair treatment of Bennett by SEPTA.  Appx605-607; 746-747.  Appellant's email thread with Civera, Herman and McAnulla about how she was confused with exactly what Sauer wanted her to do regarding the job duties previously performed by Ms. Saunders.

In an August 12, 2021, email thread with Keyes, which was copied to Odouk about still being asked to perform some of Ms. Saunders' job duties, and not provided with sufficient overtime to do the additional duties, Bennett complained to Odouk that she was still dealing with the harassment from Sauer, and Keyes responded to Bennett stating, "Unfortunately, it seems you are in an extremely bad situation".  Appx597-598. This is a materially adverse employment action in a retaliation case. Bennett was being  subjected to (1) retaliatory harassment and retaliatory assignment and asked to continue performing the duties of two AAII positions with no overtime or less overtime, (Appx743-745, 605-607, 748-750, 597-598, 777-779, 596-597, 615, 618-619, 879-882, 670, 838-840, 859-860, 885-894, 684, 908, 909-919, 580, 897-900; (2)

retaliatory denial of her annual merit increases in December 2021 until she had

to complain to Ms. Deiger in January 2022, Appx801-803, 578, (3) retaliatory

reduced and arbitrary merit increase of 3% on January 12, 2022, Appx578, 809-

811; 644; 667; (4) retaliatory involuntary transfer to a less desired position on

March 1, 2023 at a reduce grade level for the position, (Appx688-689, 574, 664,

685, 710, 578, 907, 599-600, 578, 593, 579, 626-627; and (5) retaliatory denial

of teleworking privileges on March 16, 2023.  Appx660.

These are materially adverse employment actions in a retaliation case.

These are actions by Sauer and SEPTA that could dissuade a reasonable

employee from engaging in protected activities.  As Judge Rufe found in *Dubrey

v. SEPTA*, Civil Action, 2:14-cv-01370, May 7, 2015, a copy of which is

attached here to at Appx934-935:

> The Supreme Court has held that the anti-retaliation provision in
> Title VII reaches more broadly than the substantive anti-
> discrimination provisions, and "prohibits any employer action that
> might well have dissuaded a reasonable worker from making or
> supporting a charge of discrimination." *Burlington,* 548 U.S. at 66
> (internal quotation omitted); *Thompson,* 562 U.S. at 173-74. Thus,
> contrary to Defendants' argument, Plaintiff need not put forth
> evidence that she experienced severe and pervasive hostile work
> conditions, or a change in compensation, terms or conditions of
> employment, in order to state a claim for illegal retaliation. Nor does
> she need to demonstrate that she, herself, was dissuaded from further
> pursuing claims of discrimination. She need only show that she was
> subjected to retaliatory actions sufficient to dissuade a reasonable
> worker from pursuing a charge of discrimination.

The standard for finding materially adverse action is not limited to

conduct that affects terms or conditions of employment but includes any action

that would have dissuaded reasonable worker from making or supporting

charge of discrimination. See, *Alers v. City of Philadelphia*, 919 F.Supp.2d 528

(E.D. Pa. 2013). [Emphasis added]. It has been held that, "the antiretaliation

provision of Title VII "is not limited to discriminatory actions that affect the

terms and conditions of employment". *Burlington N & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 63-64 (2006), and *Stovall v. Grazioli*, 2023 WL 3116439 at

*3 (3d Cir. April 27, 2023).

In a decision by the United States Supreme Court, *Thompson v. North*

*American Stainless, LP*, 131 S. Ct. 863, the Court reiterated its earlier decision

that the anti-retaliation provision of the Civil Rights Act should be interpreted

broadly and more liberally than the substantive anti-discrimination provision.

The intent of the anti-retaliation statute is to give citizens the right to protest or

complain against actions of an employer that the employee reasonably believed

to be discriminatory, even if the action turns out not to be race discrimination,

without the fear of being subjected to reprisal by the employer. *See, Brock v.*

*Richardson*, 812 F.2d 121 (3d Cir. 1987); *Mandia v. Acro Chemical Co.*, 618 F.

Supp. 1248 (E.D. Pa. 1985); *Novotny v. Great American Federal,* 539 F. Supp.

437 (W.D. Pa. 1982); and *Loe v. Re/Max of America, Inc.*, 35 PEP Cases 564

(10th Cir. 1984). Retaliatory harassment is a materially adverse action for the

purposes of a retaliation claim.

Appellant, Deborah Bennett had adduced sufficient facts in this case to show that after she engaged in protected activities she was subjected to materially adverse employment actions that violate these respective federal and state statutes.

      **6.**    **Appellant adduced  sufficient facts to show causal connection between her protected activities and the adverse actions.**

It has been held that on the last prong of a retaliation claim, the causal element is generally a factual issue left for a jury to resolve.  *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996).  The Third Circuit has stated that the causal connection required in establishing a *prima facie* case of retaliation may be "demonstrated by evidence of retaliatory motive such as protected conduct followed closely by adverse action".  *Jalil v. Avdel Corp*., 873 F.d3 701 (1998).

The Court also noted that a more aggressive enforcement of employer policy after an employee engaged in protected activity could give the inference of retaliatory animus. See, *Moore v. City of Philadelphia*, 461 F. 3d 331,352 (3rd Cir. 2006).  Evidence of animosity towards the Plaintiff has also been considered as circumstantial evidence that could support causal connection and retaliatory intent.  See, *Moore v. City of Philadelphia*, *supra*.

The element of causal connection is for the jury to decide.  Regarding the

causation prong of a retaliatory harassment claim, the standard in the Third
Circuit is whether a reasonable jury could link the employer's conduct to
retaliatory animus. *Seybert v. Int'l Group, Inc.* 2009 U.S. Dist. Lexis 21543
(March 17, 2009) at 72; *Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d. Cir. 2006)
(explaining that "[t]he ultimate question in any retaliation case is an intent to
retaliate *vel non*").

In assessing this, courts generally focus on two factors: (1) the "temporal
proximity" between the plaintiff's protected activity and the employer's allegedly
retaliatory response, and (2) "the existence of a pattern of antagonism in the
intervening period." *Id.* at 73; *Jensen* at 450 (quotations and citations omitted).
[Emphasis added].  However, "each case must be considered with a careful eye
to the specific facts and circumstances encountered." *Seybert* at 73 quoting
*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)); see
also *Burlington*, 548 U.S. at 69.

"Temporal proximity alone may be sufficient to establish the causal
connection required for the *prima facie* case or may be considered along with
other factors in establishing the requisite causal connection".  *Seybert* at 73*;*
*Shellenberger v. Summit Bancorp Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

"[W]hen only a short period of time separates an aggrieved employee's
protected conduct and an adverse employment decision, such temporal proximity

may provide an evidentiary basis from which an inference of retaliation can be drawn." *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005) (holding that three-month period between protected activity and adverse action raises inference of retaliation).

As shown above, Bennett filed her first EEO complaint with SEPTA on July 6, 2021, on July 30, 2021, the retaliatory action started with Bennett being asked to continue performing the duties of the two AAII position with little or no overtime compensation. Appx743-745, 605-607; 748-750, 596-597; 777-779; 596-597, 615, 618-619; 879-882, 671, 838-840, 859-860, 885-894,672; 908, 909-919, 571, 897-900.

Bennett has also presented sufficient facts of the animosity and antagonistic behavior of Sauer and West towards her after she made complaints of race motivated discriminatory practices against Sauer. Sauer stopped communicating with Bennett, who he supervised from September 2021 until March 2023, and excluded her from email communications that she needed to do her job; these are evidence of his animosity towards her. Appx576. Sauer canceling Bennett's invitation to the December 6, 2022 Holiday Breakfast, is evidence of animosity towards her. Appx835, 836, 837; 713. *See also* Appx578; Appx 835-837. Sauer's involuntary transfer of Bennett to a less desired position is evidence of animosity towards her. Appx688-689, 579. 664,

685, 712, 578, 907, 599-600; 578; 600.  Bennett's removal from an office

location with sufficient space and view to an enclosed cubicle with no windows

is evidence of animosity towards her.  Appx 908, 909-919, 580, 897-900. *See*

*also* Appx908 and Appx 909-919.

West's failure to have Bennett's new office cleaned by janitorial staff

before she moved to her new position, and then instructing her to clean it herself

is animosity towards Appellant.  Appx 908, 909-919, 580, 897-900.  These are

animosities towards Bennett from which the jury could find the causal link

between her protected activities and the respective materially adverse actions.

### 7.    Appellees' so-called explanation for their discriminatory and retaliatory actions against Appellant are pretext and cover-up for race discrimination and retaliation

Appellant submits that Septa failed to articulate legitimate, non-

discriminatory, and non-retaliatory reasons for the adverse employment actions

she was subjected to in this case.  Septa failed to articulate the legitimate reason

for reducing Appellant's merit increases and not that of Ms. Medernach. Septa

failed to give legitimate reason why Bennett would be asked to perform the

duties of two AAIIs with little or no overtime compensation after she filed her

EEO complaint with SEPTA.  Septa provided no legitimate reason for the

retaliatory harassment of Bennett.  Even if Appellees' deemed to have met their

burden to articulate legitimate non-discriminatory or non-retaliatory reason for

the adverse actions taken against Bennett, Septa could still be held liable if
Appellant produces, "evidence, direct or circumstantial, from which a fact finder
could reasonably either (1) disbelieve the employer's articulated legitimate
reason, or (2) believe that an invidious discriminatory or retaliatory reason was
more likely than not a motivating or determinative factor of the employer's
action. *McDonnell Douglas*, 411 U.S. 792, at 801.  In doing so, Appellant may
"demonstrate such weaknesses, implausibility, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons for its actions that a
reasonable fact finder could rationally find them unworthy of credence."
*McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.

Appellees' did not present any legitimate non-discriminatory reason for
Sauer's presumed discriminatory reduction of Deborah Bennett's merit increase
from 4.5% to 3.5%, except to argue that as the head of the Operations Sauer can
do whatever he wants. Septa also failed to produce Ms. Medernach's
compensation record but argue there is no record that Medernach was awarded
a 4.5% merit increase.

It has been held that, "[t]o rebut the presumption of discrimination
created by the employee's *prima facie* case, the employer must articulate a
legitimate, nondiscriminatory reason for its decision." See *Patrick v. Ridge,*
394 F.3d 311, 315 (5th Cir. 2004).  In reviewing a motion for summary

judgment, "if at this stage of the litigation, the plaintiff employee has produced evidence sufficient to make out a *prima facie* case and the defendant employer has failed to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for its employment decision, the employee is entitled to take her case to a jury…." *Id*. at 316.

"It does mean, though, that to rebut an employee's *prima facie* case, a defendant employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee…" *Patrick*, *supra*, at 317. Also, the legitimate reason an employer must provide, must be "at the time it made the decision adverse to the complaining [employee] . . .  It is axiomatic that the ultimate factual inquiry in an employment discrimination case is whether the employer intentionally discriminated against its employee."

Albeit in a mixed motive case, the Supreme Court in *Price Waterhouse v. Hopkins* emphasized that an employer may not prevail with respect to the ultimate inquiry by offering a "legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." *Patrick*, *supra*, at 318. [Emphasis added].  The "snapshot" inquiry into an employer's motive is limited to the instant the decision was made.

Neither Sauer nor SEPTA has provided any non-discriminatory reasons for this presumed race discriminatory reduction of Bennett's merit increase that

they provided to her when the decision was made or when she filed her EEO complaint about it in 2021. Appellees' should not have been awarded summary judgment based on new a "explanation" provided for the first time in this litigation that is not supported by any credible evidence, and not when the decision was made by Sauer in December, 2020. A reasonable jury can certainly disbelieve Appellees' so-called explanation for the race discriminatory reduction of Bennett's merit increases.

Appellant also presented sufficient evidence from which a reasonable jury could conclude that Septa's so-called legitimate reason for the involuntary transfer of Bennett from her position to the position in CCT in March, 2023 was pretext for the retaliatory motives of Septa. As O'Neal and Sauer admitted, Bennett was not even given the opportunity to decide whether she would like to transfer to that position, she was simply instructed she must go. When asked by her Union president if what Sauer was doing was even legal, O'Neal response was, Mr. Sauer "can do anything that he wanted to do because it's his department". Appx579. That response in of itself shows the animosity in Appellees' decision to involuntarily transfer Bennett to this position. Furthermore, the position was vacated in March 2022, by an AAII that was compensated at grade 37, Appx 908, 909-919, 580, 897-900, and taken over by Mondesir at grade 38, but Bennett was asked to assume those duties at grade 36.

Appellees' have not provided a legitimate reason for transferring hereto this

position at grade 36 other than that was the grade the position was posted for in

February 2023.  But, Bennett never applied for this undesired position at grade

36.  Appx712, 907, 600-601, 579, 600, 626-627.

Deborah Bennett has also presented evidence of the incredible testimonies

of Sauer (Appx584, 603-604, 574; 585, 589, 575; 615, 622-624, 633; 652-653,

604; 576; 655, 667; 651-652, 801-803, 809-811, and O'Neal (Appx674, 679-

684) from which a reasonable jury could totally disbelieve them at trial. At trial

the jury would be instructed that if they disbelieve one testimony of a witness

they may disbelieve all that witness's testimony. If a jury disbelieves Septa's so-

called legitimate non-discriminatory or non-retaliatory "explanations" provided

by these witnesses or finds that an invidious reason was more likely than not a

motivating reason, then Bennett would have met her burden to show the "but

for" cause for the retaliatory actions by Septa. See *Fuentes v. Perskie*, 32 F.3d

759, 764 (3d Cir. 1994).

> **C.    The District Court erred in denying Appellant, Deborah Bennett's Motion pursuant to Fed. R. Civ. P. 56(d) to obtain discovery to supplement the motion record where Appellant made a showing that the discovery was germane to the motion and Appellant could not present certain facts to justify her opposition to the Motion**

In response to Appellees' Motion for Summary Judgment and following

oral argument  motion on January 16, 2024 (Appx988-1072), Appellant requested

the records of Mariellen Medernach's salary history and related documents to be produced by SEPTA; SEPTA refused to produce those documents, despite the fact they argued that there are no records to show that Ms. Medernach received a merit increase of 4.5% for her FY 2020 merit.

Appellant argued Appellees' failure to produce these records despite the request estopped Appellees' from making this argument in a Summary Judgment Motion. Appellant sought an Order from the Court, pursuant to Rule 56(d), deferring decision on SEPTA's motion and requiring SEPTA to produce the records of Ms. Medernach in order for Appellant to submit additional facts to justify her opposition to the Motion for Summary Judgment.  Appx951-973.

