# COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

24-1376

_____

DEBORAH BENNETT

*Plaintiff/Appellant,*

v.

SEPTA and SCOTT SAUER

*Defendants/Appellees.*

_____

## BRIEF OF APPELLEES SEPTA AND SCOTT SAUER

_____

Appeal from the United States District Court for the Eastern District of
Pennsylvania, Pappert, J., Civil Action No. 23-1271(GJP)
Dated February 2, 2024

_____

Respectfully submitted by:

**PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP**

*/s/ Jesse A. Marra*
Gaetan J. Alfano, Esquire (32971)
Mark T. Sottile, Esquire (312555)
Jesse A. Marra, Esquire (333805)
1818 Market St., Ste. 3401
Philadelphia, PA 19103
(215) 320-6200 (telephone)
GJA@pietragallo.com
MTS@pietragallo.com
JM@pietragallo.com

Dated:  November 20, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................iv

COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW ...................1

COUNTERSTATEMENT OF THE CASE ...............................................................1

SUMMARY OF THE ARGUMENT ......................................................................10

ARGUMENT ........................................................................................................12

    A. The District Court Correctly Dismissed Bennett's Race
       Discrimination Claims under Title VII and the PHRA............................12

        1. The District Court correctly held that Bennett failed to
           make out a *prima facie* case of race discrimination.......................13

        2. The District Court correctly held that, even if Bennett
           established a *prima facie* case of race discrimination,
           nothing in the record shows Appellees' conduct was
           pretextual ...........................................................................................15

    B. The District Court Correctly Dismissed Bennett's Purported
       Hostile Work Environment Claims under Title VII and the
       PHRA...................................................................................................17

        1. Bennett's hostile work environment claims fail because
           nothing in the record shows she suffered intentional
           discrimination....................................................................................18

        2. Even if Bennett did face intentional discrimination,
           Bennett's hostile work environment claims would still
           fail because such discrimination was neither severe nor
           pervasive............................................................................................20

    C. The District Court Correctly Dismissed Benett's Retaliation
       Claims under Title VII and the PHRA ...................................................22

Page

1. Bennett's allegation that AGM Sauer wanted her to perform extra work without overtime pay cannot support a claim of retaliation .........................................................23

   a. The record shows that AGM Sauer was trying to reduce Bennett's workload, not add to it; Bennett did not engage in protected activity; and, even if Bennett did engage in protected activity, she cannot show causation .........................................................23

   b. Even if Bennett could set forth a *prima facie* case, Appellees had a legitimate, nondiscriminatory reason to reduce Bennett's excessive overtime, and nothing shows that reason was pretextual.........................................................27

2. Bennett's 3% merit increase for Fiscal Year 2021 cannot support a claim of retaliation.............................................28

   a. Bennett's Fiscal Year 2021 merit increase does not constitute an adverse employment action and, even if it did, no evidence shows that Bennett's protected activity had anything to do with the amount she received or when she received it.........................................................28

   b. Even if Bennett could establish a *prima facie* case of retaliation, SEPTA offered legitimate, nondiscriminatory reason reasons for the Fiscal year 2021 merit increase, and Bennett points to nothing that shows those reasons are pretextual.................30

3. Bennett's involuntary transfer and denial of telework privileges were not retaliatory, adverse employment actions.........................................................31

D. The District Court Correctly Denied Bennett's Untimely Fed. R. Civ. P. 56(d) Motion .........................................................33

Page

CONCLUSION ........................................................................36

CERTIFICATE OF COMPLIANCE ......................................37

CERTIFICATE OF SERVICE ...............................................38

## TABLE OF AUTHORITIES

Page

**Cases**

*Andrews v. City of Phila.*, 895 F.2d 1469 (3d Cir. 1990) ........................................18

*Banks v. City of Philadelphia*, 309 F.R.D. 287 (E.D. Pa. 2015) ............................34

*Bennett v. SEPTA*, No. CV 23-1271, 2024 WL 404959, at *1
  (E.D. Pa. Feb. 2, 2024 ....................................................12, 13, 17, 20, 21, 30

*Blakney v. City of Phila.*, 559 F. App'x 183 (3d Cir. 2014).....................................31

*Bumbarger v. New Enter. Stone and Lime Co., Inc.*,
  170 F. Supp. 3d 801 (W.D. Pa. 2016).......................................................................21

*Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181 (3d Cir. 2015).......................22, 27, 32

*Davis v. City of Newark*, 417 Fed. Appx. 201 (3d Cir. 2011) ..........................24, 25

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).............................................20

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994). ....................................12, 15, 16, 32

*Harbor Bar & Brasserie Restaurant*, 386 F. App'x. 352 (3d Cir. 2010)................21

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ....................................................18

*Hernandez v. EHC Associates, Inc.*, No. 5:17-CV-05263, 2018
  WL 3032880, at *3 (E.D. Pa. June 19, 2018)........................................................24

*In re Taylor*, 548 F. App'x 822 (3d Cir. 2013).......................................................35

*Jones v. Sch. Dist. of Phila.*, 198 F.3d 403 (3d Cir. 1999) ...............................27, 31

*Koplove v. Ford Motor Co.*, 795 F.2d 15 (3d Cir. 1986).........................................34

*LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658 (E.D. Pa. 2016) .......................21

*Lunderstadt v. Colafella*, 885 F.2d 66 (3d Cir. 1989) .............................................34

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .....................................12

Page

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ...........................20

*Moore v. City of Phila.*, 461 F.3d 331 (3d Cir. 2006) ...............................22

*Murphy v. Millennium Radio Group LLC*, 650 F.3d 295 (3d Cir. 2011) ...............34

*Nitkin v. Main Line Health*, 67 F.4th 565 (3d Cir. 2023) ...........................20

*Norman v. Kmart Corp.*, 485 F. App'x 591 (3d Cir. 2012) .....................................12

*Opsatnik v. Norfolk S. Corp.*, 335 Fed. Appx. 220 (3d Cir. 2009)....................14, 15

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789 (3d Cir. 2003).........................................13

*Shelton v. Bledsoe*, 775 F.3d 554 (3d Cir. 2015) .......................................35

*Smith v. City of Allentown*, 589 F.3d 684 (3rd Cir. 2009) .........................................14

*Smith v. Walgreen Co.*, 964 F. Supp. 2d 338 (D. Del. 2013) ....................................19

*Spence v. City of Philadelphia*, 147 Fed. Appx. 289 (3d Cir. 2005) .......................17

*Steidle v. U.S. Liab. Ins. Co., Inc.*, No. CV 22-4972, 2024
    WL 4374110, at *6 (E.D. Pa. Oct. 1, 2024)...............................................29

*Summy-Long v. Pa. State Univ.*, 226 F. Supp. 3d 371 (M.D. Pa. 2016).................17

*Tourtellotte v. Eli Lilly and Co.*, 636 Fed. Appx. 831 (3d Cir. 2016) ....................28

*U.S. v. Quillen*, 335 F.3d 219 (3d Cir. 2003)...........................................................10

*Wilcher v. Postmaster Gen.*, 441 Fed. Appx. 879 (3d Cir. 2011) ...........................14


**Rules**

Federal Rule of Civil Procedure 56(d).......................................... 1, 9, 33, 34, 35, 36

**Treatises**

*Moore's Federal Practice* § 56.91 (2023) ...............................................................14

**COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW**

1. Whether the District Court correctly dismissed Deborah Bennett's race discrimination claims under Title VII and the PHRA?
2. Whether the District Court correctly dismissed Deborah Bennett's purported hostile work environment (race discrimination) claims under Title VII and the PHRA?
3. Whether the District Court correctly dismissed Deborah Bennett's retaliation claims under Title VII and the PHRA?
4. Whether the District Court correctly denied Deborah Bennett's untimely Fed. R. Civ. P. 56(d) Motion?