Furthermore, Appellant, Bennett requested ADA accommodation to telework from SEPTA on December 6, 2023 and submitted all documents and completed forms required of her to support her request but was not provided with the opportunity to telework; yet, SEPTA provided another employee in the CCT Department with immediate approval to telework,  while her ADA request to telework was being processed. *Id.*

Appellant moved, pursuant to Rule 56(d) that Appellees' motion for summary judgment be deferred until Appellees' have produced the requested records of Ms. Medernach *and* she be given the opportunity to file a sur-reply brief to supplement the record to justify her opposition to Appellees' Motion for

Summary Judgment. *Id.* The District Court denied the Motion for Relief

pursuant to Fed. R. Civ. P. 56(d). *See Bennett*, at *26-27, n. 6 & 52-53 n. 18.

On appeal, this Honorable Court reviews the denial of a motion for

additional discovery under Rule 56(d) for abuse of discretion. *Murphy v.

Millennium Radio Grp. LLC*, 650 F.3d 295, 309-10 (3d Cir. 2011). The Court, on

appeal, will not disturb the District Court's exercise of discretion unless it was

"arbitrary, fanciful or clearly unreasonable," and "no reasonable person would

adopt [its] view." *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 412 (3d

Cir. 2002) (internal quotation marks omitted).

A district court may grant summary judgment before discovery is completed

as long as the party opposing summary judgment has had "an adequate

opportunity to obtain discovery." *Dowling v. City of Phila.*, 855 F.2d 136, 138-39

(3d Cir. 1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a

party opposing summary judgment "believes that [she] needs additional time for

discovery, Rule 56(d) specifies the procedure to be followed." *Pa. Dep't of Pub.

Welfare v. Sebelius*, 674 F.3d 139, 157 (3d Cir. 2012)(quoting *Dowling*, 855 F.2d

at 139, which addressed the predecessor to Rule 56(d), Rule

56(f)). Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified
> reasons, it cannot present facts essential to justify its opposition, the
> court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The rule requires "a party seeking further discovery in response to a summary judgment motion [to] submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Dowling*, 855 F.2d at 139-40. Except in rare cases, "failure to comply with [Rule 56(d)] is fatal to a claim of insufficient discovery on appeal." *Bradley v. United States*, 299 F.3d 197, 207 (3d Cir. 2002).

A court may defer ruling on a summary judgment motion if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition . . . ." Fed. R. Civ. P. 56(d). In addition to filing an affidavit or declaration, the rule "requires that a party indicate to the district court its need for discovery, what material facts it hopes to uncover and why it has not previously discovered this information." *Radich,* 886 F.2d at 1393-94. Summary judgment may be granted if the Rule 56(d) declaration is inadequate. *See Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015).

Appellees' failed to produce any document to support their "so-called" legitimate non-retaliatory reason for denying Bennett's request to telework, other

than Ms. West's bald statement that the individuals she noted were allowed to telework, did so, based on ADA approved accommodations.

In order to show that this submission by Appellees' was pretext for retaliatory denial of this benefit to Bennett, on December 6, 2023, Appellant made a similar request for ADA accommodation to telework, and the record she sought to submit as supplement in opposition to Appellees' motion for summary judgment shows that the non- retaliatory their reason for denying Bennett the benefit to telework was pretext.

Appellant submitted a declaration, dated December 6, 2023, noting she applied to Cassandra West and Ms. O'Neal for ADA accommodation because of her serious medical condition to be allowed by SEPTA to telework. Appx956-957.

On the same afternoon, Appellant received an email from SEPTA's ADA Manager, Lonnie Allbaugh, providing her with a Medical Questionnaire to be completed and returned to him. Appx958-970. After providing the questionnaire to her doctor for completion, Bennett provided Mr. Allbaugh with the completed questionnaire on December 13, 2023. On December 21, 2023, after not having heard back from SEPTA about her request for ADA accommodation to telework, as SEPTA claimed it granted other co-workers in CCT, Appellant requested a status on her request from SEPTA's Director of EEO. *Id.*

As of the time of the oral argument, on January 17, 2024, Appellant had not

received any decision from SEPTA about her request for ADA accommodation to telework.  Appx988-1072.  Yet, another employee in SEPTA's CCT Department , Rhoshina Stewart requested ADA accommodation to telework, and she was immediately approved in the interim by the CCT department, while her ADA request to telework was being processed by SEPTA's ADA manager. Appellant, Deborah Bennett was not provided with this same temporary accommodation to telework by Ms. West, the head of CCT, while her request was being "processed" since December 6, 2023.

Similarly, Appellant requested that SEPTA should be ordered to produce the requested records of Ms. Medernach's salary history and related documents for FY2020 merit increase awarded to her. Specifically, the FY2020 performance evaluation, the FY2020 recommendation for her merit increases by her supervisor, Mr. Gottlieb, who was also a direct report of Mr. Sauer in FY2020, just like Mr. Brennan and record of her merit increase that was approved by Mr. Sauer for FY2020.

Appellant should have been given the opportunity to file a sur-reply brief to supplement the record to justify her opposition to the original motion for summary judgment and the District Court's failure to do so was a clear abuse of discretion.

## VII.  CONCLUSION

For the foregoing reasons, the District Court erred in granting summary judgment to Appellees on Appellant, Deborah Bennett's discrimination and retaliation claims.  It is respectfully requested this Honorable Court reverse the Order of the District Court granting Appellees' Motion for Summary Judgment and remand the matter to the United States District Court for the Eastern District of Pennsylvania for a trial on the merits.

<div style="margin-left: 40%;">

Respectfully submitted,

**LAW OFFICES OF JONATHAN J. SOBEL**


*/s/Jonathan J. Sobel, Esquire*
JONATHAN J. SOBEL, ESQUIRE
1500 Walnut Street, Suite 2000
Philadelphia, PA 19102
(215) 735 7535
(215) 735 7539
Mate89@aol.com

Attorney for Appellant, Deborah Bennett

</div>

Date:  October 7, 2024

## <u>REQUIRED CERTIFICATIONS</u>

A.      Bar Membership. I certify that the attorney whose name and signature appear on this brief is a member of the Bar of this Court.

B.      Type-Volume. This brief was prepared in a 14-point Times New Roman, proportional typeface. Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify, based on the word-counting function of my word processing system (Word 2003), that this brief complies with the type-volume limitations of Rule 32(a)(7)(B), in that the brief contains fewer than 13,000 words – that is, 11,865 words – including footnotes.

C.      Electronic Filing. I certify pursuant to LAR 31.1(c) that the text of the electronically filed version of this brief is identical to the text in the paper copies of the brief as filed with the Clerk. The anti-virus program with current updates, has been run against the electronic (PDF) version of this brief before submitting it to this Court's CM/ECF system, and no virus was detected.

<u>/s/Jonathan J. Sobel</u>

Date:  October 7, 2024

## <u>CERTIFICATE OF SERVICE</u>

On October 7, 2024, I served a copy of the foregoing brief and the

accompanying Appendix, on counsel for the United States, via ECF filing and first

class mail (within 5 days thereafter), addressed to:

Mark T. Sottile, Esquire
**PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP**
1818 Market Street, Suite 3402
Philadelphia, PA 19103

/s/Jonathan J. Sobel

Date:  October 7, 2024

IN THE

# UNITED STATES COURT OF APPEALS

### FOR THE THIRD CIRCUIT

_____

No. 24-1376

_____

DEBORAH BENNETT

*Appellant*

V.

SEPTA and SCOTT SAUER

*Appellee*

_____

## JOINT APPENDIX – VOLUME ONE (APPX1-APPX51)

_____

Appeal from the
the United States District Court
for the Eastern District of Pennsylvania
Pappert, J., Civil Action No. 23-1271(GJP)
Dated February 2, 2024

_____

Jonathan J. Sobel, Esquire
*Counsel for Appellant, Deborah Bennett*

**LAW OFFICES OF JONATHAN J. SOBEL**
15000 Walnut Street, Suite 2000
Philadelphia, PA  19102
(215) 735-7535

# **TABLE OF CONTENTS**

**PAGE**

**VOLUME ONE**

1. Notice of Appeal (DDE 31 ), filed February 28, 2024………    Appx1

2. Order Granting Motion for Summary Judgment (DDE 28), filed February 2, 2024……………………………………….    Appx4

3. Memorandum / Opinion re:  Motion for Summary Judgment (DDE 27), filed February 2, 2024…………………..    Appx5

4. Docket Entries……………………………………………….    Appx46

**VOLUME TWO**

6. Complaint (DDE 1), filed April 2, 2023………………………    Appx52

7. Amended Complaint (DDE 3), filed April 18, 2023…………...    Appx71

8. Answer to Amended Complaint (DDE 8), filed June 16, 2023…    Appx82

9. Appellees' Motion for Summary Judgment (DDE 15), filed November 21, 2023………………………………………….    Appx90

    Memorandum of Law……………………………………    Appx92

    Statement of Material Facts………………………………..    Appx122

    Exhibits

    "A" – Deposition of Deborah Bennett………………………    Appx143

    "B" – Application for Transfer………………………………    Appx215

    "C" – Letter, March 5, 2014…………………………………    Appx219

"D" – Employee Performance Evaluation (2015)............... Appx221

"E" – Employee Salary / Status Notification.................... Appx230

"F" – Employee Performance Evaluation (2016)............... Appx232

"G" – Employee Salary / Status Notification.................... Appx242

"H" – Employee Performance Evaluation (2017)............... Appx244

"I" – Employee Salary / Status Notification..................... Appx252

"J" – Employee Performance Evaluation (2018)................ Appx254

"K" – Employee Salary / Status Notification..................... Appx262

"L" – Employee Performance Evaluation (2019)................. Appx264

"M" – Employee Salary / Status Notification..................... Appx273

"N" – Employee Performance Evaluation (2020)................. Appx275

"O" – Employee Performance Evaluation (2021)................. Appx283

"P"  - Employee Salary / Status Notification.......................Appx286

"Q" – Memo. Merit Increase...................................... Appx288

## **VOLUME THREE**

"R" – Oral Deposition of Scott Sauer............................. Appx292

"S" – Appellant's Overtime Hours................................ Appx319

"T" – Certification of Jessica Herman............................ Appx321

"U" – Appellant's Employee Earnings History.................... Appx325

"V" – Employee Spreadsheet...................................... Appx335

"W" – Oral Testimony of Appellant…………………………… Appx339

"X" – Certification of Leslie Moore…………………………. Appx358

"Y" – Letter, November 1, 2022………………………………….. Appx361

"Z" – Email, June 23, 2021……………………………………….. Appx366

"BB" – Medical Department…………………………………… Appx368

"AA – Email, July 1, 2021………………………………………. Appx375

"CC" – Email, August 10, 2021………………………………. Appx379

"DD" – Email, August 13, 2021………………………………. Appx384

"EE" – Email, August 24, 2021………………………………… Appx391

"FF" – Correction Statement, Appellant…………………….. Appx394

"GG" – Letter, October 7, 2021………………………………… Appx398

"HH" – Email, October 8, 2021………………………………… Appx400

"II" - Investigation Summary…………………………………… Appx403

"JJ" - FY 2022 Performance Review, Appellant……………. Appx409

"KK" - FY 2023 Performance Review, Appellant…………… Appx413

"LL" - Email, November 21, 2022……………………………… Appx419

"MM" – Oral Deposition of Stephanie Deiger………………… Appx421

"NN" – Email, February 1, 2023……………………………… Appx432

"OO" – Certification of Trayia Hill…………………………… Appx434

"PP" – Oral Deposition of Cassandra West…………………. Appx437

"QQ" – Job Title, Administrative Assistant II...................... Appx462

"RR" – Certification of Carol A. O'Neal........................... Appx465

"SS" – Appellant's Responses to Appellees' First Set of
Interrogatories and Request for Production of Documents........ Appx468

"TT" – PY 2024 Performance Review for Appellant............ Appx488

10. Appellant's Memorandum of Law in Opposition to Appellees'
Motion for Summary Judgment (DDE 16), filed December 5, 2023... Appx495

## VOLUME FOUR

Statement of Disputed Material Facts in Opposition to
Appellees' Motion for Summary Judgment (DDE 16-1),
filed December 5, 2024......................................... Appx525

Appellant's Response to Appellees' Statement of Material
Facts in Opposition to Appellees' Motion for Summary
Judgment (DDE 16-2), filed December 5, 2024............... Appx546

Appellant's Appendix of Exhibits in Opposition to
Appellees' Motion for Summary Judgment (DDE 16-3),
All filed December 5, 2024.................................... Appx568

    App.1-9    Declaration of Deborah Bennet........... Appx573

    App.10-21    Joseph Brennan Dep. Transcript.......... Appx582

    App.22-29    Michael Keyes Deposition Transcript.... Appx594

    App.30-39    Michael Civera Deposition Transcript..... Appx602

    App.40-47    Dennis McAnulla Deposition Transcript.... Appx612

    App.48-65    Jeff Coppedge Deposition Transcript......... Appx620

    App.66-75    Stephanie Deiger Deposition Transcript..... Appx638

App.76-100 Scott Sauer Deposition Transcript…………. Appx648

App.101-113 Carol O'Neal Deposition Transcript……… Appx673

App.114-136 Cassandra West Deposition Transcript….. Appx686

App.137-146 Nehemiah Mondesir Deposition Transcript. Appx709

App.147-149 Exhibit P-1 May 18, 2021,
email thread Mangold with Appellant………………….. Appx719

App.150 Exhibit P-2 Sauer's May 27, 2021 email……… Appx722

App.151-152 Exhibit P-5 Appellant's June 15, 2021
email to Sauer and Lund……………………………. Appx723

App.153 Exhibit P-6 Hill's June 22, 2021 email to
Appellant…………………………………………. Appx725

App.154-155 Exhibit P-7 Moore's June 22, 2021
email thread with Appellant………………………….. Appx726

App.156-159 Exhibit P-8 Appellant's July 1, 2021
email to Deiger and Leslie Richards……………………. Appx728

App.160-161 Exhibit P-9 Appellant's July 6, 2021
email thread with Moore……………………………….. Appx732

App.162-168 Exhibit P-10 Appellant's July 6, 2021
EEO Complaint………………………………………. Appx734

App.169-170 Exhibit P-11 Appellant's Jul16, 2021
email thread with Hopkins………………………………. Appx741

App.171-173 Exhibit P-12 Civera's August 2, 2021
email to Appellant…………………………………… Appx743

App.174-175 Exhibit P-16 Appellant's August 12, 2021
email thread with McAnulla/Mangold and Civera……….Appx746

App.176-178 Exhibit P-17  Appellant's August 12, 2021
email thread with Keyes………………………………… Appx748