**COUNTERSTATEMENT OF THE CASE**

Appellant Deborah Bennett started working for SEPTA in 2000. (Appx122, at ¶ 1). In 2014, she became an Administrative Assistant II and supported Joseph Brennan ("Supervisor Brennan") (Appx123, at ¶¶ 6-7). Bennett was eligible for a salary merit increase each year. The amount she received was based on her performance review and whether her salary was above or below her position's midpoint. (Appx289). Employees who received a "Meets Expectations" review with a salary below their position's midpoint were eligible to receive a 2.75-4.5% increase. (*Id*). Employees rated as "Exceeds Expectations" were eligible to receive a 4.0-5.5% increase, and employees rated as "Needs Improvement" were eligible to receive a 2.0-2.5% increase. (*Id*). All SEPTA employees were informed, however, that merit increases are "not an entitlement," and that "[t]he respective division AGM/deputy General Manager, the Finance Department and ultimately the General Manager must approve all merit increases before they can be finalized." (*Id*).

1

Supervisor Brennan rated Bennett as "Meets Expectations" each year from 2015 to 2021. (Appx123-124, ¶¶ 14-30). Bennett's merit increases ranged from 4% in 2016 to 1% in 2017, and she received a 2.5% merit increase in 2015, 2018, and 2019. (*Id*. at ¶¶ 15, 19, 22, 26, 28). Bennett does not believe any of these raises were discriminatory. (Appx152, 155).

In March 2020, Bennett served as the SEPTA ambassador at the Philadelphia Flower Show, where she was responsible for guiding other SEPTA employees to their assigned areas. (Appx174-175, at 121:24-124:5). Then-Assistant General Manager Scott Sauer ("AGM Sauer") was standing in a section called platform "A." Bennett approached AGM Sauer and said, "Excuse me, but, Scott, you belong in the 'B' section." (Appx175, at 122:6-11). AGM Sauer allegedly "laughed it off" and walked to his assigned section. (*Id.* at 122:12-19). When he later returned to the "A" section, AGM Sauer's administrative assistant, Trayia Hill, purportedly said, "Oh, I thought you were the AGM. I guess [Bennett] showed you." (*Id*). Bennett contends AGM Sauer's "entire demeanor" changed after this incident. (*Id*. at 123:3-4).

Later that year, Bennett received another "Meets Expectations" review from Supervisor Brennan and he recommended she receive a 4.5% merit increase for Fiscal Year 2020. (Appx124, ¶ 30). But AGM Sauer adjusted Bennett's increase to 3.5% before it was finalized. AGM Sauer testified that he did so to come under budget, something he had discretion to do, and often did, every year, randomly, for

as many as 100 SEPTA employee of "all different races, all different genders, all different pay grades and levels." (Appx300, at 30:17-23; Appx314, at 85:2-5; Appx318, at 102:17-18; Appx290).

In February 2021, another administrative assistant, Desiree Saunders, was promoted to a new position, and SEPTA reallocated her work to existing employees. (Appx584, at 11:1-12:24; 12:10-24). Supervisor Brennan asked Bennett if she could perform some of the work created by Saunders' promotion, and she agreed to do so. (Appx585, at 13:7-8). Bennett then worked 88 hours of overtime in April and then an even greater 109 hours of overtime in May, receiving overtime pay for all of those additional hours. (Appx585, at 14:1-24). Due to her overtime usage, SEPTA placed Bennett on an official "heavy hitter" list—a list of employees who were earning in excess of 20% of their base hourly requirement in overtime pay. (Appx126, ¶ 44). Supervisor Brennan then went out on medical leave. (Appx585, at 15:8-11).

Seeking to limit overtime usage consistent with SEPTA objectives (Appx324, ¶ 28), AGM Sauer met with Bennett in his office on June 22, 2021 to discuss her overtime usage. (Appx125, ¶ 40). According to Bennett, AGM Sauer yelled at her, "your overtime is excessive," and said that "if [her] workload gets to be too heavy let [him] know in advance and [he will] get someone to help [her]." (Appx377). After the meeting, project manager Leslie Moore emailed Bennett, "If you need assistance with your workload, don't hesitate to let me know what it is so that I can help

alleviate the load." (Appx127, ¶ 57). But Bennett responded, "*My daily workload is suitable for me*. I required overtime for a workload from which was left by another employee and supporting the Vehicle Engineering Group. I was advised by Scott to terminate the assignment. I can and will continue to focus on the assignments that fall under my job description." (*Id*. at ¶ 58) (emphasis added).

On July 1, 2021, in response to the June 22 meeting with AMG Sauer, Bennett emailed SEPTA's Equal Employment Opportunity ("EEO") department saying she felt "subject to an atmosphere of workplace harassment and intimidation from Scott Sauer … *as a result of the ongoing conflict between himself and [her] supervisor, Joseph Brennan*[.]" (Appx376-378) (emphasis added). Bennett added that "all of Joseph Brennan's direct reports feel the way [she did]," and that she believed "Sauer has a dislike for [her] since … the Philadelphia Flower Show." (*Id*). Bennett also noted that AGM Sauer changed her Fiscal Year 2020 salary merit increase from 4.5% to 3.5%, which made her feel like she had "been hit with multiple punches that [were] directed at [her] *as a result with AGM Sauer's conflict with Joseph Brennan*." (*Id*). There was no mention of race or discrimination in the email. (*Id*).

Echoing the same sentiments, but again never mentioning racial discrimination, Bennett sent a letter to SEPTA's EEO Department on July 6, 2021. (Appx734-740). She alleged that her encounter with AGM Sauer was "collateral damage" from an apparent feud between Supervisor Brennan and AGM Sauer, as

well as harassment and retaliation for the Flower Show incident. (*Id*). The 3.5% raise Bennett received for Fiscal Year 2020 was one of the largest in her time at SEPTA. (Appx123-124, ¶¶ 15, 19, 22, 26, 28). Nevertheless, Bennett wanted an apology and asked—for the first time—to have her Fiscal Year 2020 merit increase raised by 1% (and applied retroactively), noting that she heard "rumors" a white administrative assistant, Mariellen Medernach, received a 4.5% merit increase from a different supervisor. (Appx734-740; Appx180, at 142:19-143:7).