App.179-184 Exhibit P-18  Odouk's August 13, 2021
email to Appellant…………………………………   Appx751

App.185-189 Exhibit P-19  Appellant's August 23, 2021
email thread with Odouk………………………………   Appx757

App.190-195 Exhibit P-20  Appellant's August 24, 2021
email thread with Hopkins…………………………….   Appx762

App.196-201 Exhibit P-21 Appellant's August 24, 2021
email thread with Odouk……………………………..   Appx768

App.202-204 Exhibit P-22 Appellant's Statement
Correction to Odouk………………………………….   Appx774

App.205-207 Exhibit P-23 McAnulla's September 1, 2021
email to Appellant……………………………………… Appx777

App.208 Exhibit P-25 Appellant's September 8, 2021
email to Sauer………………………………………….   Appx780

App.209 Exhibit P-26 Appellant's October 6, 2021
email to Odouk and Richards…………………………   Appx781

App.210-211 Exhibit P-28 Odouk's October 7, 2021
email to Appellant……………………………………… Appx782

App.212-214 Exhibit P-29 Appellant's October 8, 2021
email to Richards…………………………………….   Appx784

App.215-216 Exhibit P-30 Appellant's 10/21/21
and 11/3/21 email thread with Richards………………..   Appx787

App.217-219 Exhibit P-31 Appellant's November 5, 2021
PHRC/EEOC Complaint………………………………   Appx789

App.220-222 Exhibit P-32 Appellant's November 3, 2021

EEOC Inquiry Information…………………………… Appx792

App.223-224 Exhibit P-33 Hill's 12/3/21 and 12/9/21
email thread with Coppedge………………………….. Appx795

**VOLUME FIVE**

App.225-228 Exhibit P-34 Coppedge's 12/8/21 and
12/9/21 email thread with Sauer……………………….. Appx797

App.229-231 Exhibit P-35 Appellant's 1/4/22 and
1/5/22 email thread with Deiger………………………. Appx801

App.232-234 Exhibit P-36 Deiger's
January 7, 2022 email to Appellant……………………. Appx804

App.235-236 Exhibit P-37 11/15/21 and 1/7/22
email thread between Keyes, Sanderson,
and Rawls-Allen…………………………………………. Appx807

App.237-239 Exhibit P-38 Appellant's 1/7/22 and 1/12/22
email thread with Deiger……………………………….. Appx809

App.240-242 Exhibit P-39 Appellant's March 29, 2022
EEOC Charge…………………………………………….. Appx812

App.243-247 Exhibit P-40 SEPTA's November 1, 2022
EEOC Position Statement……………………………… Appx815

App. 248-249 Exhibit P-41 Appellant's November 21, 2022
rebuttal letter to EEOC………………………………… Appx820

App.250-252 Exhibit P-43 SEPTA's SAM FY2021
approved Merit Plan……………………………………. Appx822

App. 253-257 Exhibit P-44 Appellant's FY2023
Performance Review……………………………………. Appx825

App. 258-261 Exhibit P-45 August 10, 2023 email
thread between Appellant and Brennan………………… Appx830

App.262 Exhibit P-46 Appellant's February 2022 letter to Comber…………………………………………… Appx834

App.263 Exhibit P-49 Invite for 12/2/22 Sauer's Holiday Breakfast……………………………………………. Appx835

App.264 Exhibit P-50 date change for Holiday Breakfast to December 6, 2022…………………………………. Appx836

App. 265 Exhibit P-51 12/5/22 Holiday Breakfast cancelation notice to only Appellant…………………… Appx837

App.266-268 Exhibit P-52 Appellant's requests for personal personal time to Sauer in 2022 and 2023……………… Appx838

App.269-270 Exhibit P-54 SEPTA's Administrative Assistants Phone List as of 4/22/21…………………… Appx841

App.271-274 Exhibit P-55 December 9, 2021 email thread between Brandis, Coppedge, Herman, Appellant and Sauer……………………………………………… Appx843

App.275-276 Exhibit P-57 Sauer's August 12, 2021 email to himself…………………………………… Appx847

App.277-279 Exhibit P-58 November 21, 2022 email thread between Sauer, O'Neal, and Comber………….. Appx849

App.280-281 Exhibit P-59 November 21, 2022 email thread between Sauer, O'Neal, and Comber…………. Appx852

App.282-283 Exhibit P-60 November 21, 2022 email thread between Sauer, O'Neal, and Comber…………. Appx854

App.284-286 Exhibit P-61 November 21, 2022 email thread between Sauer, O'Neal, and Comber………… Appx856

App.287-288 Exhibit P-62 February 1, 2023 email thread between Sauer, O'Neal, and Comber…………. Appx859

App.289-290 Exhibit P-63 February 1, 2023 email
thread between Sauer, O'Neal, and Comber…………..    Appx861

App.291-296 Exhibit P-64 Several conference schedule
notices between, Sauer, Brandis, West, O'Neal, Appellant
and Comber…………………………………………….    Appx863

App.297 Exhibit P-67 Appellant's March 13, 2023
email to West…………………………………………    Appx869

App.298-300 Exhibit P-69 March 16, 2023 email thread
between O'Neal, West, Herman, and Sauer………….    Appx870

App.301-302 Exhibit P-74 2/14/2023 Job Posting for
Administrative Assistant II CCT……………………..    Appx873

App.303-306 Exhibit P-76 West and Appellant's 3/13/23
and 3/16/23 email thread…………………………….    Appx875

App.307-310 Exhibit P-77 March 23, 2023 email thread
between Appellant and West………………………….    Appx879

App.311-312 Exhibit P-78 March 24, 2023 email thread
between Appellant, West and Mondesir……………...    Appx883

App.313-322 Exhibit P-79 Coppedge's March 24, 2023
email to Appellant……………………………………    Appx885

App.323-324 Exhibit P-80 Appellant's March 30
and April 3, 2023 email thread with Coppedge………    Appx895

App.325-328 Exhibit P-81 April 17 and 18, 2023 email
thread between Appellant Coppedge and West……….    Appx897

App.329-330 Exhibit P-86 West's August 1 and 2, 2023
email thread with Appellant………………………….    Appx901

App.331-332 Exhibit P-87 records of Donna Mail in
CCT allowed to telework in March 2023 by West……    Appx903

App.333-334 Exhibit P-88 Records of Charles Horton in CCT allowed to telework in August 2023…………… Appx905

App.335 Exhibit P-90 Appellant's March 9, 2023 email to Keyes………………………………………… Appx907

App.336 Exhibit P-91 Picture of Appellant's office as AAII at VEM……………………………………… Appx908

App.337-347 Exhibit P-92 Pictures of Appellant's office at CCT……………………………………… Appx909

App.348-361 Appellants' Responses to Appellant's Requests for Documents…………………………… Appx920

App.362-363 Copy of Opinion, *Dubrey v. SEPTA*, Civil Action, 2:14-cv-01370……………………. Appx934

11. Appellants' Reply Brief in Further Support of Motion for Summary Judgment (DDE 17), filed December 12, 2023………… Appx936

Exhibit "A" – Certification of Scott Sauer (DDE 17-1), Filed December 12, 2023……………………………... Appx947

12. Appellant's Rule 56(d) Motion to Supplement the Record in Opposition to Appellees' Motion for Summary Judgment (DDE 22), filed January 17, 2024………………………………… Appx951

Declaration of Deborah Bennett (DDE 22-1), filed January 17, 2024……………………………… Appx956

Exhibit "A" Email (DDE 22-2), filed January 17, 2024……. Appx958

Order – *Gardner v. SEPTA*, (DDE 22-3), filed January 17, 2024……………………………… Appx971

Administrative Assistant Phone Listing (DDE 22-4), filed January 17, 2024…………………………………….. Appx972

13. Appellees' Response in Opposition to Appellant's
Rule 56(d) Motion (DDE 26), filed January 25, 2024……………….    Appx974

14. Transcript of Testimony, Oral Argument………………………..    Appx988

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEBORAH BENNETT                    :
                                   :
     Plaintiff,                  :
                                   :
    v.                           :No.: 23-cv-1271(GAP)
                                   :
SEPTA, ET AL.                      :
                                   :
     Defendant.                  :

## <u>NOTICE OF APPEAL</u>

**TO THE CLERK'S OFFICE:**

Notice is hereby given that Plaintiff, Deborah Bennett, in the above-named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the Order dated February 2, 2024 (D.E. #), of the Honorable Gerald A. Pappert, U.S.D.J., granting Defendants' Motion for Summary Judgment.

     Respectfully submitted,

     **LAW OFFICES OF JONATHAN J. SOBEL**


     <u>s/JONATHAN J. SOBEL, ESQ.</u>
     1500 Walnut Street, Suite 2000
     Philadelphia, PA  19102
     (215) 735 7535
     (215) 735 7539
     Mate89@aol.com

     Attorney for Plaintiff

Date:  February 28, 2024

## PROOF OF FILING / SERVICE

I, JONATHAN J. SOBEL, ESQUIRE, attorney for Petitioner hereby certifies that I am duly authorized to make this certification; that on February 20, 2024, I electronically filed the Notice of Appeal and caused it to electronically mailed, addressed as follows:

Respectfully submitted,

**LAW OFFICES OF JONATHAN J. SOBEL**

s/JONATHAN J. SOBEL, ESQ.
1500 Walnut Street, Suite 2000
Philadelphia, PA  19102
(215) 735 7535
(215) 735 7539
Mate89@aol.com

Attorney for Petitioner

Date:  February 28, 2024

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEBORAH BENNETT,

        *Plaintiff,*

   v.

SEPTA, et al.,

        *Defendants.*

CIVIL ACTION
NO. 23-1271

## ORDER

**AND NOW**, this 2nd day of February, 2024, upon consideration of Defendants'

Motion for Summary Judgment, (ECF No. 15), all briefs and exhibits filed in support of

the Motion and Plaintiff's Response, (ECF No. 16), Defendant's Reply (ECF No. 17),

Plaintiff's Motion for Relief Pursuant to Rule 56(d), (ECF No. 22), Defendants' Response

(ECF 26), and after holding oral argument, (ECF No. 21), it is hereby **ORDERED** as

follows:

1. Defendants' Motion for Summary Judgment is **GRANTED** and judgment
shall be entered in favor of Scott Sauer and SEPTA.

2. Plaintiff's Motion for Relief Pursuant to Rule 56(d) is **DENIED**. *See*
Footnotes 6 and 18 in the Court's accompanying Memorandum.

3. The Clerk of Court shall close this case.

BY THE COURT:

**_/s/ Gerald J. Pappert_**

GERALD J. PAPPERT, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBORAH BENNETT,<br><br>*Plaintiff,*<br><br>v.<br><br>SEPTA, et al.,<br><br>*Defendants.* | CIVIL ACTION<br>NO. 23-1271 |

**Pappert, J.**                                                February 2, 2024

## MEMORANDUM

Longtime SEPTA employee Deborah Bennett sued her employer and a former supervisor, Scott Sauer, alleging race discrimination, hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act. Bennett's allegations stem from a string of incidents that took place between 2020 and 2023. Among them, Bennett, who is black, contends Sauer, who is white, discriminated against her when he reduced her proposed Fiscal Year 2021 merit increase from 4.5% to 3.5%, confronted her about "excessive" overtime usage and transferred her to work under a different supervisor. Bennett further contends that her 3% raise for Fiscal Year 2022, less than she felt she deserved, was discriminatory and retaliatory.

SEPTA moves for summary judgment contending Bennett's case collapses under its own weight. In fact, Bennett's case weighs very little and the record supports SEPTA's assessment. There is no evidence from which a jury could reasonably find for Bennett on any of her claims. Specifically, there is nothing to show that Bennett's race

1

played any role in anything Sauer or anyone else at SEPTA did or didn't do. To the contrary, Bennett repeatedly attributed her issues with Sauer to everything but race— whether it be an interaction at the 2020 Philadelphia Flower Show or that Sauer's treatment of her made her "collateral damage" from an apparent feud between Sauer and her former manager, Joseph Brennan. And to the extent Bennett can establish a *prima facie* case on any of her retaliation claims, SEPTA had legitimate, non-discriminatory reasons for its actions and nothing in the record would allow reasonable jurors to either disbelieve those reasons or conclude they were pretext for illegal discrimination.

After thoroughly reviewing the record, the parties' submissions and holding oral argument, the Court grants the Defendants' motion and enters judgment in their favor.

## I

## A

Bennett started at SEPTA in 2000 working at a service desk. (Bennett Dep. 9:13–10:14, ECF No. 15-4); (Def's SUMF, ECF No. 15-3, ¶ 1). In 2014, she became an Administrative Assistant II and worked under the Chief of Vehicle Maintenance, Joseph Brennan. (Def's SUMF ¶ 6); (Pl's SUMF, ECF No. 16-2, ¶ 6). Bennett enjoyed working for Brennan and performed her job ably; in her annual performance reviews, Brennan rated her as "Meets Expectations" every year from 2015-2021. (Def's SUMF ¶¶ 14–30).

Each year, SEPTA employees are eligible for a salary merit increase, and the amount they ultimately receive is based on their performance assessment and whether their salary is above or below their position's midpoint. (SAM FY 2021 Merit Increase,

ECF No. 15-20, at 1–2).[1]  For example, in Fiscal Year 2021, an employee who received a
"Meets Expectations" review and whose salary was below their position's midpoint was
eligible to receive a 2.75-4.5% merit increase.  (*Id.* at 1).  Employees who were rated as
"Exceeds Expectations" were eligible for a higher percentage increase (up to 5.5%),
whereas employees who were scored as "Needs Improvement" were eligible for a lower
range of increase.  (*Id.*)  Between 2015 and 2019, Bennett's merit increases ranged from
1% in 2017 to 4% in 2016, and she received a 2.5% merit increase in 2015, 2018 and
2019. (Def's SUMF ¶¶ 15, 19, 22, 26, 28); (Pl's SUMF ¶¶ 15, 19, 22, 26, 28).  Bennett
never alleged those raises were discriminatory.  (Bennett Dep. 31:2–45:18).

## B

In March 2020, Bennett served as the lead ambassador for SEPTA at the
Philadelphia Flower Show.  (*Id.* at 121:24–124:5).  In this role, she was responsible for
guiding other SEPTA employees to their assigned areas.  (*Id.* at 121:24–122:5).  One of
those employees was then-Assistant General Manager Scott Sauer, who was standing
with another colleague in a section called platform "A."  Bennett approached him and
said, "Excuse me, but, Scott, you belong in the 'B' section."  (*Id.* at 122:6–11).  According
to Bennett, Sauer "laughed it off" and walked to his assigned section, but later, Sauer
returned to the "A" section and his administrative assistant, Trayia Hill, purportedly
said, "Oh, I thought you were the AGM.  I guess [Bennett] showed you."  (*Id.* at 122:12–
19).  Bennett contends Sauer's "entire demeanor" changed after this incident.  (*Id.* at
123:3–4).