Following their June meeting, SEPTA looked for ways to minimize unnecessary work Bennett was performing because it was "not fair for [Bennett] to work so much OT when [SEPTA] could relieve her of some of her functions." (Appx126, ¶ 46). For example, AGM Sauer emailed project managers Jessica Herman, Mike Civera, and Leslie Moore on July 30, stating, "I offered Deborah assistance from Operations Admin in prioritizing her work. She was told not to worry about mistakes that she was correcting from Desiree Saunders." (Appx607). Dennis McAnnula, a member of Supervisor Brennan's staff, told Bennett, "You no longer have to keep [COVID spreadsheets]," as did Herman, stating "We don't need regular spreadsheets." (Appx597).

Despite these efforts, Bennett worked 16 hours of overtime in August. AGM Sauer emailed McAnulla, Bennett's supervisor in Supervisor Brennan's absence, and said:

I still don't understand why [Bennett] needs so much overtime. I would like a detailed accounting of the 'extra' work that we need completed causing us to require so much overtime of her. Within that detail, I need an estimate of the time it takes to perform the tasks. If you still reach the conclusion that she needs overtime then I want you to reassign work to other people within Vehicle Maintenance to keep that overtime at zero.

No other Administrative Assistant in Operations is required to work overtime like this and we have other AA's that are serving multiple supervisors as well.

(Appx618, at 28:13-24). In response, McAnnula told Bennett to "write down her daily job duties, what she was doing each day and the amount of work that she was performing each day so we can provide a justification to support the need for overtime." (Appx615, at 15:16-16:3). But Bennett "chose that she didn't want to work the overtime and … provide [McAnnula] the justification, so that was kind of the end of it." (*Id*. at 16:4-8).

In August 2021, Investigator Ekaette Oduok, SEPTA's EEO/Employee Relations Manager, interviewed Bennett about her July 6 EEO complaint. (Appx129, ¶ 70). There was no reference to race in the statement Investigator Oduok drafted on Bennett's behalf (Appx129-130, ¶ 72). Regarding AGM Sauer's random change of her merit increase from 4.5% to 3.5%, Bennett's statement said, "I never asked [Sauer] about why the change occurred because I thought it was related to the Flower Show." (*Id*). Though Bennett claimed Investigator Oduok did not type down the "information exactly as [she] explained it," Bennett *again* stated, "I feel that I didn't

get the full merit because of the Incident at the flower show" in her proposed corrections, not because of anything having to do with her race. (Appx774).

Bennett took medical leave from September 9 to December 8, 2021. (Appx133, ¶ 85). On October 7, 2021, Investigator Oduok found that there was "not enough evidence to substantiate a violation of SEPTA's EEO & Affirmative Action and related policies." (Appx131, ¶ 76). In her response the next day, Bennett again blamed the feud between AGM Sauer and Supervisor Brennan for any alleged harassment, and noted that AGM Sauer bullied "everyone," regardless of race. (Appx131, ¶ 77). On November 5, 2021, Bennett filed a charge of discrimination with the Equal Employment Opportunity Commissions ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), claiming that AGM Sauer "accused [her] of overcharging/stealing overtime hours" at the June 22, 2021 meeting. (Appx789).

In January 2022, Bennett emailed SEPTA's HR Department, Chief Stephanie Deiger, informing her that she had not yet received her Fiscal Year 2021, as opposed to Fiscal Year 2020, merit increase. (Appx801). According to SEPTA's policy, "Employees who are out on sick leave during the time of the merit consideration process generally receive proposed budgeted merit amount increases," which was 3% for calendar year 2021. (Appx194, at 200:1-22). Because Bennett was on

medical leave during the merit consideration process, she received a 3% merit increase pursuant to this policy. (*Id*).

On March 29, 2022, Bennett filed a second charge of race discrimination with the EEOC, alleging that AGM Sauer accused her of fabricating work to qualify for overtime and reduced her merit increase. (Appx812). AGM Sauer was never made aware of this Charge of Discrimination or the previous one filed in November 2021. (Appx141, ¶ 151).

For about a year, Bennett had no contact with AGM Sauer aside from a few emails where she requested time off, which he granted. (Appx420). Because AGM Sauer already had an administrative assistant, he emailed the Director of SEPTA's EEO Department on November 21, 2022, saying:

> I also need to speak with someone about having Deborah report to someone else for the coming year. I have no need for a second AA and it's not fair to Deborah to continue having her work with little to no direction. She's completing her routine work but there's nothing else for her to do without a manager directly supervising her.

(*Id*). At the time, Cassandra West, the newly promoted Assistant Chief Operations Officer ("ACOO") of Customized Community Transportation ("CCT"), "desperately" needed an administrative assistant. (Appx135, ¶ 99). So in March 2023, Bennett was transferred to support ACOO West. (Appx861). SEPTA EEO Director Carol O'Neal, whose job was to "ensure fairness" in transfers at SEPTA, participated in the process to guarantee that Bennett received the same pay, benefits,

and pension and that the transfer was above board. (Appx136, ¶¶ 104-106). Bennett could no longer work remotely, but that was because ACOO West ended telework for all CCT employees in February 2023, *before* Bennett was transferred, except for those employees who were granted accommodations under the Americans with Disability Act. ("ADA"). (Appx442, at 17:11-24).

Bennett filed this lawsuit in April 2023 against SEPTA and AGM Sauer ("Appellees"), claiming intentional race discrimination and retaliation under Title VII and the PHRA. Notably, Bennett did not plead a hostile work environment claim; her complaint merely mentioned the term "hostile work environment" under the heading for race discrimination, a separate action under Title VII and the PHRA. (Appx77). Appellees moved for summary judgment after the close of discovery, and the District Court held oral argument on January 16, 2024. A day later, Bennett moved for Federal Rule of Civil Procedure 56(d) relief, asking the District Court to: (1) delay deciding the motion until SEPTA produced Medernach's compensation and employment records although Plaintiff had never filed a motion to compel in response to SEPTA's objection that Medernach was not a proper comparator, and (2) consider as part of the record an application for ADA accommodations Bennett submitted to SEPTA on December 6, 2023—after discovery had ended and SEPTA had moved for summary judgment. (Appx951-957).

## SUMMARY OF THE ARGUMENT

The District Court correctly held that Bennett's frivolous claims of discrimination, hostile work environment, and retaliation were meritless. This Court should affirm that decision.