---

[1]     All page numbers are referring to the ECF page number.

Later that year, Bennett received another "Meets Expectations" review from Brennan and he recommended she receive a 4.5% merit increase for Fiscal Year 2021. (Def's SUMF ¶ 30). Before the merit increase took effect, however, Sauer reduced it to 3.5%, (Def's SUMF ¶ 31), something he has discretion to do every year for budgetary reasons; there were years when he "adjusted" up to 100 employees' recommended increases. (Sauer Dep. 30:17–23, 85:2–5, 102:17–18, ECF No. 15-21). Brennan testified he was "not aware" of Sauer reducing anyone else's merit increase in his department, (Brennan Dep. 26:2–15, ECF No. 16-5), and Bennett heard "rumors" that another administrative assistant, Mariellen Medernach, a white woman who had been in the position for just 2 years, received a 4.5% merit increase. (Bennett Dep. 142:19–143:7).

C

In February 2021, another administrative assistant, Desiree Saunders, was promoted to a new position, (Brennan Dep. 11:1–12:24), and SEPTA decided not to fill Saunders' position but rather reallocate the work to existing employees. (*Id.* at 12:10–24). Brennan asked Bennett if she could perform the additional work created by Saunders' promotion, and she agreed to work roughly twenty additional hours per week, on top of her responsibilities for Brennan. (*Id.* at 13:7–18). For those additional hours, Bennett received overtime pay, which allowed her to earn more money: she worked 88 hours of overtime in April and 109 hours of overtime in May. (Bennett Overtime Hours, ECF No 15-22, at 2); (Brennan Dep. 14:1–24).

On June 7, 2021, Brennan went out on medical leave. (Brennan Dep. 15:8–11). Looking for ways to limit overtime usage consistent with SEPTA objectives, (Herman Cert., ECF No. 15-23, ¶ 28), Sauer met with Bennett in his office on June 22, 2021 to

4

discuss her "excessive" overtime. (Bennett Decl., ¶ 13, ECF No. 16-5). Bennett says Sauer accused her of stealing hours and "belittled and embarrassed" her in front of his staff. (*Id*.) Sauer says he never yelled at her or accused her of stealing time. (Sauer Dep. 35:22–36:3); (Herman Cert. ¶¶ 21–25). Nonetheless, after the meeting, Bennett was "visibly upset." (Coppedge Dep. 21:4–22:18, ECF No. 16-5). Later in the day, Bennett received an email from Leslie Moore, stating, "If you need assistance with your workload, don't hesitate to let me know what it is so that I can help alleviate the load." (Moore June 23 email to Bennett, ECF No. 15-29, at 2). Bennett responded, "My daily workload is suitable for me. I required overtime for a workload from which was left by another employee and supporting the Vehicle Engineering group. I was advised by Scott to terminate the assignment. I can and will continue to focus on the assignments that fall under my job description." (*Id*.)

Still bothered by her meeting with Sauer, however, Bennett emailed SEPTA's EEO department on July 1 saying she felt "subject to an atmosphere of workplace harassment and intimidation from Scott Sauer . . . as a result of the ongoing conflict between himself and my supervisor, Joseph Brennan . . . ." (Bennett July 1 email to Hopkins, ECF No. 16-6, at 12). She added that she believed Sauer "had a dislike for me since . . . the Philadelphia Flower Show." (*Id*.) Bennett also noted that Sauer changed her 2021 salary merit increase from 4.5% to 3.5%, which made her feel like she had "been hit with multiple punches that are directed at me as a result with AGM Sauer's conflict with Joseph Brennan." (*Id*. at 13).

Five days later, Bennett's email morphed into a formal complaint. (July 6 EEO Compl., ECF No. 16-6, at 17–22). Echoing many of her prior sentiments, Bennett

alleged that her encounter with Sauer was "collateral damage" from an apparent feud between Brennan and Sauer as well as harassment and retaliation for the Flower Show incident. (*Id.* at 18). Bennett wanted an apology, but she also said, "I would like to have my 1% increase retro . . . Mariellen Medernach (who is white) was given her 4.5% increase and she has only been an AAII for approximately two years." (*Id.* at 22). Ten days later, Bennett followed up with SEPTA's EEO department, where she said she was "a little baffled" because she had been receiving phone calls about her claim yet had not been interviewed. (Bennett July 16 email to Hopkins, ECF No. 16-6, at 23).

Following their June meeting, Sauer attempted to reduce Bennett's overtime hours by minimizing unnecessary work. For instance, he emailed Jessica Herman (then Mangold), Mike Civera and Leslie Moore on July 30, stating, "I offered Deborah assistance from Operations Admin in prioritizing her work. She was told not to worry about mistakes that she was correcting from Desiree Saunders." (Late July/Early August 2021 emails, ECF No. 16-6, at 25). Dennis McAnulla told Bennett, "You no longer have to keep [COVID spreadsheets]," (*id.* at 29), as did Herman, "We don't need regular spreadsheets." (*Id.* at 28).

Bennett struggled with the uncertainty surrounding what was expected of her, causing her stress. She felt there was "no consistency" in her work and thought Sauer was overly monitoring her. She believed Sauer thought she was "creating work just to get overtime." (Bennett email to Keyes, ECF No. 16-6, at 30). Still, she worked 16 hours of overtime in August and 8.5 hours in September. (Bennett Overtime Hours, ECF No. 15-22, at 2). She contacted her union representative, Michael Keyes, who told her "it seems you are in an extremely bad situation" and to seek clarity from Sauer as

6

to what he expected her to do. (*Id*.) At some point, Bennett also filed a grievance against Sauer, alleging a hostile work environment stemming from the June meeting. (Keyes Dep. 7:22–10:8, ECF No. 16-5).

With Brennan gone, Civera and McAnulla back-filled Brennan's position and supervised Bennett. (Bennett Decl. ¶ 12). During August 2021, Sauer emailed McAnulla and said:

> I still don't understand why the AA needs so much overtime. I would like a detailed accounting of the "extra" work that we need completed causing us to require so much overtime of her. Within that detail, I need an estimate of the time it takes to perform the tasks. If you still reach the conclusion that she needs overtime then I want you to reassign work to other people within Vehicle Maintenance to keep that overtime at zero.
>
> No other Administrative Assistant in Operations is required to work overtime like this and we have other AA's that are serving multiple supervisors as well.

(ECF No. 16-7, at 12); (McAnulla Dep. 28:13–24, ECF No. 16-5). McAnulla accordingly told Bennett that "until further notice she couldn't work overtime," and he told her to "write down her daily job duties, what she was doing each day and the amount of work that she was performing each day so we can provide a justification to support the need for overtime." (*Id*. at 15:16–16:3). According to McAnulla, Bennett "chose that she didn't want to work the overtime and she didn't . . . want to provide [McAnulla] the justification, so that was kind of the end of it." (*Id*. at 16:4–8).

In early August 2021, Bennett was interviewed by Ekaette Oduok, SEPTA's EEO/Employee Relations Manager, pursuant to Bennett's July 6 internal complaint. Based on that interview, Oduok drafted a statement on Bennett's behalf. (Proposed EEO Statement, ECF No. 16-6, at 33–38). Regarding Sauer's change of her merit

7

increase from 4.5% to 3.5%, the letter said, "I never asked Scott about why the change occurred because I thought it was related to the Flower Show." (*Id.* at 35–36). Bennett alleges that Oduok did not accurately capture her statement yet wanted her to sign it despite Bennett's attempts to make corrections. (Bennett emails to Oduok, ECF No. 16-6, at 39–49). Though she claimed Oduok misrepresented her version of events, in her proposed corrections, Bennett *again* stated, "I feel that I didn't get the full merit because of the Incident at the flower show," not because of anything having to do with her race, though she again references her belief that Sauer did not reduce Medernach's merit increase. (Proposed Corrections, ECF No. 16-7, at 8).

Bennett's work-related stress led to her taking sick leave from September 9 to December 8, 2021. While away from the office, Bennett, on October 8, complained to SEPTA's Assistant General Manager for Human Resources, Stephanie Deiger, and SEPTA's General Manager, Leslie Richards, about alleged bias in Oduok's investigation. (Bennet. Decl. ¶ 20). Bennett said that Sauer bullied everyone, regardless of race, and was upset that none of the witnesses she identified, including white men Dennis McAnulla, Mike Civera and Mike Wright, and a black man, Jeff Coppedge, were interviewed in Oduok's investigation. (*Id.* ¶ 20); (Bennett Dep. 149:25–150:18). Moreover, Bennett stated it was her belief they were "not being told what is really going on in Vehicle Maintenance and how everyone is being bullied by AGM Sauer. Mr. McAnulla told me and others that he would tell people the truth but is afraid of the retaliation." (Bennett Oct. 8 email, ECF No. 16-7, at 17). On November 3, 2021, Bennett filed a charge of discrimination with the Equal Employment Opportunity Commission, and on November 5, 2021, a complaint with the Pennsylvania Human

8

Relations Commission and the EEOC, alleging race and age discrimination and retaliation. (Bennet Decl. ¶ 21); (PHRA Complaint, ECF No. 16-7, at 23–27).

<div align="center">D</div>

When Bennett returned from sick leave in December 2021, Sauer became her direct supervisor. But for the rest of the year, she only worked Mondays because she had vacation time she needed to use. (Bennett Dec. 8 email to Herman, ECF No. 16-7, at 32).

In January, Bennett emailed Deiger that she had not received her merit increase for the year, noted her pending EEOC and PHRA claims and said she did not feel comfortable with Sauer giving her a fair and accurate performance review and merit increase recommendation. (Bennett Jan. 5 email to Deiger, ECF No. 16-7, at 34); (Herman emails, ECF No. 16-7, at 35–36). About a week later, Bennett received a 3% merit increase, which she disagreed with because two white men, Mike Civera and Ed Carruthers, received "Exceeds Expectations" reviews while allegedly performing two jobs. Bennett believed this to be retaliation for filing the EEOC charge, and further complained that she had not received a performance evaluation. (Bennett Jan. 12 email to Deiger, ECF No. 16-7, at 42). However, in a February 23, 2022 letter, which Bennett confirmed receiving, SEPTA informed Bennett the reason for both the delayed raise and its amount. (Bennett Dep. 200:1–22). SEPTA explained that because Bennett was on sick leave during the fall of 2021, she was absent for the merit consideration process, and according to SEPTA's policy, she received an increase amount that was set at the average for employees with a "Meets Expectations" rating. (Id. at 200:12–21).

<div align="center">9</div>

On March 25, 2022, Bennett filed an EEOC charge of race discrimination, where she again alleged that Sauer accused her of fabricating work to qualify for overtime and reduced her merit increase but allegedly did not do the same for Medernach. (EEOC Charge, ECF No. 16-7, at 46). SEPTA filed its position statement on November 1, 2022, and Bennett filed a rebuttal letter on November 21. (ECF No. 16-7, 48–54).

<p style="text-align:center">E</p>

For roughly a year, Bennett had little to no contact with Sauer aside from a few emails where she requested time off, which he granted. (Sauer Nov. 21 email, ECF No. 15-41, at 2); (ECF No. 16-8, at 46–48). Bennett claims Sauer started excluding her from email communications, so she received assignments from "third parties." (Bennet Decl. ¶ 19). But Sauer already had an administrative assistant and did not need another, (Sauer Nov. 21 email, ECF No. 15-41, at 2), and so in November 2022, Sauer emailed Carol O'Neal, the Director of SEPTA's EEO Department, saying:

> You'll probably recall that I never met with Deborah Robinson-Bennett about her performance review last year. She still received her merit last year but the rule is that we don't award merits without a completed evaluation. I have a performance review for Deborah Robinson-Bennett this year. Deborah has been reporting to me since June 2021. We haven't had much interaction though. Aside from a few emails from Deborah requesting time off, I haven't really had much interaction with her. I scored her Meets Expectations. I plan to conduct the 1:1 Meeting but I think I'll need assistance with that.
>
> I also need to speak with someone about having Deborah report to someone else for the coming year. I have no need for a second AA and it's not fair to Deborah to continue having her work with little to no direction. She's completing her routine work but there's nothing else for her to do without a manager directly supervising her.

(*Id.*)

<p style="text-align:center">10</p>

Bennett similarly felt detached from Sauer and his team. In December 2022, he invited his staff to a holiday breakfast, but Bennett received an email from Sauer's assistant cancelling the invitation and Bennett did not attend. (Holiday Breakfast Invitation, ECF No. 16-8, at 1–3). In February 2023, Sauer again raised the issue of Bennett:

> We need to discuss Deborah's position. She's technically reporting to me. She needs to be relocated to another management center. Her supervisor's position is eliminated. I don't want to let another year go by where she's working unsupervised. Can we try to bring a resolution to this next week?

(Sauer Feb. 1 email, ECF No. 15-43, at 2). SEPTA employees, including Sauer, can be transferred "involuntarily" based on need, (Sauer Dep. 100:17–24), but O'Neal participated in the transfer process to ensure that Bennett would get the same salary, benefits and pension. (O'Neal Cert., ECF No. 15-47, at 3).

At the time, Cassandra West, the newly promoted assistant COO of Customized Community Transportation (CCT), needed an administrative assistant. (West Dep. 89:15–20, ECF No. 15-45). So in March 2023, Bennett was transferred to work under West, a position Bennett did not apply for and considered "less desired." (Bennett Decl. ¶ 28). Bennett was paid at her existing grade 36, though she thought it should be compensated at a higher grade because employees who had done similar work were paid at higher levels. (Bennett Mar. 9 email to Keyes, ECF No. 16-8, at 73). But Bennett testified she did not even know what grade 38 responsibilities entailed, (Bennett Dep. 199:4–12), and West said that Bennett does not perform any grade 38 duties. (West Dep. 89:4–10). Bennett's hours also changed from 6:00 a.m. to 2:30 p.m. to 7:00 a.m. to 4:30 pm (if she took a lunch break). (Bennett Decl. ¶ 31). Bennett lost her telework privileges, as West ended telework for CCT employees in

11

February 2023, except for those with an ADA accommodation. (West Dep. 17:11–24). Bennett's new work area—right outside West's door—was an enclosed cubicle that was in "disarray" and Bennett had to clean it herself. (Bennett Dep. 170:6–10); (Bennett Decl. ¶ 36); (Resp. To Mot. For Summ. J., ECF No. 16, at 25). Keyes, who accompanied Bennett to the meeting where she was informed of the transfer, described the move as "retaliation." (Bennett Dep. 165:14).