**First**, the District Court correctly dismissed Bennett's discrimination claims under Title VII and the PHRA. Undermining her case, Bennett attributed any supposed mistreatment to intraoffice personnel conflicts, not her race. (*See* Appx376-378; Appx734-740; Appx129, ¶¶ 70–72; Appx131, ¶ 77). Bennett pins her entire argument on the assertion that she had her Fiscal Year 2020 merit increase reduced from 4.5% to 3.5% while Mariellen Medernach, a white administrative assistant, perhaps did not. (Doc. 24, p. 34-36).[1] But nothing in the record shows that Medernach—who had a different supervisor determining her merit increase—is a valid comparator, dooming Bennett's *prima facie* case. (Appx138, ¶ 125). Even if Bennett could make out a *prima facie* case, Appellees have articulated a legitimate, nondiscriminatory reason for AGM Sauer's decision to change Bennett's Fiscal Year

---

[1] At summary judgment, Bennett argued that two other "adverse actions" raised an inference of race discrimination: (1) she received a 3% merit increase in January 2022, but white men who held senior positions received higher raises; and (2) she was involuntarily transferred in March 2023 to a less desirable position, but other white administrative assistants were not. Because the District Court correctly held that both arguments lacked merit and Bennett abandons them on appeal, Appellees do not address them. *See U.S. v. Quillen*, 335 F.3d 219, 224 (3d Cir. 2003) ("[A]rguments not raised in an appellant's opening brief are deemed waived.").

2020 merit increase (and that of dozens of others), and nothing indicates that reason was pretextual.

*Second*, the District Court correctly dismissed Bennett's hostile work environment claims under Title VII and the PHRA. She claims that she was subjected to a race-based hostile work environment when, during a meeting on June 22, 2021, AGM Sauer "berated her, falsely accused her of overcharging, and stealing overtime hours, and belittled and embarrassed her." (Doc. 24, p. 40). But this alleged confrontation cannot support Bennett's hostile work environment claim because there is no evidence it had *anything* to do with her race. (*See* Appx376-378; Appx734-740; Appx129, ¶¶ 70-72; Appx131, ¶ 77). Even if there were, Bennett's hostile work environment claims would still fail because she cannot prove that she suffered severe or pervasive discrimination.

*Third*, the District Court correctly dismissed Bennett's retaliation claims under Title VII and the PHRA. Advancing the same arguments the District Court rejected, Bennett claims that she engaged in protected activity and, as a result, suffered the following adverse employment actions: (1) AGM Sauer wanted her to perform extra work without overtime pay in July and August 2021; (2) her 3% merit increase for Fiscal Year 2021 was delayed and less than expected; and (3) she was involuntarily transferred to a less desired position and denied telework privileges in 2023. (Doc. 24, p. 49-51). None of these arguments set forth a *prima facie* case of

retaliation. Even if they could, Appellees offered legitimate, nondiscriminatory reasons for every action they took, and Bennett points to nothing that shows pretext. The District Court's Order should be affirmed.

## ARGUMENT

### A. **The District Court Correctly** Dismissed Bennett's Race Discrimination Claims under Title VII and the PHRA.

The record contains no evidence that Bennett was discriminated against for any reason, including race. Claims of discrimination under Title VII and the PHRA are governed by the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "[T]he plaintiff must first carry the initial burden of establishing a *prima facie* case of discrimination." *Norman v. Kmart Corp.*, 485 F. App'x 591, 592 (3d Cir. 2012). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the defendant articulates a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to prove that the legitimate reason offered by the defendant is pretextual. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Here, the District Court correctly held that Bennett failed to make out a *prima facie* case of race discrimination because "there is nothing to show that Bennett's race played any role in anything Sauer or anyone else at SEPTA did or didn't do." *Bennett v. SEPTA*, No. CV 23-1271, 2024 WL 404959, at *1 (E.D. Pa. Feb. 2, 2024).

In fact, Bennett cannot cite to one discriminatory comment, a borderline necessity in employment discrimination cases. (Appx140, ¶ 146). Even if she could establish a *prima facie* case, nothing shows that Appellees' conduct was pretextual.

### 1. The District Court correctly held that Bennett failed to make out a *prima facie* case of race discrimination.

Bennett cannot establish a *prima facie* case of race discrimination because no evidence shows that she experienced an adverse employment action under an inference of discrimination. The "central focus" of the *prima facie* case "is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

Bennett points to nothing that shows her "race played any role in anything Sauer or anyone else at SEPTA did or didn't do." *Bennett*, 2024 WL 404959, at *1. Bennett routinely attributed any supposed mistreatment to personnel conflicts, not her race. (*See* Appx376-378; Appx734-740; Appx129, ¶¶ 70-72; Appx131, ¶ 77). With no evidence, Bennett pins her entire argument on the speculative assertion that she had her Fiscal Year 2020 merit increase reduced from 4.5% to 3.5% while Mariellen Medernach, a white administrative assistant, did not. (Doc. 24, p. 34-36).

The District Court correctly disposed of this argument because nothing shows that Medernach is a valid comparator—not even remotely. *See Bennett*, 2024 WL 404959, at *8. An employee is a valid comparator only if they are "similarly situated

in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 Fed. Appx. 879, 881–82 (3d Cir. 2011). This requires the plaintiff to show that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009).

Bennett fails to make this baseline showing. She claims that Medernach is a valid comparator because AGM Sauer "did not reduce [her] 4.5% salary increase[.]" (Doc. 24, p. 26). But Bennett admits she has no evidence of this assertion, conceding that it is based only on "rumors." (Appx180, at 142:23-143:7). Given Bennett's failure to depose Medernach, these hearsay statements are not enough to show that Medernach was treated more favorably. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3rd Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."); 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.91 (2023) ("[T]he failure to secure sworn statements at the summary-judgment stage—or to confirm that the witnesses can and will testify as expected later—can significantly undercut the claim that the statements actually can be presented in an admissible form at trial.").

Even if these "rumors" were true, Bennett cannot show that Medernach is similar to her in "all relevant respects." *Wilcher,* 441 Fed. Appx. at 881-82. Not only

did Medernach have a different supervisor—the individual who recommends the raise—but nothing in the record shows Medernach's annual review rating, her proposed 2021 merit increase, her actual increase, or whether it was reduced. (Appx138, ¶ 125). As Bennett could never establish that Medernach is a similarly situated, valid comparator, the District Court's decision should be affirmed. *See Opsatnik v. Norfolk S. Corp.*, 335 Fed. Appx. 220 (3d Cir. 2009) (affirming a grant of summary judgment because there was no evidence that comparators were similarly situated).

### 2. The District Court correctly held that, even if Bennett established a *prima facie* case of race discrimination, nothing in the record shows Appellees' conduct was pretextual.

Even if Bennett could make out a *prima facie* case, Appellees have articulated a legitimate, nondiscriminatory reason for AGM Sauer's decision to change Bennett's Fiscal Year 2020 merit increase (and that of dozens of others), and nothing indicates that reason was pretextual. If a plaintiff sets forth a *prima facie* case of discrimination, "the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant satisfies this "relatively light burden," the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason

was more likely than not a motivating or determinative cause of the employer's action." *Id*. at 764. Put differently, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Id*. at 765.