## F

In April 2023, Bennett filed this lawsuit, alleging intentional race discrimination, hostile work environment based on race[2] and retaliation claims under Title VII and the PHRA. (Am. Compl., ECF No. 3). SEPTA moved for summary judgment, and the Court held oral argument on January 16, 2024. (ECF No. 21). A day later, Bennett filed a motion for relief pursuant to Federal Rule of Civil Procedure 56(d), asking the Court to (1) delay deciding the motion until SEPTA produced Medernach's compensation and employment records, and (2) consider as part of the record an application for accommodations under the ADA Bennett's filed December 6, 2023—after discovery had ended and SEPTA moved for summary judgment. (ECF No. 25).

---

[2]     Bennett does not assert hostile work environment claims as separate counts in her amended complaint; rather, she mentions them as part of her intentional discrimination claims. (ECF No. 3, ¶¶ 34, 40). A plaintiff is the "master of her complaint," and Bennett may not defeat summary judgment by asserting a claim she did not include in her complaint. *Summy-Long v. Pa. State Univ.,* 226 F. Supp. 3d 371, 387–88 (M.D. Pa. 2016), *aff'd,* 715 F. App'x 179 (3d Cir. 2017). In any event, the amended complaint includes factual allegations supporting such a claim, SEPTA addressed it in its reply and both sides argued the issue during oral argument. (Jan. 16, 2024 H'rg Tr. 2:10–3:19, ECF No. 23). As such, the Court will consider the claim on the merits.

12

II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and

13

inferences in the light most favorable to the non–moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

<center>III</center>

Bennett contends that she was subject to intentional race discrimination under Title VII and the PHRA.[3] She contends specifically that she: (1) had her Fiscal Year 2021 merit increase reduced from 4.5% to 3.5% while Medernach, a white administrative assistant, did not; (2) she received a 3% merit increase in January 2022, but white men who held senior positions received higher raises; and (3) she was involuntarily transferred in March 2023 to a less desirable position, but other white administrative assistants were not.

The Court's inquiry is governed by the burden shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Under this analysis, the plaintiff must first carry the initial burden of establishing a *prima facie* case of discrimination, meaning: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

---

[3]     Bennett's Title VII and PHRA discrimination claims are analyzed under the same framework and the Court considers them together. *Rosencrans v. Quixote Enters.*, 755 F. App'x 139, 141 (3d Cir. 2018) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

<center>14</center>

If the plaintiff succeeds in establishing the *prima facie* case, the burden shifts to

the defendant "to articulate some legitimate, non-discriminatory reason for the

employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. The defendant satisfies

this burden "by introducing evidence, which, taken as true, would permit the conclusion

that there was a non-discriminatory reason for the unfavorable [action]." *Branch v.*

*Temple University*, 554 F. Supp.3d 642, 649 (E.D. Pa. 2021) (internal quotation marks

omitted). The defendant does not need to prove the offered reason was the actual

reason for its decision. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir.

2010).

If the defendant articulates a legitimate, non-discriminatory reason, the burden

shifts back to the plaintiff to prove by a preponderance of the evidence that the

legitimate reason offered by the defendant is mere pretext. *Fuentes v. Perskie*, 32 F.3d

759, 764 (3d Cir. 1994). A plaintiff can show pretext by pointing to "some evidence,

direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve

the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of

the employer's action." *Id.* at 764–65. "The plaintiff cannot simply show the employer's

decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise,

shrewd, prudent or competent." *Jones v. School Dist. of Phila.*, 198 F.3d 403, 413 (3d

Cir. 1999). Instead, the plaintiff "must demonstrate such weakness, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fennell v. Comcast Cable Communications Management, LLC*, 628 F. Supp.3d 554, 580 (E.D. Pa. 2022) (quoting *Fuentes* 32 F.3d at 765).

<div align="center">A</div>

Beginning with the reduced merit increase for Fiscal Year 2021, SEPTA contends that Bennett fails to establish her *prima facie* case because she did not suffer an adverse employment action, and even if she did, it was not done under an inference of discrimination.

<div align="center">1</div>

The Third Circuit Court of Appeals has not stated definitely that an employee suffers an adverse employment action when a proposed, though not yet implemented, merit increase is reduced. But on this record, coupled with holdings from other circuits and non-precedential Third Circuit decisions, that is likely the case here.

An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015). SEPTA argues that Bennett did not suffer an adverse action because the proposed merit increase was discretionary, not an entitlement and never finalized. Therefore, the reduction was not an adverse action, especially given a less than expected merit increase is not an adverse employment action. *See EEOC v. Wyeth Pharmaceutical*, No. 03-2967, 2004 WL 503417, at *2 n.3 (E.D. Pa. 2004).

<div align="center">16</div>

However, Sauer's discretion to reduce Bennett's merit increase does not necessarily preclude a reasonable juror from finding an adverse employment action. *See Sala v. Hawk*, 481 F. App'x 729, 732 (3d Cir. 2012). Bennett's Fiscal Year 2021 merit increase was not simply less than expected. Her direct supervisor recommended it based on how he reviewed her 2020 performance. Sauer, who neither supervised nor reviewed Bennett, then cut it back. Sauer's decision was arguably akin to the denial of a performance based, discretionary bonus, which can constitute an adverse employment action.[4] *See Davis v. New York City Dept. of Educ.*, 804 F.3d 231, 236 (2d Cir. 2015) (holding that the district court erred in ruling that a denial or reduction of a bonus could not constitute an adverse employment action solely because the employer had discretion to pay a bonus); *Russell v. Principi*, 257 F.3d 815 (D.C. Cir. 2001) (holding that a negative evaluation which resulted in the denial of a purely discretionary bonus was an adverse employment action).

2

Bennett's discrimination claim fails because there is no record evidence indicating Sauer's decision to reduce Bennett's proposed 2021 merit increase had anything to do with her race. Bennett cites no direct evidence of racial discrimination and pins her entire argument on her assertion that Medernach, another white administrative assistant, was treated differently. (Resp. To Mot. For. Summ. J., at 8–10); (Jan. 16 H'rg Tr. 51:24–52:3, ECF No. 23).

---

[4]     SEPTA's reliance on *Tucker v. Merck & Co., Inc.*, 131 F. App'x 852, 857 (3d Cir. 2005), is unpersuasive because the Third Circuit decided *Sala* seven years later and cited *Russell* with approval for the proposition that the "denial of a purely discretionary bonus constituted an adverse employment action." *Sala,* 481 F. App'x at 732.

17

To show an inference of discrimination, plaintiffs may introduce evidence that comparators—similarly situated employees who are not members of the same protected class—were treated more favorably under similar circumstances. *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp.3d 571, 589 (E.D. Pa. 2017). "Similarly situated" does not mean identically situated, but the plaintiff must nonetheless be similar in "all relevant respects." *Collins*, 247 F. Supp.3d 571, 589 (E.D. Pa. 2017) (citing *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009)). This requires a showing that the relevant aspects of the plaintiff's employment situation are "nearly identical" to those of the co-workers that the plaintiff alleges were treated more favorably. *Id.* (citing *Hobson v. St. Luke's Hosp. & Health Network*, 735 F. Supp.2d 206, 214 (E.D. Pa. 2010)). Thus, showing that employees are similarly situated includes "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik*, 335 F. App'x at 223. A plaintiff must show the other employee's acts were of "comparable seriousness" to her own infraction. *See Anderson v. Haverford College,* 868 F. Supp. 741, 745 (E.D. Pa. 1994). The relevancy of certain facts or circumstances for the purposes of the "similarly-situated" analysis is determined by the context of each case. *Collins*, 247 F. Supp.3d at 590.

Bennett claims that Medernach, a white Administrative Assistant II who did not have her proposed 4.5% merit increase reduced by Sauer, is a valid comparator. (Resp. To Mot. For Summ. J., at 8–9.) But Bennett failed to adduce any evidence to support that assertion. Bennett's belief that Medernach received a 4.5% raise for Fiscal Year

18

2021 is based on "rumors" and "her talking about it."[5]  (Bennett Dep. 142:23–143:7).

Bennett cannot claim Medernach is similar to her in "all relevant respects" because

there is nothing in the record which shows, *inter alia*, how Medernach was rated in her

annual reviews, what her proposed 2021 merit increase was and whether or not she

received the proposed increase.  Bennett hangs her hat on nothing more than rumors,

assumptions and speculations, none of which create questions of fact for a jury.[6]

---

[5]      As an initial matter, this is hearsay, and "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."  *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).  However, "hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*."  *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 239 (3d Cir. 2016) (emphasis in original).  Medernach was not among the ten people Bennett chose to depose, nor did Bennett move to compel discovery related to her compensation records.  Nothing in the record indicates whether Medernach could or would testify at trial.  *See, e.g., Tomaszewski v. City of Phila.,* 460 F. Supp.3d 577, 596 (E.D. Pa. 2020).  11 James Wm. Moore et al., *Moore's Federal Practice* § 56.91 (2023) ("Depending on the circumstances, the failure to secure sworn statements at the summary-judgment stage—or to confirm that the witnesses can and will testify as expected later—can significantly undercut the claim that the statements actually can be presented in an admissible form at trial.").

[6]      During discovery, Bennett sought from SEPTA "[c]omplete employment records, including but not limited to, performance evaluation records, payroll records, attendance records, compensation records of Mariellen Medernach."  (Def's Resp. To Pl's Req. For Docs., at 17).  SEPTA objected to the request claiming it was "ambiguous, vague, overbroad, and/or unduly burdensome" and sought "information/documentation which is protected by the attorney-client privilege and/or work product doctrine."  (*Id.*)

Bennett never sought the Court's intervention or moved to compel the production of those documents.  A defendant's failure to produce documents related to the plaintiff's claim is properly raised in the context of a motion to compel, not as a defense to summary judgment.  *See Finizie v. Peake*, 548 F. Supp.2d 171, 179 (E.D. Pa. 2008).

Bennett's motion for relief pursuant to Federal Rule of Civil Procedure 56(d) does not help her, either.  Under that rule:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1)  Defer considering the motion or deny it;
> (2)  Allow time to obtain affidavits or declarations or to take discovery; or
> (3)  Issue any other appropriate order.

Federal Rule of Civil Procedure 56(d).  "A request for relief under [Rule 56(d)] is extremely unlikely to succeed when the party seeking delay has failed to take advantage of discovery."  *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir. 1986).  And while Rule 56(d), which protects parties opposing

Without any evidence to show that Medernach is a valid comparator, and because inferences of race discrimination cannot arise from "speculations, generalities and gut feelings, however genuine," *Paradoa v. Phila. Hous. Auth.*, 610 F. App'x 163, 166 (3d Cir. 2015) (internal quotation marks omitted), Bennett fails to establish her *prima facie* case.

3

Even if Bennett could make out a *prima facie* case, Defendants articulated a legitimate, non-discriminatory reason for Sauer's decision to change Bennett's merit increase and there is nothing in the record to indicate that reason was a pretext for racial discrimination. All merit increases must be approved by each division general manager, the finance department and the general manager before they are finalized, and thus "managers are instructed not to divulge 'proposed' or 'preliminary' increase amounts." (SAM FY 2021 Merit Increase, ECF No. 15-20, at 2). Pursuant to this policy, Sauer changed Bennett's merit increase—before it was finalized—to come under budget, which he had discretion to do every year, apparently at random, for as many as 100 SEPTA employees of "all different races, all different genders, all different pay grades and levels." (Sauer Dep. 30:17–23, 102:6–103:3).

---

summary judgment when, *for valid reasons,* they cannot present facts essential to justify their opposition to the motion, the rule is not intended to reward parties who have been "lazy or dilatory." *See* 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Fed. Prac. & Proc. § 2740 (4th ed. 2023) (emphasis added).

Bennett filed her 56(d) declaration nearly three months after fact discovery closed, two months after SEPTA filed its motion for summary judgment and the day after the Court held oral argument on the pending motion—after counsel perhaps began to realize his case's shortcomings. Here, counsel failed to use mechanisms available during discovery. *See, e.g., Banks v. City of Phila.*, 309 F.R.D. 287, 293 n.3 (E.D. Pa. Aug. 14, 2015) ("[T]he rule is not intended to protect those who have had an opportunity to complete discovery, but failed to do so by their own lack of diligence.").

20

Rather than point to any evidence which could demonstrate any inconsistencies, weaknesses or contradictions with respect to the reason for the reduction, *Fuentes,* 32 F.3d at 764–65, Bennett complains, belatedly, that Medernach's compensation records were not produced and contends that Sauer's budgetary reasons are simply a "new explanation" provided for the first time during litigation. (Resp. To Mot. For Summ. J., at 27). Bennett's argument and reliance on *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004), is unpersuasive. In *Ridge*, the court noted a logical impossibility in the employer's proffered explanation that the "best qualified" candidate was selected because the candidate who was ultimately chosen was not under consideration at the time the plaintiff was rejected. *Id*. at 318. This indicated the employer's explanation "*could not have motivated* the employer" at the time the decision was made. *Id*. (emphasis in original). Here, Sauer said he adjusts, for budgetary reasons, the proposed merit increases for many employees every year, and nothing in the record calls that explanation into question.

### B

Bennett next contends that the 3% salary increase she received for Fiscal Year 2022—higher than her 2015, 2017, 2018 and 2019 raises and .5% less than her increase for 2021—was discriminatory because Mike Civera and Ed Carruthers, white men with positions senior to Bennett's, received "Exceeds Expectations" reviews and higher increases.[7]

---

[7]    Similar to Medernach's alleged merit increase, Bennett's assertion as to Civera and Carruthers's increases is based on "rumors." (Bennett Dep. 276:20–277:13).

Unlike her Fiscal Year 2021 increase, there is no evidence the Fiscal Year 2022 increase was reduced or a recommendation was denied, and the receipt of a less than expected merit increase is not an adverse employment action.[8]  *See Tourtellotte v. Eli Lilly and Co.*, 636 F. App'x 831, 845 (3d Cir. 2016).  Even if getting a smaller raise than she wanted or expected could constitute an adverse employment action, Bennett fails to show how it occurred under an inference of discrimination.  Again, without pointing to any direct evidence of discrimination and relying on the rumor mill, Bennett cites Civera and Carruthers as "comparators."  But comparators must be similar in "all relevant respects." *Collins*, 247 F. Supp.3d at 589.  Civera and Carruthers had different jobs than Bennett: Civera is currently a Program Manager for SEPTA's Zero Emission Bus Transmission and was previously the Senior Director of Maintenance in the Southern Division; Carruthers was a director.  (Civera Dep. 6:16–24); (Bennett Jan. 12 email to Deiger, at 42).  Although Bennett claims that, like Civera and Carruthers, she also performed two jobs during 2021, they are not valid comparators because they had different job duties and responsibilities.