Here, Appellees set forth a legitimate, nondiscriminatory reason for AGM Sauer's decision to change Bennett's Fiscal Year 2020 merit increase. All merit increases must be approved by each division general manager, the finance department, and the general manager before they are finalized. (Appx290). Pursuant to this policy, AGM Sauer changed Bennett's merit increase to come under budget, something he does every year, randomly, for as many as 100 employees of "all different races, all different genders, all different pay grades and levels." (Appx300, at 30:17-23; Appx314, at 85:2-5; Appx318, at 102:17-18; Appx290).

Bennett identifies nothing to doubt this legitimate, nondiscriminatory reason. *Fuentes*, 32 F.3d at 765. Instead, she turns a blind eye to the evidence and baldly asserts it is a "new explanation" a "reasonable jury [could] certainly disbelieve[.]" (Doc. 24, p. 59). This argument falls far short of showing pretext; otherwise, a plaintiff could always avoid summary judgment "simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations[.]" *Fuentes*, 32 F.3d at 764. Since AGM Sauer adjusts many employees' proposed merit

increases for budgetary reasons every year, and nothing calls that into question, the

District Court's Order dismissing Bennett's discrimination claims under Title VII

and the PHRA should be affirmed.

### B. <u>The District Court Correctly</u> Dismissed Bennett's Purported Hostile Work Environment Claims under Title VII and the PHRA.

Bennett did not plead a hostile work environment claim; she merely

mentioned the term under the heading for race discrimination, a completely separate

action under Title VII and the PHRA. (Appx77). This deficiency alone dooms her

claim because "a plaintiff may not defeat summary judgment by asserting a claim

that [s]he did not plead in the complaint." *Summy-Long v. Pa. State Univ.,* 226 F.

Supp. 3d 371, 387–88 (M.D. Pa. 2016)*, aff'd*, 715 F. App'x 179 (3d Cir. 2017); *see*

*also, Spence v. City of Philadelphia*, 147 Fed. Appx. 289, 291–92 (3d Cir. 2005)

(precluding plaintiff from raising a disparate treatment claim for the first time at the

summary judgment phase "because the City faced different burdens and defenses

under this second theory of liability.").[2]

Still, Bennett's attempt to establish a *prima facie* case fails miserably. To

establish a *prima facie* case for a hostile work environment, Bennett must show that:

(1) she suffered intentional discrimination because of her race; (2) the discrimination

---

[2] Despite recognizing that Bennett did not assert a hostile work environment claim in her complaint, the District Court nevertheless considered it because "SEPTA addressed [the claim] in its reply and both sides argued the issue during oral argument." *Bennett*, 2024 WL 404959, at *5.

was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) *respondeat superior* liability exists. *Andrews v. City of Phila*., 895 F.2d 1469, 1482 (3d Cir. 1990). Factors supporting a hostile work environment may include: "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

The record contains no evidence that Bennett suffered intentional discrimination because of her race, including by way of any comments and/or disparate treatment. (Appx140, ¶ 146). Rather, Bennett attributes any "mistreatment" to factors other than race, including issues between Supervisor Brennan and AGM Sauer. (Appx376-378; Appx734-740; Appx129, ¶¶ 70-72; Appx131, ¶ 77). Even if she did endure racial discrimination, which she did not, such discrimination was neither severe nor pervasive enough to constitute a hostile work environment.

### 1. Bennett's hostile work environment claims fail because nothing in the record shows she suffered intentional discrimination.

No evidence shows that Bennett was subject to intentional race discrimination. She claims that she was subjected to a race-based hostile work environment when, during a meeting on June 22, 2021, AGM Sauer "berated her,

falsely accused her of overcharging, and stealing overtime hours, and belittled and embarrassed her." (Doc. 24, p. 40).

This confrontation cannot support Bennett's hostile work environment claim because there is no evidence it had *anything* to do with race. Despite admitting that AGM Sauer never made any racial remarks (Appx179-180), Bennett baldly asserts that the confrontation was discriminatory because her "Caucasian colleagues in the Operations Division … were not subjected to such outrageous conduct." (Doc. 24, p. 45). But Bennett does not identify what "Caucasian colleagues" she is referring to, let alone point to any evidence that shows they are valid comparators. This undermines her claim from the start. *See Smith v. Walgreen Co.*, 964 F. Supp. 2d 338, 350 (D. Del. 2013) ("Summary judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated.").

Bennett's contemporaneous statements demonstrate that the confrontation was *not* fueled by racial animus. Shortly after it took place, Bennett emailed SEPTA's EEO department saying she felt "subject to an atmosphere of workplace harassment and intimidation from Scott Sauer … *as a result of the ongoing conflict between himself and my supervisor, Joseph Brennan*[.]" (Appx127-128, ¶ 61) (emphasis added). Bennett added that "*all* of Joseph Brennan's direct reports feel the way [she did]," that she believed "Sauer ha[d] a dislike for [her] since … the Philadelphia Flower Show," and that "[t]he incidents with the Overtime, Flower Show, and Merit

Decrease" felt like she had been "hit with multiple punches that [were] directed at [her] *as a result with AGM Sauer's conflict with Joseph Brennan*." (*Id*) (emphasis added). In another email, Bennett stated that "everyone," which include white men, were bullied by AGM Sauer (Appx131, ¶ 77), a statement she later confirmed during her deposition. (Appx181, at 149:2-150:21).

The June 22 meeting had nothing to do with Bennett's race. As Bennett cannot maintain "a claim of racial discrimination or hostile work environment based on race where [her] stated reasons for [Appellees'] conduct had nothing to do with race," the District Court's Order should be affirmed. *Bennett*, 2024 WL 404959, at *12.

### 2. Even if Bennett did face intentional discrimination, Bennett's hostile work environment claims would still fail because such discrimination was neither severe nor pervasive.

Even if Bennett could show intentional discrimination, her hostile work environment claims would still fail because it was neither severe nor pervasive. Severe or pervasive behavior "alter[s] the conditions of employment and create[s] an 'abusive working environment.' " *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not enough. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Bennett does not argue that the alleged discrimination was pervasive;[3] she claims, however, "[a] reasonable jury could find [that] Sauer's June 22, 2021 conduct towards [her]" was severe. (Doc. 24, p. 41). But as the District Court held, Bennett's allegation that AGM Sauer yelled at her does not come close to the type of conduct that creates a hostile work environment. *See LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 694 (E.D. Pa. 2016), *aff'd*, 769 F. App'x 57 (3d Cir. 2019) (holding actions were not sufficiently severe or pervasive where a co-worker refused to work with plaintiff because of her nationality and the way she spoke English, another co-worker called her a "stupid immigrant" and "bitch" and said all aliens should return to their countries, and the manager tolerated these comments, assigned plaintiff the more difficult assignments, and accused plaintiff of faking injuries); *Harbor Bar & Brasserie Restaurant*, 386 F. App'x. 352, 354 (3d Cir. 2010) (finding reference to the plaintiff as a "Haitian F—k," while "unpalatable and inappropriate," was not sufficiently severe to support a hostile work environment claim); *Bumbarger v. New Enter. Stone and Lime Co., Inc.*, 170 F. Supp. 3d 801, 827 (W.D. Pa. 2016) (finding conduct not severe or pervasive where plaintiff was called "bitch" and "cunt" and her supervisor had "mooned" her).