And even if Bennett established her *prima facie* case, there is a legitimate, non-discriminatory reason SEPTA gave her the 3% increase for 2022.  Bennett was out on sick leave throughout the fall of 2021, which was when the merit consideration process occurred.  As such, according to SEPTA policy, Bennett received the average percentage for employees with a "Meets Expectations" rating.  (Deiger Dep. 37:11–22, ECF No. 16-5).

---

[8]      In a footnote, *Tourtellotte* did not rule out the possibility that in the retaliation context—as opposed to a discrimination claim—the receipt of a less than expected merit increase "could rise to the level of an adverse employment action."  636 F. App'x at 845 n.26.

In response, Bennett contends that Stephanie Deiger, the Chief Human Resource Officer, and James Fox, an Assistant General Manager, both used more sick time than she did and yet received higher merit increases. (EEOC Rebuttal Letter, ECF No. 16-7, at 53). Even if Bennett's speculation amount their amount of sick leave is correct, there is no evidence as to what Deiger and Fox's increases actually were, and, in any event, both held more senior positions than Bennett, making them invalid comparators. Bennett must do more than argue SEPTA's decision was "wrong or mistaken." *Fuentes*, 32 F.3d at 765. Because she offers no evidence of inconsistencies, implausibilities or contradictions, no reasonable juror could find SEPTA's reason for the 3% merit increase unworthy of credence. *Id.*

### C

Finally, SEPTA contends that Bennett fails to establish her *prima facie* case for alleged racial discrimination pertaining to her March 2023 transfer to CCT because it was not an adverse action. And even if it was, there is nothing to suggest the move was related to Bennett's race. SEPTA also proffers a legitimate, non-discriminatory reason for the transfer and Bennett cannot show pretext.

### 1

An adverse employment action is one that affects the compensation, terms, conditions or privileges of employment, *Jones*, 796 F.3d at 326, and transfers may establish the third element of a *prima facie* race discrimination claim where the new position is shown to be detrimental or undesirable in an objective way. *Jones*, 198 F.3d at 411–12. While the transfer did not affect Bennett's pay or pension, she generally

viewed the CCT position as less desired, her hours changed and her telework privileges—which had previously been granted and were set to expire in 2025—ended. (Bennett Decl. ¶ 34). As such, reasonable jurors could find she suffered a tangible change to the terms and conditions of her employment. *See Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994) ([T]ransfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse [employment] action.").

<div align="center">2</div>

Bennett fails, however, to show how the March 2023 transfer occurred under the inference of discrimination. Bennett contends, relying again solely on comparator evidence, that Medernach, Michelle Fisher, Julia McCauley, Eleanor Stinger, Nancy Granozio-Mazzuca, Janet Looby, and Lynn Rohr, all white administrative assistants with less seniority in the Operations Division under Sauer's chain of command were not involuntarily removed from their positions and reassigned to CCT. (Bennett Decl. ¶ 32). But all these alleged comparators—at least as of April 2021—reported to different managers.[9] Medernach reported to Josh Gottlieb, Fisher reported to Kate O'Connor, McCauley reported to Kim Kennedy and Chrystalle Cooper, Granozio-Mazzuca reported to Leonard Nardone and Jack McElwee, Looby reported to Kevin O'Brien, Rohr reported to Nick Grieshaber and Martha Behan. (Administrative Assistants Phone List, ECF No. 16-8, at 7–8). The record does not indicate who Eleanor Stinger reported to, but at least as of April 2021, it was not Brennan. (*Id.*)

---

[9]    The record does not indicate if they any of these women have since changed positions, but at the very least, they did not work for Brennan at the time he went out on sick leave in June 2021.

<div align="center">24</div>

Moreover, there is no evidence these alleged comparators were similarly unsupervised. When Brennan left, Bennett was temporarily supervised by Civera and McAnulla, but then permanently reported to Sauer, who already had an administrative assistant. Given the nature of her position, there is not much she can do without a manager directly supervising her. (Sauer Nov. 21 email, ECF No. 15-41, at 2). With different managers and different circumstances, they are not similar in "all relevant respects" and thus not valid comparators. *Collins,* 247 F. Supp.3d at 589. Without any other evidence, no reasonable juror could find Bennett's March 2023 transfer had anything to do with her race.

3

Even if Bennett established the *prima facie* case for intentional race discrimination regarding her March 2023 transfer, SEPTA offered a legitimate, non-discriminatory reason for the move. Bennett's previous position under Brennan "did not exist anymore," and Bennett worked without a direct manager for over a year. (Sauer Dep. 60:1–21). Sauer said he had "no need for a second AA and it's not fair to Deborah to continue having her work with little to no direction. She's completing her routine work but there's really nothing else for her to do without a manager directly supervising her." (Sauer Nov. 21 email, ECF No. 15-41, at 2). A few months later, Sauer reiterated this belief to Carol O'Neal, Thomas Comber and Stephanie Deiger, where he said Bennett "needs to be relocated to another management center. Her supervisor's position is eliminated. I don't want to let another year go by where she's working unsupervised." (Sauer Feb. 1 email, ECF No. 15-43, at 2). Soon thereafter,

25

Bennett was transferred to CCT to work under West, who needed an administrative assistant.

Bennett contends that SEPTA's stated reason for the transfer is pretextual because after SEPTA reorganized departments and combined Vehicle Maintenance and Vehicle Engineering to form the Railroad, Engineering, Equipment and Maintenance Department, Sachit Kakkar took over as the Deputy Chief Operation Officer and hired Lauren Guinan as his administrative assistant in August 2023. (Bennett Decl. ¶ 35). Bennett claims that Guinan's position is the one she occupied before being transferred to CCT and says she could have been the administrative assistant for Kakkar and worked her old hours with telework privileges. (Bennett Decl. ¶ 35).[10]

Again, however, the record is at odds with whichever of Bennett's shifting positions she wishes to rely on. Bennett's old position did not exist—she did not have a direct manager since Brennan left and the Vehicle Equipment Maintenance Department, where she formerly worked, no longer existed in its previous form.[11] (Sauer Dep. 60:4:21); (O'Neal Dep. 19:7–11, ECF No. 16-5). Showing pretext is a "difficult burden" that Bennett has not met, as she has failed to demonstrate any weaknesses, implausibilities or inconsistencies in SEPTA's proffered reason for the transfer. *Fuentes*, 32 F.3d at 765.

---

[10]   Bennett executed her declaration over a month after her deposition and a week and a half after SEPTA filed its motion for summary judgment. "A plaintiff cannot avoid summary judgment by simply relying upon a self-authored declaration that relies not on evidence, but on the plaintiff's own interpretation of events and, essentially, opinion testimony." *See Njos v. United States*, No. 15-0931, 2017 WL 6949812, at *4 (M.D. Pa. 2017).

[11]   Guinan was hired in August 2023, five months after Bennett's transfer to CCT. The position was posted, the hiring process was competitive and Bennett apparently did not apply. (Sauer Decl., ECF No. 17-1, at 2).

IV

Bennett also contends she was subjected to a hostile work environment based on race because Sauer "berated her, falsely accused [her] of overcharging, and stealing overtime hours, and belittled and embarrassed [her]." (Resp. To Mot. For Summ. J., at 13–14). Bennett contends that Sauer treated her "like a child," and did not treat any of the white employees in the same way. (*Id.* at 14, 17).

To succeed on her claim, Bennett must show that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) *respondeat superior* liability exists.[12] *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990), *superseded in part by statute as recognized in Moody v. Atl. City Bd. Of Educ.*, 870 F.3d 206 (3d Cir. 2017). Factors which may indicate a hostile work environment include: "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

---

[12]     Hostile work environment claims pursuant to Title VII and the PHRA involve the same analysis. *See, e.g., LaRochelle v. Wilmac Corp.,* 769 F. App'x 57, 61 (3d Cir. 2019).

A

Bennett's hostile work environment claim fails for the same reason her discrimination claim fails—nothing in the record shows she was subject to intentional racial discrimination.

Bennett baldly asserts that other white, female workers were not treated the same way by Sauer, (Jan. 16, 2024 H'rg Tr. 63:11–14), but the record does not corroborate that assertion.[13] In a contradiction fatal to her claim, Bennett testified that everyone—regardless of race—was bullied by Sauer, including white men Dennis McAnulla, Mike Civera and Rob Zigler. (Bennett Dep. 149:2–150:21); (Bennett Oct. 8 email, ECF No. 16-7, at 17).

More to the point, Bennett did not think Sauer confronted her based on any racial animus. Prior to filing her internal EEO complaint, Bennett said she felt she was "subject to an atmosphere of workplace harassment and intimidation from Scott Sauer . . . as a result of the ongoing conflict between himself and my supervisor, Joseph Brennan[.]" (Bennett July 1 email to Hopkins, ECF No. 16-6, at 12). She continued: "I

---

[13] As an initial matter, it is unclear who Bennett is referring to as "all the other female and Caucasian employees in the department that [Sauer] . . . did not yell at." (Jan. 16, 2024 H'rg Tr. 63:19–23). If Bennett is referring to Trayia Hill, Jessica Herman and Leslie Moore, Bennett did not show any of them were valid compactors. In fact, Hill and Moore are also black. (SDMF, ¶ 35, ECF No. 16–1). And if the purported comparators are Medernach, Michelle Fisher, Julia McCauley, Eleanor Stinger, Nancy Granozio–Mazzuca, Janet Lobby and Lynn Richard, Bennett refers to them in the context of not being involuntarily removed from their positions and reassigned to CCT. As of April 2021, only Medernach and McCauley worked in Operations. (Administrative Assistants Phone List, ECF No. 16-8, at 8). More importantly, there is no evidence they were engaged in similar conduct as Bennett, namely, logging significant overtime hours. (Bennett Decl. ¶ 32); *Anderson*, 868 F. Supp. at 745. Finally, if she is referring to Alexanna Cruz or Leonides Ramos, (EEOC Rebuttal Letter, ECF No. 16-7, at 53), she only mentions them in the context of covering her work while she was on sick leave, and the record does not indicate who they reported to or whether they were also engaged in similar conduct as Bennett.

believe AGM Scott Sauer has had a dislike for me since February 29, 2020 Ambassador duty for the Philadelphia Flower Show," and she concluded the letter by saying, "The incidents with the Overtime, Flower Show, and Merit Decrease have felt like I have been hit with multiple punches that are directed at me as a result with AGM Sauer's conflict with Joseph Brennan." (*Id.* at 13). In her EEO complaint, she attributed the incident to "collateral damage for my supervisor Joseph Brennan, harassment & retaliation for flower show." (July 6 EEO Complaint, ECF No. 16-6, at 18). The Court cannot recall a claim of racial discrimination or hostile work environment based on race where the plaintiff's stated reasons for the defendant's conduct had nothing to do with race.

## B

Even if Bennett did face intentional discrimination, it was neither severe nor pervasive enough to constitute a hostile work environment. Severe or pervasive behavior "alter[s] the conditions of employment and create[s] an 'abusive working environment.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are inadequate. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Hardly "altering the conditions of employment," the alleged discrimination could not have been pervasive because Bennett had little, if any, contact with Sauer after the June 22 meeting. Bennett said, "I never see him" after she returned from her sick leave in December 2021 through March 2023. (Bennett Dep. 156:9–15). Sauer said, "[a]side

from a few emails from Deborah requesting time off, I haven't really had much interaction with her."  (Sauer Nov. 21 email, ECF No. 15-41, at 2).

Moreover, Bennett's allegation that Sauer yelled at her pales in comparison to other conduct that courts have *still* found insufficiently severe to create an abusive work environment.  *Compare LaRochelle v. Wilmac Corp.,* 210 F. Supp. 3d 658, 694 (E.D. Pa. 2016), *aff'd,* 769 F. App'x 57 (3d Cir. 2019) (holding actions were not sufficiently severe or pervasive where a co-worker refused to work with plaintiff because of her nationality and the way she spoke English, another co-worker called her a "stupid immigrant" and "bitch" and said all aliens should return to their countries, and the manager tolerated these comments, assigned plaintiff the more difficult assignments and accused plaintiff of faking injuries); *Harbor Bar & Brasserie Restaurant*, 386 F. App'x. 352, 354 (3d Cir.2010) (finding reference to the plaintiff as a "Haitian F—k," while "unpalatable and inappropriate," was not sufficiently severe or pervasive to support a hostile work environment claim); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607–11 (E.D. Pa. 2001) (granting summary judgment for employer on a hostile work environment claim where supervisor made racist comments, including calling the black community a "baby factory," saying blacks were incapable of thinking analytically, and warning the plaintiff, who was black, not to talk to white women).

## V

Finally, Bennett brings retaliation claims under Title VII and the PHRA. Bennett contends she engaged in numerous instances of protected activity, and as a result, suffered multiple adverse employment actions.  To establish a *prima facie* case for retaliation, Bennett must prove: (1) she engaged in protected activity; (2) she

suffered an adverse employment action; and (3) causal connection between the protected activity and the adverse employment action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

If Bennett establishes the *prima facie* case, the burden shifts to SEPTA to advance a legitimate, non-discriminatory reason for its conduct; if it does so, Bennett must be able to convince the factfinder both that the proffered explanation was false, and that retaliation was the real reason for the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). While Bennett must ultimately "prove that retaliatory animus was the 'but-for' cause of the adverse employment action," in proving the *prima facie* case, she only "must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action.'" *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 258 (3d Cir. 2017).

## A

SEPTA first contends that Bennett fails to establish the *prima facie* case because she never engaged in protected activity; Bennett points to six specific instances of her doing so: (1) her July 6, 2021 internal EEO complaint; (2) the October 8, 2021 complaint to Oduok that the SEPTA EEO investigation was biased; (3) her November 5, 2021 complaint to the PHRC; (4) the January 4, 2022 email to Stephanie Deiger stating she had not received a merit increase; (5) her January 12, 2022 complaint to Deiger about

31

her 3% merit increase; and (6) her March 25, 2022 EEOC charge of race discrimination.[14]

Title VII prohibits discrimination against an employee because she "opposed . . . an unlawful employment practice . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. 2000e-3(a). "[T]he anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings ('the participation clause') and those who oppose discrimination made unlawful by Title VII ('the opposition clause')." *Moore*, 461 F.3d at 341.