---

[3] Nor could she. The alleged discrimination could not have been pervasive because Bennett had virtually no contact with AGM Sauer after the June 22, 2021 meeting. *See Bennett*, 2024 WL 404959, at *13.

Thus, even if Bennett could show that the June 22, 2021 meeting with AGM Sauer was racially discriminatory, which it was not, her hostile work environment claim would still fail because such discrimination was neither severe nor pervasive.

## C. **The District Court Correctly** Dismissed Bennett's Retaliation Claims under Title VII and the PHRA.

The District Court correctly held that there is no evidence from which a jury could reasonably find for Bennett on her retaliation claims. To establish a *prima facie* case of retaliation, Bennett must prove: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015). If Bennett establishes a *prima facie* case, the burden shifts to SEPTA to advance a legitimate, nondiscriminatory reason for its conduct. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). If it does, Bennett must be able to convince the factfinder both that the proffered explanation was false, and that retaliation was the real reason for the adverse employment action. *Id.*

Advancing the same arguments the District Court rejected, Bennett claims that she engaged in protected activity and, as a result, suffered the following adverse employment actions: (1) AGM Sauer wanted her to perform extra work without overtime pay in July and August 2021; (2) her 3% merit increase for Fiscal Year 2021 was delayed and less than expected; and (3) she was involuntarily transferred

to a less desired position and denied telework privileges. (Doc. 24, p. 49–51). All three arguments lack merit.

### 1. Bennett's allegation that AGM Sauer wanted her to perform extra work without overtime pay cannot support a claim of retaliation.

Bennett claims that, following her July 6, 2021 EEO complaint, she suffered a retaliatory adverse employment action when "Sauer wanted her to continue doing Saunders' duties but did not want to pay her overtime for doing all those additional duties." (Doc. 24, p. 49). This argument misses every prong of a *prima facie* case.

### a. The record shows that AGM Sauer was trying to reduce Bennett's workload, not add to it; Bennett did not engage in protected activity; and, even if Bennett did engage in protected activity, she cannot show causation.

***First***, nothing in the record shows that Bennett suffered the adverse action she now complains about. She claims that AGM Sauer wanted her "to continue doing the duties of the two AAII position without overtime." (Doc. 24, p. 50). But the record shows that AGM Sauer was trying to *reduce* Bennett's workload, not add to it.[4] That is why he met with Bennett in June to scale *back* her workload (Appx306, at 55:9-21), and Project Manager Moore asked Bennett if she could do anything to "help alleviate [her] load." (Appx127, ¶ 57). Though Bennett maintained that her "daily workload [was] suitable for [her]" (Appx127, ¶ 58), SEPTA still tried to

---

[4] The record also shows that Bennett received overtime pay for all of the overtime hours she worked. (Appx585, at 14:1–24).

reduce her workload because it was "not fair for [Bennett] to work so much OT when they could relieve her of some of her functions." (Appx126, ¶ 46). For example, AGM Sauer "told [Bennett] not to worry about mistakes that she was correcting from Desiree Saunders" (Appx607), and McAnnulla and Herman told Bennett that she "no longer [had] to keep [COVID spreadsheets]." (Appx597). Thus, no reasonable juror could find that AGM Sauer wanted Bennett to perform extra work without overtime, undermining any argument that Bennett suffered an adverse action.

***Second***, even if AGM Sauer did want Bennett to perform additional duties without overtime (he did not), Bennett would still be unable to make out a *prima facie* case of retaliation because her July 6, 2021 EEO complaint—which Bennett claims prompted AGM Sauer's actions—does not amount to protected activity. "Not every complaint or report entitles its author to protection from retaliation under Title VII." *Davis v. City of Newark*, 417 Fed. Appx. 201, 202 (3d Cir. 2011). "[O]nly complaints about discrimination prohibited by Title VII—that is, discrimination on the basis of race, color, religion, sex, or national origin—constitute 'protected activity.' " *Id*. at 203 (internal citation omitted); *Hernandez v. EHC Associates, Inc.*, No. 5:17-CV-05263, 2018 WL 3032880, at *3 (E.D. Pa. June 19, 2018) ("[A] report to a superior may constitute protected activity *where discrimination is specifically alleged* in the verbal or written report.") (emphasis added). "General complaints of unfair treatment will not suffice." *Id*.

Bennett's EEO complaint neither explicitly nor implicitly complained about discrimination prohibited by Title VII—simply mentioning Medernach was white. (*See* Appx734-740; Appx377-378). Importantly, the complaint explicitly stated that AGM Sauer's "harassment and intimidation" at the June 22, 2021 meeting was "*a result of the ongoing conflict between himself and [her] supervisor, Joseph Brennan*[.]" (*Id*) (emphasis added). Bennett pointedly blamed the "incidents of the Overtime, Flower Show, and Merit Decrease" on "AGM Sauer's conflict with [Supervisor] Brennan." (*Id*). And Bennett stated that "all of Joseph Brennan's direct reports," which include white men, felt "the way [she did]," and that she believed "Sauer ha[d] a dislike for [her] since … the Philadelphia Flower Show," not because of her race or any illegal retaliation. (*Id*). In other words, Bennett's EEO complaint raised "general complaints of unfair treatment," not "complaints about discrimination prohibited by Title VII." *Davis v. City of Newark*, 417 Fed. Appx. 201, 202 (3d Cir. 2011). That falls short of protected activity.

***Third***, even if Bennett's EEO complaint amounted to protected activity, Bennett cannot show that the complaint caused a change in her overtime and workload, particularly when she already blamed the change in her overtime on the conflict between AGM Sauer and Supervisor Brennan. (Appx734-740; Appx377-378). The record shows that AGM Sauer began questioning (and reducing) Bennett's overtime usage in June—*weeks before* Bennett filed her EEO complaint. (Appx306,

at 55:9-21; Appx127, ¶ 57). It also shows that the June 2021 meeting—where AGM Sauer apparently "yelled" at Bennett about her excessive overtime usage—was the reason why Bennett filed the EEO complaint in the first place. (Appx734-740; Appx377-378). How could the reduction in overtime be retaliatory when it was the reduction that prompted Bennett to file the EEO complaint? This timeline precludes Bennett from showing that her EEO complaint caused AGM Sauer to change Bennett's overtime usage and workload.