"Protected activity" includes not only formal charges of discrimination, but also informal complaints of discrimination. *Id.* at 343. But an employee is entitled to statutory protection under Title VII and the PHRA only if the employee acts based on an objectively reasonable belief that the conduct alleged actually constituted an illegal form of discrimination. *See Toth v. California Univ. of Pennsylvania*, 844 F. Supp.2d 611 (W.D. Pa. 2012). If no reasonable person could have believed that the underlying incident complained about by an employee constituted unlawful discrimination, then the employee's complaint cannot be the basis for liability for retaliation. *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315 (3d Cir. 2008). "[W]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes

---

[14]     Though she does not mention it, Bennett's November 21, 2022 EEOC rebuttal letter could also constitute protected activity and the Court considers that as well. *See, e.g., Mentor v. Hillside Bd. of Educ.*, No. 08-1173, 2009 WL 2413636, at *5 (D.N.J. Aug. 5, 2009).

32

Appx00036

the employee's opposition to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009).

All of Bennett's alleged protected activities were either formal charges of discrimination or informal protests of discriminatory practices communicated to management. The July 6, 2021 internal EEO complaint, November 5, 2021 PHRA complaint and March 2022 EEOC complaint are based on the belief Sauer discriminated against her by reducing her merit increase but not Medernach's. Bennett's October 8, January 4 and January 12 emails constituted informal protests stemming from her participation in protected activity or new protests of discriminatory conduct. The October 8, 2021 email to Oduok pertains to her involvement and participation in the internal investigation into the allegations in the July 6 complaint. On January 4, 2022, Bennett complained about not receiving her merit increase and noted that "based on the discriminatory, retaliatory and biased treatment that I have endured at the hands of AGM Scott Sauer," she did not trust him to give her a fair merit increase for that year. (Bennett Jan. 4 email to Deiger, ECF No. 16-7, at 34). And on January 12, Bennett disagreed with her 3% merit increase, noting that other white men received higher performance evaluations than her. (Bennett Jan. 12 email to Deiger, ECF No. 16-7, at 42). A reasonable juror could find Bennett had an objectively reasonable belief that discriminatory conduct had occurred when she heard "rumors" that another white administrative assistant did not have her 4.5% merit increase reduced, or that other white men received a better review than her for performing two jobs, even if such conduct did not actually violate Title VII. *See, e.g., Mitchell v. Miller*, 884 F. Supp.2d 334, 378 (W.D. Pa. 2012).

33

B

SEPTA next contends that Bennett did not suffer any adverse employment actions relating to her retaliation claims. To satisfy the second prong of the *prima facie* case, Bennett must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it would have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Daniels,* 776 F.3d at 195. However, the action must be material, meaning more than just "petty slights, minor annoyances, and simple lack of good manners." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

Bennett contends the following events constituted adverse employment actions: (1) Sauer still wanted her to perform extra work without overtime pay in late July/early August 2021; (2) her 3% merit increase for Fiscal Year 2022 was delayed; and (3) she was involuntarily transferred to CCT, denied telework privileges, had her hours changed and was relegated to a messy office in March 2023.

1

Bennett claims that in late July/early August 2021, Sauer wanted her to continue doing additional duties without overtime. Imposing a higher workload, particularly when those responsibilities come without additional pay, could dissuade a reasonable worker from making or supporting a charge of discrimination and constitute an adverse employment action. *See Homel v. Centennial Sch. Dist.,* 836 F. Supp.2d 304, 324 (E.D. Pa. 2011).

Appx00038

However, the record shows that SEPTA was trying to reduce Bennett's workload, not add to it.[15]  Sauer met with Bennett to scale back her workload and overtime hours, (Sauer Dep. 55:9–21), and that is why Moore followed up with Bennett and asked if she could "help alleviate the load."  (Moore June 22 email to Bennett, ECF No. 15-29, at 2).  Indeed, Civera said that SEPTA was finding "ways to justify reducing the load of her work so she wouldn't have to be forced to work overtime."  (Civera Dep. 26:8–27:6).  For instance, Sauer wrote, "I offered Deborah assistance from Operations Admin in prioritizing her work.  She was told not to worry about mistakes that she was correcting from Desiree Saunders."  (Late July/Early August 2021 emails, ECF No. 16-6, at 25).  Dennis McAnulla told Bennett, "You no longer have to keep [COVID spreadsheets]," (*id.* at 29), as did Jessica Herman, "We don't need regular spreadsheets."  (*Id.* at 28).  Although Bennett felt there was "no consistency in what I'm supposed to be doing," (Bennett Aug. 12 email, ECF No. 16-6, at 30), McAnulla, Bennett's supervisor at the time, said:

> I told Deborah that until further notice that she couldn't work the overtime and I asked Deborah to start to justify and write down her daily job duties, what she was doing each day and the amount of work that she was performing each day so we can provide a justification to support the need for overtime.
>
> And at that point Deborah chose that she didn't want to work the overtime and she didn't I guess want to provide me the justification, so that was kind of the end of it.

---

[15]     But to the extent Bennett performed additional work, she received 16 overtime hours in August and 8.5 in September.  (Bennett Overtime Hours, ECF No 15-22, at 2).

(McAnulla Dep. 15:16–16:8). No reasonable juror could find that SEPTA's decision to eliminate unnecessary work and better manage Bennett's overtime hours would dissuade a reasonable worker from making or supporting a charge of discrimination.

Even if a genuine issue of fact remains as to whether the circumstances amounted to an adverse employment action, a reasonable juror would be unable to infer that Bennett's protected activity caused the reduced overtime and change in workload. Causation can be shown in various ways such as offering evidence of an inconsistent explanation for taking an adverse action, a pattern of antagonism, or temporal proximity that is "unusually suggestive of a retaliatory motive." *Carvalho-Grevious*, 851 F.3d at 260 (citing *Shaner v. Synthes*, 204 F.3d 494, 503 (3d Cir. 2000)). The record evidence, taken as a whole, may also suffice to show causation. *Id.*

Here, however, concerns about Bennett's overtime hours and work responsibilities predated her July 6 internal complaint, precluding Bennett from being able to show that her EEO complaint was the likely reason for the changes. *See* (Sauer Dep. 45:1–6); (Moore June 22 email to Bennett, ECF No. 15-29, at 2).

2

Next, Bennett alleges the delayed receipt of her 3% merit increase for Fiscal Year 2022 was retaliatory. A delay in receiving an annual salary increase, particularly one that was lower than the preceding year's, could dissuade a reasonable worker from making or supporting a charge of discrimination.[16] *See Johnson v. District of Columbia*,

---

[16]     Because the "adverse action" in retaliation claims is broader than the "adverse action" required for disparate treatment claims, a less than expected merit increase may be an adverse action in the retaliation context, unlike the disparate treatment context. *See Tourtellotte*, 636 F. App'x at 845 n.26.

36

947 F. Supp.2d 123, 135 (D.D.C. 2013) ("If a pay raise is considered objectively tangible, then by extension the denial or delay of a pay raise would be an objectively tangible harm."); *McQuilkin v. Delaware River Port Auth.*, No. 11-652, 2013 WL 5936983, at *15–17 (D.N.J. Nov. 6, 2013) (finding that delay in implementing a raise was an adverse action in the retaliation context).

But there is no record evidence to establish an inference that her protected activity was the likely reason for the delayed merit increase or the amount she eventually received. *See Carvalho-Grevious*, 851 F.3d at 258–59. Bennett's last protected activity before the salary increase kerfuffle was on November 5, 2021, and the record does not indicate when the Fiscal Year 2022 increases were supposed to take effect. This dooms her causation argument right off the bat. But even considering the prior year's timetable, Bennett cannot show temporal proximity. For Fiscal Year 2021, the merit plan was approved and effective on November 29, 2020, and the check date was December 18, 2020. (SAM FY 2021 Merit Increase, 15-20, at 1). Assuming similar timing for Fiscal Year 2022, Bennett's PHRC complaint was filed almost four weeks prior to the merit plan *potentially* being finalized and two months before she contacted Deiger, too long to be unduly suggestive and does not, on its own, establish causal connection. *Compare Blakney v. City of Phila.,* 559 F. App'x 183, 186 (3d Cir. 2014) ("We have found that a temporal proximity of two days is unusually suggestive of causation, but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive."); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding a period of three weeks not unusually suggestive on its own); *Kier v. F. Lackland &Sons, LLC*, 72 F. Supp.3d 597, 617 (E.D. Pa. 2014)

(observing that temporal proximity is measured in days, rather than weeks or months, to suggest causation without corroborative evidence), *with Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding two days unusually suggestive).

Moreover, no alleged pattern of intervening antagonism occurred between the PHRA complaint in early November and Bennett's email to Deiger on January 4, 2022. *Compare Woodson v. Scott Paper Corp.*, 109 F.3d 913, 920 (3d Cir. 1997). Bennett's purported pattern of antagonism is more akin to "interpersonal workplace strife" than the kind of antagonism recognized in this Circuit. *See Patel v. Shinseki*, 984 F. Supp.2d 461, 478 (W.D. Pa. 2013). By comparison, in *Robinson v. Se. Pa. Transp. Auth.*, the plaintiff, a SEPTA bus driver, filed a union grievance after a co-worker made a racially offensive comment and his supervisor became "verbally abusive" during the plaintiff's conversation about the alleged comment. 982 F.2d 892, 895 (3d Cir. 1993). After the plaintiff filed the union grievance, his relationship with his supervisors deteriorated. *Id.* Supervisors repeatedly disciplined him for minor matters, subjected him to a constant barrage of written and verbal warnings, miscalculated his points for absences from work, and generally tried to provoke him. *Id.* at 894–95.

In contrast, Bennett was never subject to discipline, verbal abuse or racially charged comments after she engaged in protected activity. Instead, her gripes are more akin to "petty intra-office squabbles" that do not suffice to establish causation. *See Martinez v. Rapidigm, Inc.,* 290 F. App'x 521, 526 (3d Cir. 2008). She was not "set up to fail," *Woodson*, 109 F.3d at 921, nor did Sauer, or any other employees, engage in a "witch hunt" to get rid of her. *See Branch*, 554 F. Supp.3d at 657. Bennett had been out on sick leave from September 9 until December 8, 2021. (Bennett Decl. ¶ 18).

38

When she returned to work, she only worked on Mondays until the end of the year. (Bennett Dec. 8 email to Herman, ECF No. 16-7, at 32). Even taking the record as a whole, since June 2021, SEPTA had been trying, for budgetary reasons, to reduce Bennett's overtime hours and workload. In short, no reasonable juror could infer that her protected activity caused a delay in her 2022 merit increase.

But even if Bennett established the *prima facie* case for retaliation, as discussed more fully *supra* subsection III.B, merit increases are contingent on performance reviews, and because Bennett had been on sick leave, she was not reviewed or included on the merit sheet. Still, she received a 3% merit increase in accordance with SEPTA policies, (Bennett Dep. 185:11–15, 200:8–22), and Bennett points to nothing in the record which could show that SEPTA's adherence to these policies was a pretext for retaliation.

3

Finally, Bennett contends that her involuntary transfer, change in hours, denial of telework privileges and messy office were retaliatory adverse employment actions. As discussed *supra* subsection III.C.1, Bennett's transfer, coupled with the other changes to the conditions of her employment, could dissuade a reasonable employee from making a report of discrimination. *See Jones*, 198 F.3d at 411–12 (3d Cir. 1999).

Where the temporal proximity between the protected activity and the adverse action is unusually suggestive, causation may be inferred. *See LeBoon v. Lancaster Jewish Cmty Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007). Bennett filed her EEOC charge in March 2022 and a rebuttal letter on November 21, 2022—the same day Sauer

39

Appx00043

first emailed O'Neal and Comber about transferring Bennett. *See* (Sauer Nov. 21 email, ECF No. 15-41, at 2). This timing is unusually suggestive of causation. *See, e.g., Jalil*, 873 F.2d at 708.

But SEPTA offered legitimate non-discriminatory reasons for the transfer and denial of telework privileges that Bennett has failed to show are pretextual. As discussed more fully *supra* subsection III.C.3, Sauer did not need a second administrative assistant and Bennett was working without a manager directly supervising her. (Sauer Nov. 21 email, ECF No. 15-41, at 2). Sauer even said, "I don't want another year to go by where she's working unsupervised," (Sauer Feb. 1 email, ECF No. 15-43, at 2), and Bennett failed to offer any evidence SEPTA "did not act for the [asserted] non-discriminatory reasons," *Fuentes,* 32 F.3d at 765, or that her protected activity was the but-for cause of the transfer.[17]

SEPTA also offered a legitimate, non-discriminatory reason for the denial of telework privileges, namely, that West changed the telework standards for all CCT employees in February 2023, prior to Bennett's arrival. In fact, she sent a memo about the change in late January 2023, over a month before Bennett was transferred. (West Dep. 17:11–19:16). The few employees who were still able to telework were allowed to

---

[17]     Keyes's apparent conclusory statement that "we all know this is retaliation" is inadmissible under Federal Rule of Evidence 701 because the jury would be in just as good a position to decide if the transfer was retaliation or not. Only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment. *See, e.g., Bender v. Norfolk Southern Corp.*, 994 F. Supp.2d 593, 600 (M.D. Pa. 2014). And in applying Rule 701(b) to testimony regarding an employer's motivations, courts have held that a "witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant was motivated by an impressible animus." *See Connearney v. Main Line Hospitals, Inc*., 2016 WL 6569326, at *4 (E.D. Pa. Nov. 4, 2016) (quoting *Hester v. BIC Corp*., 225 F.3d 178, 185 (2d Cir. 2000)).

do so because they had ADA accommodations—which Bennett did not.[18]  (*Id.* at 82:3–85:8).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.

---

[18]    There is no record evidence showing this reason is pretextual.  Months after West's deposition, SEPTA's motion for summary judgment and oral argument, Bennett filed a motion pursuant to Federal Rule of Civil Procedure 56(d) asking the Court to consider her December 6, 2023 application for ADA accommodations, which apparently remains pending.  (Mot. For Relief Pursuant to Rule 56(d), ECF No. 22, at 3–4).  Bennett contends her application is relevant to show pretext because another employee, Rhoshina Stewart, was immediately approved for telework while her ADA request was being processed, but Bennett did not get the same treatment.  (*Id.*)

     "Where the information sought is not relevant to the court's inquiry, a Rule 56(d) motion for discovery may be denied."  *In re Taylor*, 548 F. App'x 822, 825 (3d Cir. 2013) (citing *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 230 (3d Cir. 1987)).  Moreover, in a summary judgment motion, a fact is material if proof of its existence or nonexistence "might affect the outcome of the suit."  *Id.* (quoting *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012)).