The undisputed record also shows that Bennett *never* complained of discrimination to AGM Sauer (Appx141, ¶ 151), and that no such complaint was related to AGM Sauer:

> Bennett's counsel: Were you ever interviewed by any SEPTA EEO investigator regarding any Complaint of discrimination that Ms. Bennett filed against you?
>
> AGM Sauer: *Not discrimination, no*.
>
> Bennett's counsel: Did any SEPTA EEO ever tell you Ms. Bennett complained that you treated her differently from any Caucasian co-worker?
>
> AGM Sauer: I was interviewed by EEO on a Complaint of harassment from Ms. Bennett.
>
> Bennett's counsel: And you say that. I'm asking you a different question. Did any SEPTA EEO ever tell you that Ms. Bennett complained you treated her differently from her Caucasian co-worker?
>
> AGM Sauer: *No*.

(Appx299, at 28:23-29:16) (emphasis added). Because AGM Sauer did not know that Bennett ever complained about discrimination, Bennett cannot show a causal connection between her EEO complaint (the alleged protected activity) and any adverse action she allegedly suffered. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015) ("The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted."); *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 415 (3d Cir. 1999) (dismissing retaliation claim under Title VII because there was no evidence that the employees who made the decision to fire the plaintiff were aware of the protected activity).

Accordingly, Bennett misses every prong of a *prima facie* case of retaliation under Title VII and the PHRA.

> **b. Even if Bennett could set forth a *prima facie* case, Appellees had a legitimate, nondiscriminatory reason to reduce Bennett's overtime usage, and nothing shows that reason was pretextual.**

Even if Bennett could establish a *prima facie* case, the record shows that Appellees reduced Bennett's overtime usage because she worked (and was paid) 197 hours of overtime in just two months, which was "not fair for [Bennett]" when SEPTA "could relieve her of some of her functions." (Appx585, at 14:1-24). Since Bennett points to nothing that calls this legitimate, nondiscriminatory reason into question, her retaliation claim fails.

**2. Bennett's 3% merit increase for Fiscal Year 2021 cannot support a claim of retaliation.**

Next, Bennett alleges that her "delayed" 3% merit increase for Fiscal Year 2021 was retaliatory. (*See* Doc. 24, p. 51). But neither the amount of the merit increase, or the date Bennett received it, qualify as an adverse employment action. Even if it did, no evidence shows that Bennett's protected activity affected her merit increase in any way.

**a. Bennett's Fiscal Year 2021 merit increase does not constitute an adverse employment action and, even if it did, no evidence shows that Bennett's protected activity had anything to do with the amount she received or when she received it.**

Bennett's Fiscal Year 2021 merit increase does not support a *prima facie* case of retaliation for two reasons: (1) the merit increase does not constitute an adverse employment action; and (2) even if it did, no reasonable juror could infer that Bennett's protected activity contributed to the merit increase whatsoever.

***First***, Bennett's Fiscal Year 2021 merit increase does not constitute an adverse employment action. While the "receipt of a less than expected  merit increase could rise to the level of an adverse employment action" in the retaliation context, nothing in the record shows that Bennett's performance in 2021 merited a higher salary increase than what she received. *Tourtellotte v. Eli Lilly and Co.*, 636 Fed. Appx. 831 (3d Cir. 2016). To the contrary, Bennett was on sick leave during the merit consideration process. Pursuant to SEPTA policy, she automatically received the

average percentage (3%) for employees with a "Meets Expectations" rating. (Appx431, at 37:11-22; Appx194, at 200:1-22). Because Bennett does not explain why she deserved higher than the average percentage, her Fiscal Year 2021 merit increase does not rise to the level of an adverse employment action. *See Steidle v. U.S. Liab. Ins. Co., Inc.,* No. CV 22-4972, 2024 WL 4374110, at *6 (E.D. Pa. Oct. 1, 2024) (plaintiff's receipt of a less than expected merit increase was not a retaliatory adverse employment action because "there [was] nothing in the record to show [plaintiff's] performance in 2019 and 2020 merited a higher [increase] than what he received.").

Nor does the date that Bennett received her Fiscal Year 2021 merit increase amount to an adverse employment action. Bennett claims that she did not receive the merit increase until she "complain[ed] to Ms. Deiger in January 2022." (Doc. 51, p. 24). But the record does not show when the Fiscal Year 2021 increases were supposed to take effect, let alone establish that Bennett received it late. Without this evidence, Bennett's argument that her Fiscal Year 2021 merit increase was an adverse action fails.

***Second***, even if Bennett could establish an adverse action, no reasonable juror could infer that Bennett's protected activity was the likely reason for any delayed merit increase or the amount she eventually received. Bennett's last protected activity was on November 5, 2021 (Appx789), and the record does not indicate when

the Fiscal Year 2021 increases were supposed to take effect. As the District Court noted, "[t]his dooms [Bennett's] causation argument right off the bat." *Bennett*, 2024 WL 404959, at *16. More fundamentally, neither AGM Sauer nor any other SEPTA employee made *any* decisions regarding Bennett's Fiscal Year 2021 merit increase. Rather, because Bennett was out on sick leave during the merit consideration process, a SEPTA policy determined the amount Bennett received and when she received it. (Appx431, at 37:11-22; Appx194, at 200:1-22). Thus, no reasonable juror could infer that Bennett's protected activity contributed whatsoever to her Fiscal Year 2021 merit increase.

> **b. Even if Bennett could establish a *prima facie* case of retaliation, SEPTA offered legitimate, nondiscriminatory reasons for the Fiscal Year 2021 merit increase, and Bennett points to nothing that shows those reasons are pretextual.**

Merit increases are contingent on performance reviews and, because Bennett had been on sick leave, she did not participate in the merit consideration process. Under SEPTA policy, an employee who does not participate in the process automatically receives the average percentage for employees with a "Meets Expectations" rating. (Appx431, at 37:11-22; Appx194, at 200:1-22). Because the average percentage for employees with a "Meets Expectations" rating in calendar year 2021 was 3%, Bennett received a 3% merit increase. (*Id*). Nothing shows that SEPTA's adherence to this policy was a pretext for retaliation. So Bennett's merit increase for Fiscal Year 2021 cannot support a claim of retaliation.

### 3. Bennett's involuntary transfer and denial of telework privileges were not retaliatory, adverse employment actions.

Finally, Bennett claims that her transfer to a supposedly less desired position and denial of telework privileges were retaliatory. Both arguments fail.

***First***, Bennett's transfer to a less desirable position cannot be deemed retaliatory because there is no evidence of a causal connection between Bennett's protected activity and transfer. AGM Sauer, who made the decision to transfer Bennett, sent an internal email discussing his desire to transfer her on November 21, 2022. (Appx850). Though Bennett sent a rebuttal letter to the investigator handling her pending EEOC charge on the same day (Appx820), there is no evidence that AGM Sauer had any knowledge of the letter—which was sent to someone outside of SEPTA—or any other supposed protected activity.[5] Nor is there any evidence that Bennett's rebuttal letter was sent *before* AGM Sauer's email. (*Compare* Appx850 *with* Appx820). This lack of evidence dooms any argument that Bennett's transfer was causally related to her rebuttal letter. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 415 (3d Cir. 1999) (dismissing Title VII retaliation claim because there was no

---

[5] Before the rebuttal letter, Bennett's last protected activity occurred on March 25, 2022—the date she filed her charge of discrimination with the EEOC. (Appx812). A temporal proximity of eight months is too long to be unduly suggestive of retaliation. *See Blakney v. City of Phila.,* 559 F. App'x 183, 186 (3d Cir. 2014) ("[A] temporal proximity greater than ten days requires supplementary evidence of retaliatory motive."). There is no record evidence that AGM Sauer was aware of the Charges of Discrimination, anyway.

evidence that the employees who made the decision to fire the plaintiff were aware of the protected activity).