     Bennett's proffered information about her recent, pending ADA accommodations application is not relevant to the Court's inquiry because West testified that employees in CCT who were allowed to telework had ADA accommodations, and because Bennett did not (and still does not) have ADA accommodations, she was not permitted to telework.  (West Dep. 82:3–85:8).  Therefore, it is irrelevant in attempting to establish pretext for a decision made many months prior if now, after discovery and the motion for summary judgment was filed, Bennett applied for an ADA accommodation.

**United States District Court**
**Eastern District of Pennsylvania (Philadelphia)**
**CIVIL DOCKET FOR CASE #: 2:23-cv-01271-GJP**

BENNETT v. SEPTA et al
Assigned to: DISTRICT JUDGE GERALD J. PAPPERT
Case in other court:  USCA FOR THE THIRD
                          CIRCUIT, 24-01376
Cause: 28:451 Employment Discrimination

Date Filed: 04/02/2023
Date Terminated: 02/02/2024
Jury Demand: None
Nature of Suit: 442 Civil Rights:
Employment
Jurisdiction: Federal Question

<u>**Plaintiff**</u>

**DEBORAH BENNETT**                    represented by    **JONATHAN J. SOBEL**
                                                        1500 WALNUT STREET
                                                        SUITE 2000
                                                        PHILADELPHIA, PA 19102
                                                        215-735-7535
                                                        Fax: 215-735-7539
                                                        Email: mate89@aol.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **OLUGBENGA O. ABIONA**
                                                        ABIONA LAW PLLC
                                                        121 SOUTH BROAD ST SUITE
                                                        1200
                                                        PHILADELPHIA, PA 19107
                                                        215-625-0330
                                                        Fax: 215-625-0159
                                                        Email: oluesq@aol.com
                                                        *ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**SEPTA**                              represented by    **GAETAN ALFANO**
                                                        PIETRAGALLO GORDON ALFANO
                                                        BOSICK & RASPANTI LLP
                                                        1818 MARKET STREET
                                                        SUITE 3402
                                                        PHILADELPHIA, PA 19103
                                                        215-320-6200

Fax: 215-981-0082
Email: gja@pietragallo.com
*ATTORNEY TO BE NOTICED*

**MARK T. SOTTILE**
Pietragallo Gordon Alfano Bosick
& Raspanti, LLP
1818 Market Street
Suite 3402
Philadelphia, PA 19103
215-320-6200
Email: mts@pietragallo.com
*ATTORNEY TO BE NOTICED*

**Megan Young**
Pietragallo Gordon, et al.
1818 Market Street
Suite 3402
Philadelphia, PA 19103
609-617-8134
Email: mey@pietragallo.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **SCOTT SAUER** | represented by | **GAETAN ALFANO**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **MARK T. SOTTILE**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Megan Young**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 04/02/2023 | 1 | COMPLAINT against SCOTT SAUER, SEPTA ( Filing fee $ 402 receipt number APAEDC-16600543.), filed by DEBORAH BENNETT.(ABIONA, OLUGBENGA) (Entered: 04/02/2023) |

| 04/04/2023 | 2 | Summons Issued as to SCOTT SAUER, SEPTA. (rf, ) (Entered: 04/04/2023) |
|---|---|---|
| 04/18/2023 | 3 | AMENDED COMPLAINT against SCOTT SAUER, SEPTA, filed by DEBORAH BENNETT.(ABIONA, OLUGBENGA) (Entered: 04/18/2023) |
| 04/18/2023 | 4 | Summons Issued as to SCOTT SAUER, SEPTA. (rf, ) (Entered: 04/18/2023) |
| 04/21/2023 | 5 | WAIVER OF SERVICE Returned Executed by DEBORAH BENNETT. SCOTT SAUER waiver sent on 4/18/2023, answer due 6/20/2023; SEPTA waiver sent on 4/18/2023, answer due 6/20/2023. (ABIONA, OLUGBENGA) (Entered: 04/21/2023) |
| 04/24/2023 | 6 | NOTICE of Appearance by GAETAN ALFANO on behalf of SCOTT SAUER, SEPTA with Certificate of Service (Attachments: # 1 Certificate of Service)(ALFANO, GAETAN) (Entered: 04/24/2023) |
| 04/24/2023 | 7 | NOTICE of Appearance by MARK T. SOTTILE on behalf of SCOTT SAUER, SEPTA with Certificate of Service (Attachments: # 1 Certificate of Service)(SOTTILE, MARK) (Entered: 04/24/2023) |
| 06/16/2023 | 8 | ANSWER to Complaint *And Affirmative Defenses* by SCOTT SAUER, SEPTA. (Attachments: # 1 Certificate of Service)(SOTTILE, MARK) (Entered: 06/16/2023) |
| 06/22/2023 | 9 | ORDER THAT PRETRIAL CONFERENCE SET FOR 7/26/2023 11:00 AM IN Telephone Conference. SIGNED BY HONORABLE GERALD J. PAPPERT ON 6/22/23. 6/22/23 ENTERED AND COPIES E-MAILED.(rf, ) (Entered: 06/22/2023) |
| 07/21/2023 | 10 | Report Of *Rule 26(f) (Joint)* by SCOTT SAUER, SEPTA. (SOTTILE, MARK) (Entered: 07/21/2023) |
| 07/26/2023 | 11 | ORDER THAT CASE IS REFERRED TO MAGISTRATE JUDGE HEY FOR SETTLEMENT; EXPERT DISCOVERY DUE BY 11/7/2023., MOTIONS DUE BY 11/21/2023., MOTION IN LIMINE DUE BY 1/23/2024., MOTION FOR SUMMARY JUDGMENT DUE BY 11/21/2023., FINAL PRETRIAL CONFERENCE SET FOR 2/7/2024 10:00 AM IN Courtroom 11A; PLAINTIFF PRETRIAL MEMO DUE BY 2/2/2024., DEFENDANT PRETRIAL MEMO DUE BY 2/2/2024., TRIAL DATE SET FOR 2/12/2024 09:30 AM IN Courtroom 11A; TRIAL DATE SET FOR 2/13/2024 09:30 AM IN Courtroom 11A; TRIAL DATE SET FOR 2/14/2024 09:30 AM IN Courtroom 11A. SIGNED BY HONORABLE GERALD J. PAPPERT ON |

| | | |
|---|---|---|
| | | 7/26/23. 7/26/23 ENTERED AND COPIES E-MAILED.(rf, ) (VACATED PER ORDER #25) Modified on 2/5/2024 (md). (Entered: 07/26/2023) |
| 07/26/2023 | 12 | Minute Entry for proceedings held before HONORABLE GERALD J. PAPPERT retrial Conference held on 7/26/23. (rf, ) (Entered: 07/26/2023) |
| 07/28/2023 | 13 | NOTICE re: Policies & Procedures regarding settlement proceedings (rf, ) (Entered: 07/31/2023) |
| 10/05/2023 | 14 | ORDER THAT REQUEST FOR 60 DAY EXTENSION IS DENIED. SIGNED BY HONORABLE GERALD J. PAPPERT ON 10/5/23. 10/5/23 ENTERED AND COPIES E-MAILED.(rf, ) (Entered: 10/05/2023) |
| 11/21/2023 | 15 | MOTION for Summary Judgment filed by SCOTT SAUER, SEPTA.Memorandum of Law, Statement of Material Facts and Certificate of Service. (Attachments: # 1 Text of Proposed Order, # 2Memorandum, # 3 Statement of Material Facts)(SOTTILE, MARK) Modified on 11/22/2023 (va). (Additional attachment(s) added on 11/22/2023: # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit O, # 19 Exhibit P, # 20 Exhibit Q, # 21 Exhibit R, # 22 Exhibit S, # 23 Exhibit T, # 24 Exhibit U, # 25 Exhibit V, # 26 Exhibit W, # 27 Exhibit X, # 28 Exhibit Y, # 29 Exhibit Z, # 30 Exhibit AA, # 31 Exhibit BB, # 32Exhibit CC, # 33 Exhibit DD, # 34 Exhibit EE, # 35 Exhibit FF, # 36 Exhibit GG, # 37 Exhibit HH, # 38 Exhibit II, # 39 Exhibit JJ, # 40 Exhibit KK, # 41 Exhibit LL, # 42 Exhibit MM, # 43 Exhibit NN, # 44 Exhibit OO, # 45 Exhibit PP, # 46 Exhibit QQ, # 47 Exhibit RR, # 48 Exhibit SS, # 49 Exhibit TT, # 50 Certificate of Service) (va). (Modified on 11/22/2023 as per Chambers.) (va). (Entered: 11/21/2023) |
| 12/05/2023 | 16 | RESPONSE in Opposition re 15 MOTION for Summary Judgment filed by DEBORAH BENNETT. (Attachments: # 1 Plaintiff's Statement of Disputed Material Facts, # 2 Plaintiff's Response to Defendants' Statement of Facts, # 3 Text of Proposed Order, # 4 Appendix Table of Contents, # 5 App.1-146, # 6 App.147-195, # 7 App.196-262, # 8 App.263-335, # 9 App.336-363)(ABIONA, OLUGBENGA) (Entered: 12/05/2023) |
| 12/12/2023 | 17 | REPLY to Response to Motion re 15 MOTION for Summary Judgment filed by SCOTT SAUER, SEPTA. (Attachments: # 1 Exhibit A |

| | | |
|---|---|---|
| | | - Certification of Scott Sauer, # 2 Certificate of Service)(SOTTILE, MARK) (Entered: 12/12/2023) |
| 12/19/2023 | 18 | NOTICE of Appearance by Megan Young on behalf of SCOTT SAUER, SEPTA with Certificate of Service(Young, Megan) (Entered: 12/19/2023) |
| 12/19/2023 | 19 | ORDER THAT MOTION HEARING SET FOR 1/11/2024 02:00 PM IN Courtroom 11A. SIGNED BY HONORABLE GERALD J. PAPPERT ON 12/19/23. 12/20/23 ENTERED AND COPIES E-MAILED.(rf, ) (Entered: 12/20/2023) |
| 01/03/2024 | 20 | ORDER THAT MOTION HEARING RESCHEDULED FOR 1/16/2024 02:30 PM IN Courtroom 11A. SIGNED BY HONORABLE GERALD J. PAPPERT ON 1/3/24. 1/3/24 ENTERED AND COPIES E-MAILED.(rf, ) (Entered: 01/03/2024) |
| 01/16/2024 | 21 | Minute Entry for proceedings held before HONORABLE GERALD J. PAPPERT Motion Hearing held on 1/16/24 re 15 MOTION for Summary Judgment filed by SCOTT SAUER, SEPTA Court Reporter: ESR. (rf, ) (Entered: 01/16/2024) |
| 01/17/2024 | 22 | MOTION for Relief *Pursuant to Rule 56(d)* filed by DEBORAH BENNETT.Declaration of Deborah Bennett. (Attachments: # 1 Declaration of Deborah Bennett, # 2 Exhibits A to E, # 3 Exhibit F, # 4 Exhibit P-54, # 5 Text of Proposed Order)(ABIONA, OLUGBENGA) (Entered: 01/17/2024) |
| 01/18/2024 | 23 | TRANSCRIPT of ORAL ARGUMENT ON MOTION FOR SUMMARY JUDGMENT held on 1/16/24, before Judge PAPPERT. Court Reporter/Transcriber JESSICA B. CAHILL, CER/CET-708, MAUKELE TRANSCRIBERS, LLC. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 2/8/2024. Redacted Transcript Deadline set for 2/20/2024. Release of Transcript Restriction set for 4/17/2024. (rf, ) (Entered: 01/19/2024) |
| 01/18/2024 | 24 | Notice of Filing of Official Transcript with Certificate of Service re 23 Transcript - PDF,, 1/18/24 Entered and Copies Emailed and Mailed.. (rf, ) (Entered: 01/19/2024) |
| 01/23/2024 | 25 | ORDER RE 22 MOTION for Relief *Pursuant to Rule 56(d)* filed by DEBORAH BENNETT RESPONSES DUE BY 1/26/2024. THE CURRENT |

| | | |
|---|---|---|
| | | SCHEDULING ORDER (DOC. 11) IS VACATED. SIGNED BY HONORABLE GERALD J. PAPPERT ON 1/23/24. 1/23/24 ENTERED AND COPIES E-MAILED.(rf, ) (Entered: 01/23/2024) |
| 01/25/2024 | 26 | RESPONSE in Opposition re 22 MOTION for Relief *Pursuant to Rule 56(d)* filed by SCOTT SAUER, SEPTA. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(SOTTILE, MARK) (Entered: 01/25/2024) |
| 02/02/2024 | 27 | MEMORANDUM AND/OR OPINION. SIGNED BY HONORABLE GERALD J. PAPPERT ON 2/2/24. 2/2/24 ENTERED AND COPIES E-MAILED.(rf, ) (Entered: 02/02/2024) |
| 02/02/2024 | 28 | MEMORANDUM AND ORDER THAT DEFENDANTS MOTION FOR SUMMARY JUDGMENT IS GRANTED AND JUDGMENT SHALL BE ENTERED IN FAVOR OF SCOTT SAUER AND SEPTA. PLAINTIFFS MOTION FOR RELIEF IS DENIED. CLERK OF COURT SHALL CLOSE THIS CASE. SIGNED BY HONORABLE GERALD J. PAPPERT ON 2/2/24. 2/2/24 ENTERED AND COPIES E-MAILED.(rf, ) (Entered: 02/02/2024) |
| 02/14/2024 | 29 | BILL OF COSTS by SCOTT SAUER, SEPTA. (Young, Megan) (Entered: 02/14/2024) |
| 02/27/2024 | 30 | NOTICE of Appearance by JONATHAN J. SOBEL on behalf of DEBORAH BENNETT with Certificate of Service(SOBEL, JONATHAN) (Entered: 02/27/2024) |
| 02/28/2024 | 31 | NOTICE OF APPEAL as to 27 Memorandum and/or Opinion, 28 Order (Memorandum and/or Opinion), by DEBORAH BENNETT. Filing fee $ 605, receipt number APAEDC-17293968. Copies to Judge, Clerk USCA, Appeals Clerk and (Attachments: # 1 Exhibit Order Granting Motion for Summary Judgment, # 2 Exhibit Opinion in Support of Granting Motion for Summary Judgment)(SOBEL, JONATHAN) (Entered: 02/28/2024) |
| 03/05/2024 | 32 | NOTICE of Docketing Record on Appeal from USCA re 31 Notice of Appeal (Credit Card Payment), filed by DEBORAH BENNETT. USCA Case Number 24-1376 (rf, ) (Entered: 03/05/2024) |