Even if Bennett could show causation, Appellees had legitimate non-retaliatory reasons for the transfer, and Bennett points to nothing showing pretext. AGM Sauer decided to transfer Bennett because he had "no need for a second [assistant]," Bennett was working without a manager directly supervising her, and ACOO West "desperately" needed an administrative assistant. (Appx850, 860; Appx135, ¶ 99). Rather than point to any evidence questioning these legitimate reasons, Bennett merely complains that the transfer was unfair. (*See* Doc. 24, p. 59). Because that falls far short of showing pretext, Bennett cannot show that her transfer was retaliatory. *See Fuentes,* 32 F.3d at 765.

**Second**, no reasonable jury could find that Bennett's denial of telework privileges was retaliatory because ACOO West—the individual who denied Bennett's request to work remotely—did not learn that Bennett complained about discrimination until well *after* she denied the request. (Appx137, ¶ 121; Appx141, ¶ 155). This lack of knowledge dooms any argument that Bennett's protected activity caused the denial of her telework privileges. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015) ("The plaintiff, however, cannot establish that there was a causal connection without some evidence that the

individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.").

Even so, SEPTA had a legitimate, nondiscriminatory reason for the denial, and nothing shows that reason was pretextual. Bennett was denied telework privileges because ACOO West, Bennett's new supervisor, ended telework for *all* CCT employees in February 2023—a month *before* Bennett's arrival. (Appx442, at 17:11-24). As Bennett points to nothing that shows this reason was pretextual, she cannot show that the denial of her telework privileges was retaliatory. The District Court's Order dismissing Bennett's retaliation claims under Title VII and the PHRA should be affirmed.

### D. <u>The District Court Correctly</u> Denied Bennett's Untimely Fed. R. Civ. P. 56(d) Motion.

Bennett's vexatious Rule 56 Motion was rightly denied. Under Rule 56(d), when a party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

Here, Bennett filed her Rule 56(d) motion nearly three months after discovery closed, two months after Appellees' moved for summary judgment, and a day after the District Court held oral argument. (*See* Appx951-957). That motion: (1) asked

the Court to defer ruling on Appellees' motion for summary judgment until Bennett

obtained "the records of Mariellen Medernach's salary history and related

documents," and (2) asked for permission to supplement the record with Bennett's

December 6, 2023 application for ADA accommodations. (*Id*). The District Court

correctly denied both requests.[6]

    ***First***, the District Court correctly disposed of Bennett's belated attempt to

obtain the irrelevant Medernach discovery. Bennett's Rule 56 motion did not explain

why she failed to obtain the documents during the discovery period. *See Koplove v.

Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir. 1986) ("A request for relief under [Rule

56(d)] is extremely unlikely to succeed when the party seeking delay has failed to

take advantage of discovery."); *Lunderstadt v. Colafella*, 885 F.2d 66, 71–72 (3d Cir.

1989) ("Plaintiffs have not adequately explained their lack of diligence," in pursuing

discovery prior to the deadline); *Banks v. City of Philadelphia*, 309 F.R.D. 287, 292

(E.D. Pa. 2015) ("[Rule 56(d)] is not intended to protect those who have had an

opportunity to complete discovery but who failed to do so by their own lack of

diligence.").

    Tellingly, the Medernach discovery was not discoverable as she is not a proper

comparator, with a different supervisor in a completely different department. The

---

[6] The Court reviews the District Court's denial for abuse of discretion. *See Murphy v. Millennium Radio Group LLC*, 650 F.3d 295, 310 (3d Cir. 2011).

discovery would have had no meaningful effect on the outcome of this case. The Medernach documents, no matter what they displayed, would not have enabled Bennett to establish any requisite inference of discrimination because Medernach is not a valid comparator. *See supra*. Nor would the documents have called AGM Sauer's legitimate, nondiscriminatory reason for adjusting Bennett's merit increase (and that of countless others) into question. (Appx300, at 30:17-23; Appx314, at 85:2-5). Thus, the District Court correctly denied the motion. *See Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015) (noting that a Rule 56(d) motion should be denied when the "discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law").

***Second***, the District Court correctly denied Bennett's request to supplement the record with her December 6, 2023 application for ADA accommodations. Bennett argued that the application was relevant to show pretext because another employee was immediately approved to telework while her ADA request was being processed. (Appx953). But ACOO West testified that employees in CCT who were allowed to telework had ADA accommodations and, because Bennett did not have an ADA accommodation, she was not permitted to telework. (Appx442, at 17:11-24). That Bennett applied for an ADA accommodation *after* her request to telework was denied is irrelevant to establishing pretext. The District Court's Order should be affirmed. *See In re Taylor*, 548 F. App'x 822, 825 (3d Cir. 2013) ("Where the

information sought is not relevant to the court's inquiry, a Rule 56(d) motion for discovery may be denied.").

## **CONCLUSION**

For these reasons, the District Court's Order granting Appellees' motion for summary judgment and denying Bennett's meritless Fed. R. Civ. P. 56(d) motion should be affirmed.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     The undersigned, Jesse A. Marra, Esquire, is licensed to practice law in the Commonwealth of Pennsylvania, the United States District Court for the Eastern District of Pennsylvania, and the Third Circuit of Appeals, and is in good standing.

2.     This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 8,496 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

3.     This Brief complies with the typeface requirements of Circuit Rule 32(a)(1) because this Brief has been prepared in a proportionally spaced typeface using "Microsoft Word" in Times New Roman, 14 point font.

4.     The text of the electronically filed brief and the text of the hard copies of the brief are identical; and

5.     A virus check has been performed on the PDF document filed with this Court. The virus check was completed using Sophos Anti-Virus Version 10.6.  No viruses were found within the document.

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

*/s/ Jesse A. Marra*

## CERTIFICATE OF SERVICE

I, Jesse A. Marra, hereby certify that on this 20 day of November, 2024,

Defendants/Appellees' Brief was served electronically via ECF and US First Class

Mail on:

Jonathan J. Sobel, Esquire
Law Offices of Jonathan J. Sobel
15000 Walnut Street, Suite 2000
Philadelphia, PA 19102
Mate89@aol.com

**Pietragallo Gordon Alfano
Bosick & Raspanti, LLP**

*/s/ Jesse A. Marra*

*11133278v2*